No. 23-3793

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF
CALIFORNIA AND IN HIS PERSONAL CAPACITY, ET AL.,
*Defendants-Appellants*,

V.

B&L PRODUCTIONS, D/B/A CROSSROADS OF THE WEST, ET AL.,
*Plaintiffs-Appellees*.

————————

## On Appeal from the United States District Court
## for the Central District of California
No. 8:22-cv-01518 JWH (JDEx)
The Honorable John W. Holcomb, Judge

————————

## STATE APPELLANTS' OPENING BRIEF

————————

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
R. MATTHEW WISE
LARA HADDAD
Supervising Deputies Attorney
General

NICOLE J. KAU
Deputy Attorney General
State Bar No. 292026
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013-1230
  Telephone: (213) 269-6220
  Fax: (916) 731-2119
  Email: Nicole.Kau@doj.ca.gov
*Attorneys for Defendants-Appellants
Governor Gavin Newsom, Attorney
General Rob Bonta, Secretary Karen
Ross, and 32nd District Agricultural
Association*

January 16, 2024

# TABLE OF CONTENTS

**Page**

Introduction ....................................................................................1

Jurisdictional Statement .................................................................4

Issues Presented .............................................................................4

Statement of the Case......................................................................5

    I.    Gun Shows at the Fairgrounds ...................................5

        A.    The 32nd District Agricultural Association and the Fairgrounds......................................................5

        B.    AB 893 and the Del Mar Fairgrounds ...........................6

        C.    SB 264 and the Fairgrounds ...........................................8

        D.    SB 915 and State Property ..............................................9

    II.    Procedural History .......................................................9

Summary of Argument ...................................................................12

Standard of Review........................................................................15

Argument........................................................................................15

    I.    Plaintiffs Are Not Likely to Succeed on the Merits................15

        A.    Plaintiffs Are Not Likely to Succeed on the Merits of Their First Amendment Claim .................15

            1.    The Challenged Statutes Do Not Implicate the First Amendment .........................................16

            2.    In Any Event, SB 264 and SB 915 Pass Multiple Levels of Scrutiny ...............................20

                a.    The Challenged Statutes Satisfy Rational Basis Review .............................21

                b.    The Challenged Statutes Do Not Regulate or Ban Commercial Speech.......22

i

## TABLE OF CONTENTS
### (continued)

Page

      c.    The Challenged Statutes Would Also Meet the Deferential Limited Public Forum Test .............................................25

B.    Plaintiffs Are Not Likely to Succeed on the Merits of Their Equal Protection Claim ...................................29

C.    Plaintiffs Are Not Likely to Succeed on the Merits of Their Second Amendment Claim ............................30

    1.    The Text-and-History Standard for Analyzing Second Amendment Claims Under Bruen .......................................................31

    2.    Plaintiffs Failed to Establish That the Second Amendment's Plain Text Covers the Sale and Purchase of Firearms on State Property .............................................................33

        a.    The Second Amendment's Plain Text Does Not Cover the Proposed Conduct of Firearm Sales on State Property ...........................................34

            (1)    The District Court Misapplied the En Banc Decision in Teixeira...........................................35

            (2)    Plaintiffs May Purchase Firearms at Numerous Other Locations .......................................37

        b.    SB 264 and SB 915 are Presumptively Lawful Qualifications on the Commercial Sale of Firearms..................38

    3.    Prohibiting the Firearms-Related Sales on State Property is Consistent with Several Historical Traditions of Regulation ...................39

# TABLE OF CONTENTS
## (continued)

Page

      a.    The Challenged Statutes Fall Within the Government's Well-Established Authority to Regulate Conduct on its Own Property.............................................40

      b.    The Challenged Statutes Fall Within the Government's Well-Established Authority to Regulate Firearms Commerce to Promote Public Safety........44

      c.    The Challenged Statutes Fall Within the Government's Well-Established Authority to Regulate Firearms in Sensitive Places .......................................50

II.    Plaintiffs Have Not Established Irreparable Harm..................54

III.    The Equities Favor a Stay ......................................................55

Conclusion................................................................................56

Statement of Related Cases.......................................................58

Certification of Word Count .....................................................59

iii

# TABLE OF AUTHORITIES

**Page**

CASES

*Antonyuk* v. *Chiumento*
-- F.4th – (2d. Cir., Dec. 8, 2023), 2023 WL 8518003......................49, 53

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)...............................................................36

*B&L Prods., Inc. v. Newsom*
--F. Supp. 3d--, No. 3:21-cv-01718, 2023 WL 3443280
(S.D. Cal., March 14, 2023) ...................................... 7, 18, 37, 38

*B&L Prods., Inc. v. Newsom*
No. 3:21-cv-01718 (S.D. Cal.), ECF No. 1 ........................7, 18

*B&L Productions v. Newsom*
No. 23-55431 (9th Cir.) ........................................................3, 8

*Bell Atlantic Corporation v. Twombly*
550 U.S. 544 (2007)...............................................................36

*Bonidy v. U.S. Postal Serv.*
790 F.3d 1121 (10th Cir. 2015).........................................41, 42

*Bottinelli v. Slazar*
929 F.3d 1196 (9th Cir. 2019)................................................19

*Boyer v. City of Los Angeles*
2012 WL 13013037 (C.D. Cal. Aug. 23, 2012).......................24

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*
447 U.S. 557 (1980)..........................................................23, 24

*Christopher v. Ramsey Cty.*
No. CV 21-2292, 2022 WL 3348276 (D. Minn. Aug. 12,
2022) .....................................................................................53

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*Clark v. Cmty. for Creative Non-Violence*
  468 U.S. 288 (1984)........................................................16

*Def. Distributed v. Bonta*
  2022 WL 15524977 (C.D. Cal. Oct. 21, 2022).......................34

*District of Columbia v. Heller*
  554 U.S. 570 (2008)...................................................*passim*

*Dobbs v. Jackson Women's Health Org.*
  142 S. Ct. 2228 (2022).....................................................19

*GeorgiaCarry.Org, Inc. v. Georgia*
  687 F.3d 1244 (11th Cir. 2012)....................................40, 41

*GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs*
  212 F. Supp. 3d 1348 (N.D. Ga. 2016)................................42

*Granata v. Campbell*
  No. 22-1478 (1st Cir. Jan. 30, 2023), 2023 WL 1794480..............46

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*
  452 U.S. 640 (1981).........................................................27

*Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of Los Angeles*
  764 F.3d 1044 (9th Cir. 2014)...........................................27

*Interstate Nat. Gas Co. v. S. California Gas Co.*
  209 F.2d 380 (9th Cir. 1953)............................................22

*Maryland v. King*
  (2012) 567 US 1301.........................................................55

*McDonald v. City of Chicago*
  561 U.S. 742 (2010)....................................................32, 38

v

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Md. Shall Issue, Inc. v. Moore*
   86 F.4th 1038 (4th Cir. 2023)...............................................................33

*Mobilize the Message, LLC v. Bonta*
   50 F.4th 928 (9th Cir. 2022)................................................................18

*NAACP v. City of Richmond*
   743 F.2d 1346 (9th Cir. 1984)...........................................................27

*Nat'l Ass'n for Gun Rights*, Inc. v. City of San Jose
   2023 WL 4552284 (N.D. Cal. July 13, 2023)..................................33, 34

*New York State Rifle & Pistol Association, Inc. v. Bruen*
   142 S. Ct. 2111 (2022).........................................................*passim*

*Nordyke v. King*
   644 F.3d 776 (9th Cir. 2011).....................................................20, 27, 28

*Nordyke v. King*
   681 F.3d 1041 (9th Cir. 2012) (*Nordyke 2012*) ...............................28, 29

*Nordyke v. King*
   319 F.3d 1181 (9th Cir. 2003).........................................................*passim*

*Nordyke v. Santa Clara Cnty.*
   110 F.3d 707 (9th Cir. 1997).........................................................*passim*

*Oakland Tactical Supply, LLC v. Howell Twp.*
   No. 18-cv-13443, 2023 WL 2074298 (E.D. Mich. Feb. 17, 2023) .................................................................................34

*Or. Firearms Fed'n, Inc. v. Kotek*
   2023 WL 4541027 (D. Or. July 14, 2023)............................................34

*OSU Student All. v. Ray*
   699 F.3d 1053 (9th Cir. 2012)................................................................29

# TABLE OF AUTHORITIES
## (continued)

Page

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1983)..................................................................20, 26

*Puente Arizona v. Arpaio*
  821 F.3d 1098 (9th Cir. 2016)..........................................15

*Retail Digit. Network, LLC v. Prieto*
  861 F.3d 839 (9th Cir. 2017) (en banc) ................................21

*Romero-Ochoa v. Holder*
  712 F.3d 1328 (9th Cir. 2013)..........................................22

*Silvester v. Harris*
  843 F.3d 816 (9th Cir. 2016) (Thomas, J., concurring) ..........39

*Sorrell v. IMS Health Inc.*
  564 U.S. 552 (2011)......................................................18

*Teixeira v. Cnty. of Alameda*
  822 F.3d 1047 (9th Cir. 2016)..........................................29

*Teixeira v. Cty. of Alameda*
  873 F.3d 670 (9th Cir. 2017)........................................*passim*

*Texas v. Johnson*
  491 U.S. 397 (1989)......................................................16

*Tracy Rifle & Pistol LLC v. Harris*
  118 F. Supp. 3d 1182 (E.D. Cal. 2015) ................................56

*U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*
  453 U.S. 114 (1981)......................................................26

*United States v. Alaniz*
  69 F.4th 1124 (9th Cir. 2023)..........................................33

# TABLE OF AUTHORITIES
## (continued)

Page

*United States v. Class*
930 F.3d 460 (D.C. Cir. 2019) ........................................................41, 42

*United States v. Holton*
639 F. Supp. 3d 704 (N.D. Tex. 2022) ...................................3, 40, 45, 46

*United States v. O'Brien*
391 U.S. 367 (1968).......................................................................19, 20

*United States v. Serrano*
651 F. Supp. 3d 1192 (S.D. Cal. Jan. 17, 2023)...............................45, 46

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008)................................................................................15

*Wright v. Incline Village Gen. Improvement Dis.*
665 F.3d 1128 (9th Cir. 2011)............................................. 13, 25, 26, 27

**STATUTES**

28 U.S.C.
§ 1292(a)(1) .....................................................................................4
§ 1331 ..............................................................................................4
§ 1343 ..............................................................................................4

Cal. Bus. & Prof. Code § 19620(b)(3).........................................................5

Cal. Food & Agric. Code
§ 3951(a)...........................................................................................5
§ 3953 ..............................................................................................5
§ 3965(b) ..........................................................................................5

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Cal. Pen. Code
    § 27340(b) ........................................................................54
    § 27340(c) ........................................................................54
    § 27573 .............................................................................16
    § 27573(a) ..............................................................9, 10, 23
    § 27575 .............................................................................16
    § 27575(a) ..................................................................8, 23
    § 27575(b)(1)-(4) ..............................................................8
    § 27590 ...............................................................................9

1652 N.Y. Laws 128 *Ordinance of Dir. & Council of New Netherlan*d ............................................................................46

1821 Me. Laws, at 99, ch. 25, § 5 ....................................47

1825 N.H. Laws, at 74, ch. 61, § 5 ..................................47

1836 Conn. Acts, at 105, § 20 .........................................47

1845 Iowa Laws, at 119, § 12 ..........................................47

1852 N.M. Laws, at 67, § 3 ...............................................51

*Ordinances & Joint Resolutions of City of S.F.*, at 220,
    Ordinance No. 498, § 13 (1854) ..............................48

1857 R.I. Revised Statutes, at 204–05, ch. 80, § 2 .........47

1870 Ga. Laws, at 421, No. 485 ......................................43

1889 Ariz. Sess. Laws ......................................................52

1891 N.H. Laws, at 332, ch. 117, § 7 .............................47

*63 Proc. & Acts of the Gen. Assemb., June 15-July 3, 1773*, § 5 ................43

*City of Boston Dep't of Parks Twelfth Ann. Report of Bd. of Comm'rs for 1886*, at 86, § 3 (1887) ....................................52

# TABLE OF AUTHORITIES
## (continued)

**Page**

G.W. Paschal, *Digest of the Laws of Tex.*, at 1322, Article 6511
      (1875) ...................................................................................... 52

H.J. Leovy, *Laws & Gen. Ordinances of City of New Orleans*, §
      636 (1870) ............................................................................... 48

J.A. Hockaday, *Revised Statutes of State of Mo.*, at 224, ch. 24,
      § 1274 (1879) ........................................................................... 52

J. Bayon, *Gen. Digest of Ordinances & Resolutions of Corp. of
      New Orleans*, Article 1 (1831) ................................................ 51

J.H. Shankland, *Pub. Statutes of Tennessee Since 1858* .............................. 51

J. Trumbull, *Public Records of the Colony of Conn., May 1665*
      (1850) ...................................................................................... 45

1 M. Ash, *N.Y.C. Consolidation Act*, Ordinances of N.Y.C.,
      § 455 (1891) ............................................................................ 47

M.F. Tuley, *Laws and Ordinances Governing City of Chi.*,
      Chapter 31, § 6 (1873) ............................................................ 52

*Minutes of Proceedings of Bd. of Comm'rs of Central Park,
      N.Y. for Year Ending April 30, 1858*, at 166 .......................... 52

R.H. Clark, Code of State of Ga., at 818, § 4528 (1873) ............................ 52

W.T. Little, *Statutes of Oklahoma* 1890, at 496, ch. 25, § 7
      (1891) ...................................................................................... 52

1 W.W. Hening, *Laws of Va. from First Sess. of Legis. in 1619*,
      at 403 (1823) ........................................................................... 46

2 W.W. Hening, *Laws of Va. from First Sess. of Legis. in 1619*, at 403
      (1823) ...................................................................................... 45

x

# TABLE OF AUTHORITIES
## (continued)

**Page**

W.H. Bridges, *Digest of Charters & Ordinances of City of Memphis*, at 147–48, Art. VI., § 1 (1863) .............................48

W.H. Browne, *Proc. & Acts of Gen. Assemb. of Md., Jan. 1637/8–Sept. 1664*, at 273–74, § 5 (1883). ..................................43

**CONSTITUTIONAL PROVISIONS**

First Amendment .......................................................*passim*

Second Amendment.......................................................*passim*

Fourteenth Amendment ...................................................51

First and Second Amendments..............................................1

Bill of Rights ...........................................................41

**COURT RULES**

Fed. R. Evid. 301 .......................................................22

**OTHER AUTHORITIES**

Assembly Bill 311, 2021–2022 Reg. Sess. (Cal. 2023) ................................6

*Armed and Prohibited Persons System Report 2022* ...........................21, 51

*Armed and Prohibited Persons System Report 2021* ...........................21, 51

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443 (2009) ........................41

John Locke, *Two Treatises on Government* (1821) ....................................41

Patrick J. Charles, *The 1792National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective,* 9 Geo. J.L. & Pub. Pol'y 323 (2011) ...............51

xi

# TABLE OF AUTHORITIES
## (continued)

**Page**

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55 (2017) .......................46

Senate Bill 264, 2020-2021 Reg. Sess. (Cal. 2021) ............................*passim*

Senate Bill 915, 2021-2022 Reg. Sess. (Cal. 2022) ............................*passim*

William Blackstone, *Commentaries on the Laws of England* (1765) ..........................................................................................4

William J. Novak, *The People's Welfare, Law and Regulation in Nineteenth Century America* 87 (1996) .....................................................44

# INTRODUCTION

California Senate Bills 264 and 915 prohibit the sale of firearms, ammunition, and precursor parts at the Orange County Fair & Event Center (the Fairgrounds) and all other state property, respectively.  The challenged statutes are limited in scope: they do not prevent gun shows or firearms-related sales at venues on private property, such as brick-and-mortar stores.  And they allow for a range of firearms-related conduct other than the prohibited sales to continue at the Fairgrounds and state property, including expressive activity (such as sharing of "literature and information" and "gun rights discussions"); the marketing of firearm-related services (such as "firearm safety training," "defense of self and others," and "gunsmithing"); and the sales of other non-firearm products that *over 60 percent* of gun show vendors sell exclusively (such as "accessories, collectibles, home goods, lifestyle products, education information, food, and other refreshments").  2-ER-264, 265.

Plaintiffs allege that SB 264 and SB 915 violate the First and Second Amendments and the Equal Protection Clause.  They brought a motion for a preliminary injunction that the district court erroneously granted.  They are not likely to succeed on the merits of their claims.

With respect to Plaintiffs' First Amendment claim, this Court has long held that the sale of firearms and ammunition is not speech.  Nor do the challenged

statutes regulate commercial speech. They do not prohibit offers for sale or any other speech; they simply require that any transaction be finalized outside of the Fairgrounds or state property. Even assuming that the challenged statutes regulate speech (and they do not), the prohibition on sales is reasonable and viewpoint neutral in these limited public forums. Ultimately, the challenged statutes' alleged impact on the profitability of gun shows does not establish that those statutes are unlawful. The equal protection claim, which is premised on this deficient First Amendment claim, is similarly unavailing.

Plaintiffs' Second Amendment claim also fails. The challenged laws are constitutional under the Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The Second Amendment does not "guarantee[] a certain type of retail experience," *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 680 n.13 (9th Cir. 2017), nor does it "elevate convenience and preference over all other considerations," *id*. at 680. Contrary to the district court's order, the Second Amendment does not protect the "general experience of Plaintiffs' gun shows[.]" 1-ER-027. Nor do Plaintiffs allege a shortage of convenient alternatives to purchase firearms and ammunition at brick-and-mortar stores.

Simply put, the Second Amendment's plain text does not encompass a right to sell and purchase firearms and ammunition on state property. While Plaintiffs'

2

failure to allege that the challenged statutes prohibit conduct covered by the Second Amendment is dispositive, the statutes also survive the second step of the *Bruen* analysis because they are consistent with the historical analogues identified by the State regarding: (1) the government's authority to regulate conduct on its own property, (2) the regulation of firearms-related commerce to promote public safety, and (3) the regulation of firearms in sensitive places. Contrary to the district court's order, the historical laws included in the record address similar goals—"controlling and tracing the sale of firearms" and "ensuring dangerous individuals d[o] not obtain firearms." *United States v. Holton*, 639 F. Supp. 3d 704, 711–12 (N.D. Tex. 2022). And the challenged laws present similar burdens on Plaintiffs.

Lastly, the equitable factors weigh against issuing an injunction. The challenged statutes promote public safety by reducing the risk of illegal commerce and firearms trafficking at gun shows on state property, while the public may still attend gun show events on state property and may purchase firearms and ammunition at locations other than on state property.

This Court should reverse the order granting the motion for a preliminary injunction. Indeed, in the parallel appeal coordinated with this case for oral argument, the district court dismissed identical claims from some of the same plaintiffs. *B&L Productions v. Newsom*, No. 23-55431 (9th Cir.).

## JURISDICTIONAL STATEMENT

The district court has subject matter jurisdiction over the federal claims under 28 U.S.C. sections 1331 and 1343, and this Court has jurisdiction to review the district court's October 30, 2023, order granting the preliminary injunction under 28 U.S.C. section 1292(a)(1). The Notice of Appeal was filed on November 27, 2023. 2-ER-307.

## ISSUES PRESENTED

1.     Whether the district court incorrectly held that Plaintiffs demonstrated a likelihood of success on the merits of their claim that the challenged statutes — which do not prohibit gun shows or offers for sale of weapons, are reasonable and viewpoint neutral, and regulate a limited public forum — nonetheless violate the First Amendment.

2.     Whether the district court incorrectly held that Plaintiffs demonstrated a likelihood of success on the merits of their claim that the challenged statutes violate the Equal Protection Clause.

3.     Whether the district court incorrectly held that Plaintiffs demonstrated a likelihood of success on the merits of their claim that the challenged statutes violate the Second Amendment, even though there is no constitutional right to sell and purchase firearms, ammunition, and precursor parts on state property.

4.    Whether the district court incorrectly determined that the equitable factors weigh in favor of granting the preliminary injunction.

## STATEMENT OF THE CASE

I.    **GUN SHOWS AT THE FAIRGROUNDS**

### A.    The 32nd District Agricultural Association and the Fairgrounds

California's District Agricultural Associations are state institutions formed for the purpose of "[h]olding fairs, expositions and exhibitions for the purpose of exhibiting all of the industries and industrial enterprises, resources and products of every kind or nature of the state with a view toward improving, exploiting, encouraging, and stimulating them."  Cal. Food & Agric. Code §§ 3951(a), 3953. The Associations, which act through their Boards of Directors, "may do any and all things necessary to carry out the powers and the objects and purposes" for which the Associations were formed.  *Id.* §§ 3954, 3956.  The 32nd District Agricultural Association (District) covers Orange County.  *Id.* § 3883.

The California Department of Food and Agriculture (CDFA) is a state agency that provides "oversight of activities carried out by each California fair," including, for example, "[c]reating a framework for administration of the network of California fairs allowing for maximum autonomy and local decisionmaking authority[.]"  Cal. Bus. & Prof. Code § 19620(b)(3).  With the approval of the CDFA, the District's Board of Directors may "[m]anage the affairs of the [District]."  Cal. Food & Agric. Code § 3965(b).  However, the District's Board

5

may, without prior approval from the CDFA, "arrange for and conduct, or cause to be conducted, or by contract permit to be conducted, any activity by any individual, institution, corporation, or association upon its property at a time as it may be deemed advisable." *Id*. § 3965.1(a). Any such contract must accord with the District's written policies and procedures for contracting as well as all applicable state laws governing contracts. *Id*. § 4051(a)(1). Through the Board of Directors, the District contracts with third-party event organizers to conduct events at the Fairgrounds, such as concerts, festivals, gun shows, trade shows, and sporting events. *See id.* § 3951.

### B.   AB 893 and the Del Mar Fairgrounds

Before SB 264 and SB 915 were signed into law, another bill, AB 893 was enacted on October 11, 2019, and went into effect on January 1, 2021. Stats. 2019, c. 731 (A.B. 893), § 2, eff. Jan. 1, 2020, operative Jan. 1, 2021 (Addendum (Add), Add-005).

That bill prohibits the sale of firearms or ammunition at the Del Mar Fairgrounds in the County of San Diego, or any other property under the control of the 22nd District Agricultural Association. Cal. Food & Agric., § 4158. AB 893 has been amended by Assembly Bill 311 so that, beginning January 1, 2023, the prohibition also includes sale of firearm precursor parts. Stats. 2022, c. 139 (A.B. 311), § 1, eff. Jan. 1, 2023 (Add-008). Thus, AB 893, amended by AB 311,

6

includes the same prohibitions as SB 264 and SB 915, though the statute governs a different district.

The legislative findings for AB 893 state that the bill is intended to address gun violence and other illegal firearm activity at gun shows.  AB 893, § 1(a), (e), and (f) (Add-005–006.)  The findings describe several incidents regarding illegal firearm commerce or transfers at gun shows; the Legislature specifically found that from 2013 to 2017, the San Diego County Sheriff recorded 14 crimes at gun shows held by Plaintiff B&L at the Del Mar Fairgrounds.  *Id.*, § 1(e), (f) (Add-005–006).

B&L, along with other plaintiffs, filed suit in the United States District Court for the Southern District of California (3:21-cv-01718), on October 4, 2021, challenging AB 893 on First Amendment, equal protection, and state tort grounds. *B&L Prods., Inc. v. Newsom,* No. 3:21-cv-01718 (S.D. Cal.), ECF No. 1, Oct. 4, 2021.  The defendants, including Governor Newsom, Secretary Karen Ross, Attorney General Rob Bonta, and the 22nd District Agricultural Association, filed a motion to dismiss all causes of actions, which was granted.  *B&L Prods.*, No. 3:21-CV-01718, 2022 WL 3567064, at *1 (S.D. Cal. Aug. 18, 2022).  The plaintiffs then filed an amended complaint, adding a Second Amendment challenge, and the defendants filed a second motion to dismiss, which the court again granted.  *B&L Prods., Inc. v. Newsom*, --F. Supp. 3d--, No. 3:21-cv-01718, 2023 WL 3443280 (S.D. Cal., March 14, 2023).  The plaintiffs appealed, *id.*, ECF

No. 54; that appeal has been fully briefed. *B&L Productions*, *Inc*., 9th Cir., 23-55431, ECF No. 25; *see also* ECF No. 7.1.

### C. SB 264 and the Fairgrounds

On October 8, 2021, SB 264 added section 27575 to the Penal Code, which states, "Notwithstanding any other law, an officer, employee, operator, lessee, or licensee of the 32nd District Agricultural Association . . . shall not contract for, authorize, or allow the sale of any firearm, firearm precursor part, or ammunition on the property or in the buildings that comprise the OC Fair and Event Center, in the County of Orange, the City of Costa Mesa . . . ." Stats. 2021, c. 684 (S.B. 264), § 2, eff. Jan. 1, 2022 (Add-010); Cal. Pen. Code § 27575(a) (Add-017). This prohibition, which did not become operative until January 1, 2022, does not apply to (1) "a gun buyback event held by a law enforcement agency," the (2) "sale of a firearm by a public administrator, public conservator, or public guardian within the course of their duties," the (3) "sale of a firearm, firearm precursor part, or ammunition on state property that occurs pursuant to a contract that was entered into before January 1, 2022," and (4) the "purchase of ammunition on state property by a law enforcement agency in the course of its regular duties." Cal.

Pen. Code § 27575(b)(1)-(4). Subject to certain exceptions, a violation of this section is generally a misdemeanor. Cal. Pen. Code § 27590 (listing exceptions).

SB 264's legislative findings echo those in AB 893, describing the "grave danger" gun shows can bring to a community, and listing specific incidents that have occurred at gun shows. SB 264, § 1(e) (Add-010). These concerns are heightened by "gun-related tragedies . . . increasing [in] severity and frequency in the last 30 years, including mass murders [at schools], and an increasing rate of suicide by gun among all levels of society." *Id.*

### D. SB 915 and State Property

The following year, the Governor signed into law SB 915, codified in section 27573 of the Penal Code. Stats. 2022, c. 145 (SB 915), Jan. 1, 2023 (Add-013). It extends the same prohibition as AB 893, as amended by AB 311, and SB 264 on "the sale of any firearm, firearm precursor part, or ammunition" to "state property or in the buildings that sit on state property or property otherwise owned, leased, occupied, or operated by the state." Cal. Pen. Code § 27573(a) (Add-018). It has largely the same exceptions as SB 264; those exceptions are not at issue here.

## II. PROCEDURAL HISTORY

Plaintiff B&L has hosted gun show events at the Fairgrounds. 2-ER-200-201. After SB 264 was signed into law on October 8, 2021, Plaintiff B&L inquired with the District, "ask[ing] if the rental contracts [for 2022 gun shows] could be

prepared by the end of 2021." *Id*. The District "did not respond at the time, as [the] staff was in the midst of considering what, if any impact SB 264 would have on Crossroads' reservations." *Id*. As declared by the District's former event services supervisor in December 2022, "Plaintiff did not ma[k]e any inquiries to the District since December 3, 2021, about reserving dates for its events." But "[i]f contacted, the District w[ould] coordinate with [Plaintiff] in reserving the Fairgrounds for events." *Id*.

On August 12, 2022, Plaintiffs commenced the underlying lawsuit, alleging that SB 264 violates the First Amendment, Second Amendment, and Equal Protection Clause. Plaintiffs amended their Complaint on November 14, 2022, adding these same challenges to the newly enacted SB 915. Their First Amended Complaint (FAC) acknowledges that more than 60 percent of the vendors at B&L gun shows do not sell firearms or ammunition; rather, they sell "accessories, collectibles, home goods, lifestyle products, educational information, food, and other refreshments[.]" 2-ER-265. Although SB 264 and SB 915 do not prohibit these activities, the FAC nevertheless alleges that the challenged statutes will render the B&L gun shows "unprofitable and economically infeasible" because firearm and ammunition sales are "one of the main reasons people attend" B&L gun shows and "the events will no longer be able to draw many of its vendors and attendees" without those sales. 2-ER-266, 266. The FAC describes gun shows as

10

a "celebration of America's 'gun culture'" and an event that "include[s] the exchange of products and ideas, knowledge, services, education, entertainment, and recreation related to the lawful uses of firearms." 2-ER-264, 265.

Plaintiffs filed their motion for preliminary injunction on November 16, 2022. After submission of the briefs and evidence, including court-ordered supplemental briefing and declarations by historians Patrick Charles and Saul Cornell on behalf of the State Defendants, the district court held oral argument on April 6, 2023. On October 30, 2023, the district court granted Plaintiffs' motion. It held that Plaintiffs were likely to succeed on their First Amendment claim (and therefore their equal protection claim), determining that the challenged statutes regulate both commercial speech and expressive conduct, and fail to satisfy the relevant level of scrutiny, including that for limited public forums. It also held that Plaintiffs were likely to succeed on their Second Amendment claim on the basis that the plain text of the Second Amendment protects the regulated conduct, and Defendants had not shown that the challenged statutes are consistent with our historical tradition.

The district court also denied State Defendants' request to stay the injunction pending appeal, in part because of the court's impression that "it is unlikely that any gun sales will take place at the Orange County Fairgrounds before Defendants have appealed the preliminary injunction." 1-ER-033. After Plaintiffs reserved dates at the Fairgrounds for gun shows in January and March of 2024, the State

Defendants filed a motion for reconsideration of the portion of the order denying

the stay pending appeal; the district court denied that request on December 8, 2023.

## SUMMARY OF ARGUMENT

Plaintiffs are unlikely to succeed on the merits of their claims challenging SB

264 and SB 915.  The statutes' limited restrictions, which affect only the sale of

firearms, ammunition, and precursor parts on state property, do not violate the First

Amendment, Equal Protection Clause, or Second Amendment, and the equitable

factors weigh against a preliminary injunction of those laws.  The district court

erred in ruling otherwise.

With respect to Plaintiffs' First Amendment claim, the challenged statutes'

prohibition on the sale of firearms, ammunition, and precursor parts does not

regulate either commercial or non-commercial speech.  Over two decades ago, this

Court held that "the act of exchanging money for a gun is not 'speech' within the

meaning of the First Amendment." *Nordyke v. Santa Clara Cnty.* (*Nordyke 1997*),

110 F.3d 707, 710 (9th Cir. 1997); *see also Nordyke v. King* (*Nordyke 2003*), 319

F.3d 1181, 1191 (9th Cir. 2003).  Although the Court there held that an offer to sell

firearms is commercial speech (*Nordyke 1997*, 110 F.3d at 710), the challenged

statutes prohibit *only sales and not offers*.  Even if the challenged statutes were

viewed as regulating speech, they would pass constitutional muster no matter the

analytical test applied.  SB 264 and SB 915 provide a straightforward and tailored

response to the illegal firearms-related transactions that still occur at gun shows despite the various regulations governing such events. The challenged statutes also meet the deferential limited public forum test because they are "reasonable and viewpoint-neutral." *Wright v. Incline Village Gen. Improvement Dis.*, 665 F.3d 1128, 1134 (9th Cir. 2011). For the same reasons, Plaintiffs' equal protection challenge also fails.

Regarding the Second Amendment claim, this Court has already rejected—based on the Second Amendment's text and history—the assertion that there is an independent right to sell firearms, let alone a right to sell firearms on state property. *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 683 (9th Cir. 2017) (en banc). Such precedent remains sound, and applies with equal force here, because this Court, like the Supreme Court in *Bruen*, applied "a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2127; *Teixeira*, 873 F.3d at 683. Nor have Plaintiffs alleged any facts demonstrating that the sales they wish to conduct at the temporary marketplaces on state property, including the Fairgrounds, cannot be completed at any other location. Plaintiffs and the public can readily purchase firearms, ammunition, and precursor parts at many brick-and-mortar stores near the Fairgrounds and across the state. 2-ER-197. Contrary to the district court's opinion, there is no Second Amendment right to the "general experience of Plaintiffs' gun shows[.]" 1-ER-027. Nor does the Second

Amendment guarantee the right to sell or purchase firearms on state property. In any event, the challenged statutes do not prohibit gun shows but merely "impos[e] conditions and qualifications on the commercial sale of arms"—which are among those "presumptively lawful regulatory measures" identified by the Supreme Court. *Bruen*, 142 S. Ct. at 2162 (J., Kavanaugh, concurring) (internal quotations and citations omitted). The statutes do not infringe upon Plaintiffs' right to keep and bear arms.

And regardless, the challenged statutes are "consistent with the Nation's historical tradition of firearm regulation," and thus satisfy the second step of the *Bruen* analysis. *Bruen*, 142 S.Ct. at 2130. The numerous historical analogues identified here demonstrate that the challenged statutes are consistent with the traditions of governments setting limits on the use of its property, the regulation of firearms commerce to promote public safety, and the regulation of firearms in sensitive places such as public spaces.

The equities also weigh against issuing a preliminary injunction. The statutes promote public safety by reducing the risk of illegal firearms transactions taking place at gun shows. Meanwhile, Plaintiffs and the public are not prejudiced; they can still gather at gun show events and exchange "ideas, knowledge, services, education, entertainment, and recreation related to the lawful uses of firearms," 2-

ER-264, and they may continue to purchase firearms, ammunition, and precursor parts at the many brick-and-mortar stores across the state.

## STANDARD OF REVIEW

This Court reviews de novo the legal premises underlying a preliminary injunction. *Puente Arizona v. Arpaio* 821 F.3d 1098, 1103 (9th Cir. 2016). A preliminary injunction will be set aside if the district court "'abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact.'" *Id*.

To obtain a preliminary injunction, the plaintiff must prove "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

## ARGUMENT

### I.  PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

#### A.   Plaintiffs Are Not Likely to Succeed on the Merits of Their First Amendment Claim

The challenged statutes do not prohibit gun shows. *See* SB 264 and SB 915. Nor do they prohibit the expressive conduct that occurs at gun shows. They are instead limited to prohibiting the sales of firearms, ammunition, and precursor parts on state property. Thus, the challenged statutes do not violate the First

Amendment because they do not regulate speech or expressive conduct, they do not regulate commercial speech, and they meet the deferential limited public forum test. Plaintiffs' First Amendment Claim therefore fails.

### 1. The Challenged Statutes Do Not Implicate the First Amendment

The First Amendment is not implicated if the challenged statutes do not regulate speech or expressive conduct, which is conduct undertaken with an "intent to convey a particularized message" when the "likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (citation omitted). It is the Plaintiffs' burden "to demonstrate that the First Amendment even applies." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). Plaintiffs did not meet their burden here.

SB 264 and SB 915 solely prohibit "the sale of any firearm, firearm precursor part, or ammunition on the property or in the buildings" of the Fairgrounds and state property. Cal. Pen. Code §§ 27575, 27573. This Court has long held that "the act of exchanging money for a gun is not 'speech' within the meaning of the First Amendment." *Nordyke 1997*, 110 F.3d at 710 (evaluating a First Amendment challenge to a contract provision between a county fairgrounds and a fairgrounds management company that prohibited the sale and offering for sale of firearms at the fairgrounds); *see also Nordyke 2003*, 319 F.3d at 1191 ("We have previously

held that the act of exchanging money for a gun is not 'speech' for the purposes of the First Amendment.").

Importantly, the challenged statutes do not prohibit gun shows. Contrary to the district court's assertion that the District "has refused to contract with Plaintiffs" because firearm-related sales are prohibited, 1-ER-023, the District confirmed in a sworn declaration that it would continue to coordinate with Plaintiff B&L in reserving the Fairground. 2-ER-200-201; State Defendants' Opp. to Mot'n for Prel. Inj., ECF No. 22, at 11, n.8 (C.D. Cal. Nov. 16, 2022); *compare with* Order, 1-ER-020 (presuming waiver after incorrectly concluding that "Defendants fail[ed] to address in their Opposition why the 32nd DAA refused to contract with Plaintiffs or whether groups that exclude firearm vendors would be eligible to host gun shows."). Plaintiffs allege in their complaint that SB 264 and SB 915 have the "practical effect" of prohibiting gun shows because firearm and ammunition sales are an "essential function" of gun shows, which would become "unprofitable and economically infeasible" without such sales. 2-ER-266, 283, 286  But such allegations are inconsistent with Plaintiffs' other allegations that admit that more than *60 percent* of vendors at B&L gun shows *do not sell firearms or ammunition at all*, 2-ER-262, and that there are other "important reason[s] people attend" gun shows, including to "[p]articipat[e] in 'gun culture'" and "to learn about the technology and use of various firearms and ammunition." 2-ER-25.

Such inconsistency reveals the faulty premise in Plaintiffs' theory, and underscores the district court's error; namely, that it is the financial incentives of gun show vendors that sell firearms and ammunition, not SB 264 and SB 915 that prevent gun shows. The challenged statutes are not a speech restriction simply because they might impact the profitability of gun shows. Put another way, a restriction on non-speech conduct (the sale of firearms and ammunition) does not become a restriction on speech just because it might impact the *profitability* of separate, unrestricted expressive conduct (the alleged "gun culture" at gun shows). *See Nordyke 2003*, 319 F.3d at 1191 (a law could be unconstitutional when it "interfere[s] with speech itself, not [through] the hindering of actions (e.g., sales) that are not speech"); *see also B&L Prods.*, --F. Supp. 3d--, No. 3:21-cv-01718, 2023 WL 3443280 (S.D. Cal., March 14, 2023) ("act of exchanging money for a gun is not 'speech' within the meaning of the First Amendment"). If third parties make their own independent business decisions not to sell accessories or provide firearms education at a site where firearms sales are prohibited, it is those parties' intervening decisions—not SB 264 and SB 915—that cause Plaintiffs' alleged injuries. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."); *Mobilize the Message, LLC v. Bonta*, 50 F.4th 928, 935–37 (9th Cir. 2022) (holding that a worker classification statute did

not infringe First Amendment rights, even if it classified doorknockers and signature gatherers as employees and thereby indirectly impacted the employer's speech due to increased costs and loss of such workers), *cert. denied* 143 S. Ct. 2639 (2023).  Plaintiffs' First Amendment right to speak about and support a "gun culture" does not entitle them to be exempt from other, non-speech restrictions— whether it be fire-code restrictions on maximum capacity, or business taxes, or a prohibition on firearm sales—that might ultimately prevent their event from being profitable.  *See Nordyke 2003*, 319 F.3d at 1191 (an ordinance that prohibited the possession of firearms on county property did not violate the First Amendment even when the ban impaired the sale of firearms).

The district court's opinion relied on statements made by the author of both bills who described the challenged statutes as "a total ban" on gun shows.  1-ER-022, 030.  But, of course, a law's reach is defined first and foremost by the statutory language, not the inconsistent statements of a single legislator, even the bill's author.  *Bottinelli v. Slazar*, 929 F.3d 1196, 1199 (9th Cir. 2019) (when interpreting a statute, the court begins with the plain text).  And further, "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it."  *United States v. O'Brien*, 391 U.S. 367, 384 (1968); *see also Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022) (observing that the Supreme Court "has long disfavored arguments based

on alleged legislative motives"). In any event, it is settled law that "[i]n addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is *reasonable* . . . ." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n¸* 460 U.S. 37, 46 (1983) (emphasis added). "[T]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id*. (internal quotations omitted). Consistent with *Perry*, the plain text of the challenged statutes here only preclude certain sales at gun shows, not speech; the State is acting within its power to limit the commercial transactions taking place on its property to promote public safety.

Not only are the challenged statutes clear about what they actually prohibit—only certain sales and not gun shows—but the interests of the state in prohibiting those sales are also clear, to reduce illegal firearms transactions and trafficking. And this Court has specified that what matters is "the interests the state declared," not the "legislative history or stated motives of any legislator." *Nordyke v. King*, 644 F.3d 776, 792 (9th Cir. 2011) ("*Nordyke 2011*"); *see also O'Brien,* 391 U.S. at 384.

### 2.   In Any Event, SB 264 and SB 915 Pass Multiple Levels of Scrutiny

At the outset, because the challenged statues do not regulate speech, they are subject to and easily satisfy rational basis review. If this Court were to view the

challenged statutes as a speech regulation, then they would also satisfy any other applicable review standard, including: (1) the test for commercial speech regulations; (2) the reasonableness standard for a limited public forum; and (3) intermediate scrutiny.

### a. The Challenged Statutes Satisfy Rational Basis Review

Because SB 264 and SB 915 do not regulate speech, they are subject to rational basis review, which they satisfy. *See Retail Digit. Network, LLC v. Prieto*, 861 F.3d 839, 847 (9th Cir. 2017) (en banc). SB 264's legislative findings describe multiple public safety concerns related to illegal firearms commerce and transfers at gun shows, including the trafficking of illegal firearms by a vendor, sales of firearms to prohibited persons, and the illegal importation of large-capacity magazines. SB 264, § 1(e) (Add-011). Similarly, the Senate Committee on Public Safety's analysis of SB 915 concluded that it is designed to promote public safety, prevent circumvention of gun safety laws at gun shows, and reduce the risk of illegally trafficked firearms. 2-ER-238–239. Indeed, AB 893's legislative findings note that there were 14 recorded crimes between 2013 and 2017 at Plaintiff B&L gun shows at the Del Mar Fairgrounds alone. AB 893, § 1(f) (Add-006).[1]

---

[1] In addition, the California Department of Justice Armed and Prohibited Persons System (APPS) Report APPS 2021 documents the arrest of a felon for purchasing a gun magazine, as well as an AR-15 upper receiver and complete pistol ghost gun

21

Given these legislative findings and the reports of illegal activity occurring at gun shows, the Legislature could reasonably conclude that because the sale of firearms and ammunition at gun shows contributed to these public safety issues, prohibiting such transactions would enhance safety for gun show attendees and for the communities near state property, including the Fairgrounds. Preventing and mitigating gun violence arising from "those who acquire guns illegally and use them to commit crimes" is a "substantial interest." *Nordyke 1997*, 110 F.3d at 713. These are "plausible reasons" for the passage of the challenged statutes, and thus, the "inquiry is at an end." *Romero-Ochoa v. Holder*, 712 F.3d 1328, 1331 (9th Cir. 2013) (citation omitted).

### b. The Challenged Statutes Do Not Regulate or Ban Commercial Speech

Commercial speech is "expression related solely to the economic interests of the speaker and its audience," and is accorded less protection than non-commercial

---

kit, at a gun show in San Bernardino, California. The APPS 2022 Report documents the arrest of a firearms dealer selling assault weapons without proper permits at a gun show in Red Bluff, California. The APPS 2021 and 2021 Reports are public records that may be judicially noticed by the court, Fed. R. Evid. 301, *Interstate Nat. Gas Co. v. S. California Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953) ("We may take judicial notice of records and reports of administrative bodies."), and are available at https://oag.ca.gov/system/files/attachments/press-docs/APPS%20Report%202021.pdf, and https://oag.ca.gov/system/files/media/2022-apps-report.pdf, respectively. (The reports were also referenced in the State Defendants' Reply Brief in Support of Supplemental Brief, ECF No. 34, at 9, and at oral argument, Transc., 2-ER-046, 055, 061.)

speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561-563 (1980). The district court erroneously determined that "legislation that restricts sales also restricts commercial speech." 1-ER-016. But "the act of exchanging money for a gun is not 'speech' within the meaning of the First Amendment." *Nordyke 1997*, 110 F.3d at 710; *see also Nordyke 2003*, 319 F.3d at 1191. The district court cited *Nordyke 1997* for the principle that "[a]n offer to sell firearms or ammunition" is commercial speech, but that determination rests on distinct circumstances not present here. 1-ER-015. *Nordyke 1997* concerned a contract provision that prohibited the "offering for sale" of firearms. *Id.* at 708-709. This Court accordingly held in that case that an offer to sell firearms constituted commercial speech, and that the contract provision did not pass constitutional muster under the applicable analytical framework. *Id.* at 710–13. But SB 264 and SB 915 prohibit only "the act of exchanging money for a gun," which as this Court held in the same case, is not speech. *Id.* at 710. That they forbid state personnel from "contract[ing] for, authoriz[ing], or allow[ing]" such sales, *see* Cal. Penal Code §§ 27575(a), 27573(a), does not suggest that more than "the act of exchanging money for a gun" is prohibited; this statutory language is merely the enforcement mechanism for the sales restrictions.

The challenged statutes prohibit only non-speech conduct—the sale of firearms, ammunition, and precursor parts. But even if this Court were to conclude

that SB 264 and SB 915 regulate commercial speech, as the district court did, the statutes would additionally satisfy the test for regulations of commercial speech established in *Central Hudson*. Under this test, if the communication is neither misleading nor related to unlawful activity, the government must assert a substantial interest, and the restriction must directly advance the government's substantial interest. *Cent. Hudson*, 447 U.S. at 564. If the government interest's "could be served as well by a more limited restriction," then the "excessive restrictions cannot survive." *Id*.

First, there is a "substantial government interest in protecting the people from those who acquire guns illegally and use them to commit crimes resulting in injury or death of their victims." *Nordyke 1997*, 110 F.3d at 713. Second, the challenged statutes "directly advance" this government interest (*Cent. Hudson*, 447 U.S. at 566) because illegal transactions and other crimes have indeed occurred at gun shows despite existing state laws concerning gun shows. *Ante*, Arg. I.A.2.a. Third, SB 264 and SB 915's exemption for gun buyback events reasonably fits with its public safety interest because such events can help reduce gun violence. *Cf. Boyer v. City of Los Angeles*, 2012 WL 13013037, at *5 (C.D. Cal. Aug. 23, 2012) (in a Los Angeles gun buyback program, people voluntarily surrendered firearms to law enforcement in exchange for a gift card).

The district court concluded that the challenged statutes do not satisfy intermediate scrutiny based on its view that a restriction on otherwise lawful firearms cannot advance the State's interest in preventing illegal sales. 1-ER-017–018. However, the challenged laws are intended to address the particular risks created by the gun-show setting, which uniquely lends itself to illegal transactions. *See ante*, n.1 (collecting reports of illegal transactions). It is therefore irrelevant whether certain firearms can be lawfully purchased in another, regulated private setting. The evidentiary record shows that the laws "directly advance" the concern and thus the challenged statutes are the sort of "[s]ubstantial, effective, and carefully drafted legislative act[]" that this Court predicted would satisfy the *Central Hudson* test. *Nordyke 1997*, 110 F.3d at 713. The district court erred in concluding otherwise.

### c.   The Challenged Statutes Would Also Meet the Deferential Limited Public Forum Test

Even if this Court were to conclude that SB 264 and SB 915 restricted non-commercial speech, as the district court did, the statutes would nevertheless satisfy the deferential standard for speech regulations in a limited public forum. "The government may limit the use of properties under its control to the uses to which the properties are lawfully dedicated." *Wright*, 665 F.3d at 1134. But the extent of such restrictions "depends on the nature of the relevant forum." *Id.* Government property can fall into four possible categories of fora: "(1) a traditional public

forum, (2) a designated public forum, (3) a limited public forum, or (4) a nonpublic forum."  *Id.* (citing *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 679, n.11 (2010)).

The Fairgrounds and other state property fairgrounds are limited public forums—those that are "'limited to use by certain groups or dedicated solely to the discussion of certain subjects.'"  *Wright*, 665 F.3d at 1134 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 470); *see Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) ("In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."); *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981) ("The state, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.") (internal quotation marks omitted).  Use of the Fairgrounds for third-party events, such as B&L gun shows, can be done only through contracting for available space at the Fairgrounds.  *Ante*, Statement of the Case, I.A., II.; *Wright*, 665 F.3d at 1132, 1135–38 (beaches in an improvement district were, at most, a limited public forum because access to the beaches required showing identification to a security guard at a kiosk or gate).  The various events hosted at the

Fairgrounds demonstrate it "exists to provide a means for a great number of exhibitors temporarily to present their products or views, be they commercial, religious, or political, to a large number of people in an efficient fashion." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 643 655 (1981) (holding that a state fair held on state property was a limited public forum); *see also NAACP v. City of Richmond*, 743 F.2d 1346, 1355 n.8 (9th Cir. 1984) (describing *Heffron* as noting "the distinction between public streets and the more limited public forum of a fairground").

Because the Fairgrounds (and other state property fairgrounds) are limited public forums, SB 264 and SB 915 need only be "reasonable and viewpoint-neutral." *Wright*, 665 F.3d at 1134. They satisfy this deferential inquiry because mitigating gun violence by preventing illegal firearm and ammunition transactions is consistent with the public safety interest for a state property that is a major event venue for large gatherings of people. *See Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of Los Angeles*, 764 F.3d 1044, 1049 (9th Cir. 2014) (the reasonableness inquiry is deferential and is satisfied when the restriction is consistent with the government's interest in preserving the property for its lawfully dedicated use); *Nordyke 2011*, 644 F.3d at 792 (the reduction of gun violence on county property was a plausible purpose for an ordinance banning the possession

27

of firearms or ammunition on county property).[2] The challenged statutes are also viewpoint neutral because they apply to any event on the Fairgrounds, not just to gun shows. Pen. Code §§ 27573, 27575. The only exception is for a gun buyback event held by a law enforcement agency, which is consistent with the statutes' public safety purpose. Pen. Code §§ 27573, 27575.

The district court's opinion held that the challenged statutes' restrictions are unreasonable on the basis that the Fairgrounds has hosted gun shows for many years. 1-ER-021. However, the First Amendment does not prohibit the government from setting limits on commercial practices on its property for public safety, even if those limits are relatively recent. The district court cites to no legal authority for the contrary proposition, and instead attaches significance to the fact that firearm sales are otherwise allowed at brick-and-mortar gun stores, *id.*, and the statements or opinions of certain legislators regarding gun shows, 1-ER-022. Given that the laws seek to curb illegal commerce at gun shows, it is irrelevant that certain transactions are legal in private settings outside of gun shows on state property. And only the states' declared interest is relevant in determining legislative intent, not a legislators' personal opinions. *Ante,* Arg. I.A.1.

---

[2] Although this Court granted rehearing en banc of the *Nordyke 2011* panel decision, the en banc court "affirm[ed] the district court's ruling on the First Amendment for the reasons given by the three-judge panel." *Nordyke v. King*, 681 F.3d 1041, 1043 n.2 (9th Cir. 2012) (*Nordyke 2012*).

## B.    Plaintiffs Are Not Likely to Succeed on the Merits of Their Equal Protection Claim

The equal protection claim is predicated on the First Amendment claims and also fails. *OSU Student All. v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012).  Plaintiffs allege that "[i]f unequal treatment occurs in the context of exercising a fundamental right" by "singling out speakers because of the content of their speech" "or the government is motivated by animus toward a disfavored group, courts apply heightened scrutiny."  2-ER-258.  However, Plaintiffs failed to allege membership in a protected class because gun-show promoters and participants are not a suspect classification.  *Nordyke 2012*, 681 F.3d at 1043 n.2.  Plaintiffs also cannot rely on a "class-of-one" theory.  *See Teixeira v. Cnty. of Alameda*, 822 F.3d 1047, 1053 (9th Cir. 2016) (rejecting a class-of-one claim by firearm vendors because "gun stores are materially different from other retail businesses").[3]  Any claim therefore is subject only to rational basis review, and would fail for the same reasons as described above.

Plaintiffs' animus theory is also incorrect, for the reasons discussed *ante* at I.A.1.  The challenged statutes do not preclude gun shows or "target only members of the 'gun culture,'" as discussed above, and the District has confirmed that B&L

---

[3] Although this Court granted rehearing en banc of the *Teixeira* panel decision, the en banc court affirmed the district court's rejection of the equal protection claim "for the reasons given in the panel opinion."  *Teixeira*, 873 F.3d at 676 n.7.

can continue to reserve the Fairgrounds for events. 2-ER-201. Plaintiffs' equal protection claim thus fails.

### C. Plaintiffs Are Not Likely to Succeed on the Merits of Their Second Amendment Claim

In *Bruen*, the Supreme Court set forth a new analytical framework for Second Amendment claims. The threshold question is whether the plain text of the Second Amendment covers the regulated conduct at issue. If the answer is no, then the regulation does not violate the Second Amendment. That is the case here. The challenged statutes prohibit only the sale of firearms, ammunition, and precursor parts on the Fairgrounds and state property. And Plaintiffs have identified no authority suggesting that the Second Amendment guarantees a right to sell firearms, let alone a right to sell on state property. Nor could they, as this Court previously held that the text and history of the Second Amendment demonstrate it does not "confer[] an independent right to sell or trade weapons," and that holding remains good law after *Bruen*. *Teixeira*, 873 F.3d at 683. Even if Plaintiffs had carried their burden, SB 264 and SB 915 are constitutional because they fall within the presumptively lawful category of "laws imposing conditions and qualifications on the commercial sale of arms" *id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626), and they are also "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

### 1. The Text-and-History Standard for Analyzing Second Amendment Claims Under *Bruen*

In *Bruen*, the Supreme Court announced a new standard for considering Second Amendment claims, one "centered on constitutional text and history." *Bruen*, 142 S. Ct. at 2128–29.  Under this text-and-history approach, courts must first determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2129–30.  If so, "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.  To satisfy this burden, a government must identify a "well-established and representative historical *analogue*"—not a "historical *twin*" or "dead ringer"—to the challenged law that is "relevantly similar" according to "two metrics": "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133.  Thus, the historical comparator must have "impose[d] a comparable burden on the right of armed self-defense" that is also "comparably justified." *Id*.

The Court was careful to note that *Bruen* did not purport to overturn or call into question any aspect of the Court's decision in *Heller*.  To the contrary, the Court described the analytical approach articulated in *Bruen* as the same "test . . . set forth in *Heller*." *Bruen*, 142 S. Ct. at 2131; *see also id.* at 2134 ("Having made the constitutional standard endorsed in *Heller* more explicit, we

now apply that standard [here].").  Consistent with this approach, the Court

reaffirmed that the Second Amendment is not a "regulatory straightjacket."  *Id.* at

2133.  The Court also reiterated that the Second Amendment right "is not

unlimited" and is not a right to "keep and carry any weapon whatsoever in any

manner whatsoever and for whatever purpose."  *Id.* at 2128 (quoting *Heller*, 554

U.S. at 626).  Indeed, *Bruen* "decide[d] nothing about . . . the requirements that

must be met to buy a gun."  *Id.* at 2157 (Alito, J., concurring).  Justice Kavanaugh,

joined by Chief Justice Roberts, wrote separately to underscore the "limits of the

Court's decision," explaining that the Second Amendment "allows a 'variety' of

gun regulations," and reiterating *Heller*'s pronouncement that one of the

presumptively lawful categories of laws includes those "imposing conditions and

qualifications on the commercial sale of arms."  *Id.* at 2161–62 (Kavanaugh, J.,

concurring).  The Court thus reaffirmed that the Second Amendment permits

governments to enact a "variety" of regulations for combating the "problem of

handgun violence in this country" (*Heller*, 554 U.S. at 636), and "by no means

eliminates" state and local governments' "ability to devise solutions to social

problems that suit local needs and values."  *McDonald v. City of Chicago*, 561 U.S.

742, 785 (2010).

### 2. Plaintiffs Failed to Establish That the Second Amendment's Plain Text Covers the Sale and Purchase of Firearms on State Property

The proposed conduct of selling and purchasing firearms, ammunition, and precursor parts on state property does not fall within "the Second Amendment's plain text." *Bruen*, 142 S. Ct. at 2129–30. Under *Bruen*'s text-and-history approach, courts first assess "whether the plain text of the Second Amendment protects [the individual's] proposed course of conduct," *id.* at 2134—i.e., whether the regulation at issue prevents any "people" from "keep[ing]" or "bear[ing]" "Arms" for lawful purposes. *See Nat'l Ass'n for Gun Rights*, *Inc. v. City of San Jose*, 2023 WL 4552284, at *5 (N.D. Cal. July 13, 2023), *appeal docketed*, No. 23-16091 (9th Cir. Aug. 14, 2023). This "threshold inquiry" entails "determining whether the challenger is part of 'the people' whom the Second Amendment protects, whether the weapon at issue is 'in common use' today for self-defense, and whether the 'proposed course of conduct' falls within the Second Amendment." *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (internal quotation marks omitted).

It is Plaintiffs' burden to demonstrate that the plain text covers the proposed course of conduct, and courts that have applied the *Bruen* framework have held plaintiffs to that burden. *See Bruen*, 142 S. Ct. at 2134; *Md. Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1042 (4th Cir. 2023), *reh'g en banc granted*, No. 21-2017

33

(L), 2024 WL 124290 (4th Cir. Jan. 11, 2024); *see, e.g.*, *Nat'l Ass'n for Gun Rights*, 2023 WL 4552284, at *5 (N.D. Cal. July 13, 2023); *Or. Firearms Fed'n, Inc. v. Kotek*, 2023 WL 4541027, at *5, n.4 (D. Or. July 14, 2023), *appeal docketed*, No. 23-35478 (9th Cir. July 17, 2023); *Def. Distributed v. Bonta*, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022), *adopted at* 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022).

### a. The Second Amendment's Plain Text Does Not Cover the Proposed Conduct of Firearm Sales on State Property

The plain text of the Second Amendment protects the "keep[ing]" or "bear[ing]" "Arms" for lawful purposes, or to "have and carry" weapons for the purpose of "confrontation," *District of Columbia v. Heller*, 554 U.S. 570, 583–84 (2008); *Nat'l Ass'n for Gun Rights*, 2023 WL 4552284, at *5.  It does not protect the conduct prohibited by SB 264 and SB 915, the sale of firearms, ammunition, and precursor parts on the Fairgrounds or state property.  In this threshold inquiry, the challenged regulation must inform the scope of the proposed conduct; otherwise, the Supreme Court's use of the qualifier "proposed" before "course of conduct" when describing the plain text analysis would be meaningless.  *See Bruen*, 142 S. Ct. at 2134; *see also Oakland Tactical Supply, LLC v. Howell Twp.*, No. 18-cv-13443, 2023 WL 2074298, at *3, n.4 (E.D. Mich. Feb. 17, 2023), *appeal docketed*, No. 23-1179 (6th Cir. Mar. 1, 2023) ("The proposed conduct

could not be simply 'training with firearms' because the zoning ordinance does not prohibit 'training with firearms.'").

### (1)  The District Court Misapplied the En Banc Decision in *Teixeira*

This Court's en banc decision in *Teixeira* forecloses any Second Amendment claim based on a supposed right to sell firearms and ammunition, particularly on state property. *Teixeira* concerned a county zoning ordinance that imposed certain restrictions on where a gun store could be located relative to other types of properties (e.g., schools, residential zones). *Teixeira*, 873 F.3d at 673–74. When a business partnership was denied a permit to open a gun store in a location that failed to comply with the ordinance, the partnership claimed that the ordinance infringed its Second Amendment right to sell firearms and the rights of its potential customers to buy firearms. *Id.* at 673, 676. This Court conducted a "full textual and historical review" of the Second Amendment to conclude there is no "independent right to sell or trade weapons." *Id.* at 683. Beginning with the Second Amendment's text, the Court concluded that "[n]othing in the specific language of the Amendment suggests that sellers fall within the scope of its protection." *Id.* at 683. Founding-era "Second Amendment analogues in state constitutions" also "nowhere suggest[ed] in their text that the constitutional protection extends to those who would engage in firearms commerce." *Id.* The Court's historical analysis "confirm[ed] that the right to sell firearms was not

35

within" the historical understanding of the Second Amendment's scope.  *Id.*  As *Bruen* noted, this type of analysis "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2127.

While *Teixeira* acknowledged that the Second Amendment implies some "ability to acquire arms," the Court found it unnecessary to decide the precise scope of "any such acquisition right."  873 F.3d at 677–78; *id*. at 680 ("gun buyers have no right to have a gun store in a particular location, at least as long as their access is not meaningfully constrained.")  There, the plaintiffs had failed to plausibly allege that the challenged ordinance impeded their ability to acquire firearms because the conclusory allegations fell short of the pleading requirements the Supreme Court set forth in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007) and in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Teixeira*, at 678 (The complaint "did not adequately allege . . . that Alameda County residents cannot purchase firearms within the County as a whole, or within the unincorporated areas of the County in particular.").  As *Bruen* did not disturb *Twombly* or *Iqbal*, the same is true here.  The very nature of gun shows is that they are a temporary marketplace during specified dates, and those at the Fairgrounds occur infrequently, about five times per year.  2-ER-201.

Despite the plain meaning of "keep[ing]" and "bear[ing]" "arms" in the Second Amendment, the district court erroneously applied *Teixeira,* expanding the ancillary right to acquire arms to include the "general experience of Plaintiffs' gun shows." 1-ER-027 ("Defendants fail to identify how the general experience of Plaintiffs' gun shows can be replicated by alternative forums in the area."). But the Second Amendment does not "guarantee[] a certain type of retail experience," *Teixeira*, 873 F.3d 670, 680 n.13, nor does it "elevate convenience and preference over all other considerations," *id*. at 680. And, as noted, the challenged statutes do not ban gun shows; the public are free to experience them, and purchase firearms elsewhere. As another district court recently held, the Second Amendment's plain text does not cover the "sale of firearms and ammunition at a gun show" on state property. *B&L Prods.,* 2023 WL 3443280, at *4-5.

### (2) Plaintiffs May Purchase Firearms at Numerous Other Locations

While the district court observed that "there was no alternative gun show in Orange County on private property," (1-ER-027), that is irrelevant. Brick-and-mortar gun stores that sell firearms and ammunition are open throughout the state for more than the five weekends a year, which is typically how often B&L has held gun shows at the Fairgrounds. 2 ER-199. As of January 2023, there are 150 listed dealers on the Centralized List of Firearms Dealers (that sell firearms and ammunition) in Orange County, in addition to 12 vendors that sell only

37

ammunition. 2-ER-197. In the city of Costa Mesa, where the Fairgrounds is located, there are 8 dealers, and 6 within the same zip code as the Fairgrounds. *Id*. Statewide, there are 1,610 dealers authorized to sell firearms and ammunition. *Id*. There can be no credible argument that prohibiting sales of firearms, ammunition, and precursor parts at the Fairgrounds and other state property "meaningfully constrain[s]" Plaintiffs' ability to acquire firearms. *Teixeira*, 873 F.3d at 680.

> **b.    SB 264 and SB 915 are Presumptively Lawful Qualifications on the Commercial Sale of Firearms**

The challenged statutes fall within the presumptively lawful category of "laws imposing conditions and qualifications on the commercial sale of arms." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626). The Supreme Court has now expressed in its three most recent Second Amendment opinions, including in *Bruen* itself, that its decisions "should [not] be taken to cast doubt" on the presumptive lawfulness of these conditions and qualifications. *See Heller*, 554 U.S. at 626–27; *McDonald*, 561 U.S. at 787; *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

The challenged statutes' prohibition on the sale of firearms, ammunition, and precursor parts at the Fairgrounds and state property is akin to a time, place, and manner restriction that merely restricts sales on a state property. In no way do the challenged statutes restrict sales at locations outside of the Fairgrounds or state property, and Plaintiffs do not allege that such items cannot be sold in ample

alternative locations. SB 264 and SB 915 are thus similar to other public safety measures that this Court has placed in the category of presumptively lawful conditions and qualifications. *See Teixeira*, 873 F.3d at 690 (Owens, J., concurring) (county zoning ordinance that prohibited firearm retailers near residences, schools, daycares, and liquor stores fell within this presumptively lawful category); *Silvester v. Harris*, 843 F.3d 816, 830–31 (9th Cir. 2016) (Thomas, J., concurring) (same, as to a ten-day waiting period for recurrent firearm purchasers that allowed a cooling-off period to impede impulsive uses of a firearm against oneself or others).

### 3. Prohibiting the Firearms-Related Sales on State Property is Consistent with Several Historical Traditions of Regulation

This Court need not consider historical analogues, but nevertheless, SB 264 and SB 915 are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130. The Government need not identify a "historical *twin*" or "dead ringer," but only a "well-established and representative historical analogue." *Id*. at 2133. The challenged statutes fit well within at least three historical traditions, including: (1) the government's well-established authority to set limits on the use of its property when it is acting as a proprietor; (2) the regulation of firearms and ammunition commerce to promote public safety; and (3) the regulation of firearms in sensitive places, including in public spaces and at

large gatherings.  The historical analogues and challenged statutes are comparably

justified because they address similar goals, "(1) controlling and tracing the sale of

firearms and (2) ensuring dangerous individuals did not obtain firearms," albeit in

some instances by different means.  *Holton*, 639 F. Supp. 3d 704, 711–12 (N.D.

Tex. 2022); *see also ante,* Statement of the Case, I.B-D (legislative findings noting

incidence and risk of illegal commerce from gun shows), Arg., I.A.2.a.[4]  And in

most instances, the challenged statutes are significantly less restrictive than these

historical restrictions.  As further discussed below, the district court erroneously

replaced the historical analogues analysis with the First Amendment analysis, and

essentially insisted on historical twins despite acknowledging that gun shows in the

United States make a "more modern appearance."  1-ER-027.

### a. The Challenged Statutes Fall Within the Government's Well-Established Authority to Regulate Conduct on its Own Property

The right of landowners to control and exercise domain over their own

property is a well-established American legal principle deeply rooted in English

tradition.  *See, e.g.*, *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1265 (11th

Cir. 2012) ("'[Property] being by him removed from the common state nature hath

placed it in, it hath by this labour something annexed to it, that excludes the

---

[4] The text of the historical analogues cited here are included in the
Addendum, and are arranged in the order of their appearance in this brief.

common right of other men.'") (quoting John Locke, *Two Treatises on Government*, 209–10 (1821)); *id.* at 1262 ("'There is nothing which so generally strikes the imagination, and engages the affections of mankind, as the right of property.'") (quoting 1 William Blackstone, *Commentaries on the Laws of England*, 140 (1765)).  The Founding Fathers adopted these tenets and, "through the Constitution and the Bill of Rights, sought to *protect* the fundamental right of private property, not to eviscerate it."  *GeorgiaCarry.Org, Inc.*, 687 F.3d at 1265 (italics in original).  Because the Second Amendment cannot be understood to "destroy one cornerstone of liberty—the right to enjoy one's private property," the Second Amendment, "whatever its full scope, certainly must be limited by the equally fundamental right of a private property owner to exercise exclusive dominion and control over its land."  *Id.*

This right of a property owner to control conduct on its own land applies to the government when it operates as a proprietor.  *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) ("[T]he fact that the government is acting in a proprietary capacity, analogous to that of a person managing a private business, is often relevant to constitutional analysis."); *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443, 1474 (2009) ("[T]here is both precedent and reason for allowing the government acting as proprietor extra

41

power to restrict the exercise of many constitutional rights on its property.").  For

example, in *Bonidy*, the Tenth Circuit held that it was constitutional to prohibit the

carrying of firearms in a postal parking lot because the government "often has

more flexibility to regulate when it is acting as a proprietor (such as when it

manages a post office) than when it is acting as a sovereign (such as when it

regulates private activity unconnected to a government service)."  790 F.3d at

1126.  Similarly, in *Class*, the D.C. Circuit held that it was permissible to prohibit

firearms in the government-owned parking lot on United States Capitol Grounds

because "the government—like private property owners—has the power to

regulate conduct on its property."  930 F.3d at 464; *see also GeorgiaCarry.org,*

*Inc. v. U.S. Army Corps of Eng'rs*, 212 F. Supp. 3d 1348, 1363 (N.D. Ga. 2016)

(upholding prohibition of firearms on U.S. Army Corps of Engineers property,

which included public recreation areas).  To be sure, the Tenth Circuit and D.C.

Circuit did conclude that the parking lots in those cases—together with the

government buildings they were adjacent to—were sensitive places.  *Bonidy*, 790

F.3d at 1125; *Class*, 930 F.3d at 464.  But they also regarded as significant the

government's status as property owners.  *Bonidy*, 790 F.3d at 1126; *Class*, 930

F.3d at 464.

    Historical analogues dating back to the seventeenth century exemplify this

tradition of regulating firearms on government-owned property.  For example,

Maryland prohibited bringing any weapon into its state legislature in 1650 and 1773. W.H. Browne, *Proc. & Acts of Gen. Assemb. of Md., Jan. 1637/8–Sept. 1664*, at 273–74, § 5 (1883); *63 Proc. & Acts of the Gen. Assemb., June 15-July 3, 1773*, at 338, § 5. In the 1870s, Georgia prohibited the carrying of weapons to any court, election ground, place of public worship, or other public gathering spaces. 1870 Ga. Laws, at 421, No. 485; Code of the State of Ga., at 818, § 4528. And in 1879, Missouri prohibited carrying concealed weapons into schools, court rooms, or "any other public assemblage of persons met for any lawful purpose." *Revised Statutes of State of Mo. 1879*, at 224, § 1274. These laws demonstrate that, consistent with centuries of English and American legal tradition, it is permissible to place certain conditions on the use of state property—including the prohibition of firearm and ammunition sales—when the State allows private parties to host events on its land.

The district court acknowledged that "the government possesses rights that are similar to those of a private property owner when the government is acting as a proprietor of its land," 1-ER-028, but did not apply this principle in the context of the Second Amendment. Instead, the district court reasoned without explanation that because the challenged statutes "concern the ***sale*** of firearms and firearm-related goods—and not the possession of those items[,]" the First Amendment's limited public forum doctrine and commercial speech analysis applies. *Id.*

(emphasis in original). But the court's analysis misses the mark, because the challenged statutes do not regulate speech, or any expressive conduct that would bring them within the ambit of the First Amendment. *See ante*, Arg.I.A.1; *Nordyke 1997*, 110 F.3d at 710. And under the Second Amendment analysis required by *Bruen*, SB 264 and SB 915's prohibitions are consistent with the government's historic right to exercise its domain on its land—including to preclude certain sales on its property.

> **b. The Challenged Statutes Fall Within the Government's Well-Established Authority to Regulate Firearms Commerce to Promote Public Safety**

Various levels of government have long preserved the peace and welfare of the community by exercising sovereign power to regulate the commercial sale of products. William J. Novak, *The People's Welfare, Law and Regulation in Nineteenth Century America* 87 (1996) ("[E]arly Americans understood the economy as simply another part of their well-regulated society, intertwined with public safety, morals, health, and welfare and subject to the same kinds of legal controls."). As highlighted in Professor Saul Cornell's declaration, it was well understood that state and local governments possessed the inherent police power to regulate firearms commerce to address both "longstanding issues and novel problems created by firearms in America society," as "guns have been regulated from the dawn of American history." 2-ER-133, 139. Firearms and ammunition

were no exception. As this Court previously recognized, "colonial governments substantially controlled the firearms trade" by "provid[ing] and stor[ing] guns, controll[ing] the conditions of trade, and financially support[ing] private firearms manufacturers." *Teixeira*, 873 F.3d at 685; Cornell Decl., 2-ER-139 ("The common law that Americans inherited from England always acknowledged that the right of self-defense was not unlimited but existed within a well-delineated jurisprudential framework."); *id.* at 2-ER-130–133, 135–155 (discussing historical relationship between the Second Amendment right and regulation).

Several states enacted regulations restricting "where and to whom individuals could sell guns" (*Holton*, 639 F. Supp. 3d at 711), that were "designed to combat illegal arms and ammunition trafficking and to ensure that individuals considered dangerous did not obtain firearms." *United States v. Serrano*, 651 F. Supp. 3d 1192, 1212 (S.D. Cal. Jan. 17, 2023). Some examples include a seventeenth century Connecticut law that "banned the sale of firearms by its residents outside the colony,"[5] and a seventeenth century Virginia law that allowed for the sale of firearms and ammunition to only "his majesties loyal[] subjects inhabiting this colony."[6] *Teixeira*, 873 F.3d at 685, 685 n.18. There was also a "1652 New York

---

[5] 1 J. Trumbull, *Public Records of the Colony of Conn., May 1665*, at 138–39, 145–46 (1850).

[6] 2 W.W. Hening, *Laws of Va. from First Sess. of Legis. in 1619*, at 403 (1823).

law [that] outlawed illegal trading of guns, gun powder, and lead by private individuals."[7]  *Serrano*, 651 F. Supp. 3d at 1211 (quoting Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 76 (2017)).  And a "1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'"[8]  *Holton*, 639 F. Supp. 3d at 711 (quoting Spitzer, at 76).

States also enacted regulations to protect the public from defective or poorly manufactured firearms or gunpowder, which were adopted by six states in the late 1700s and early 1800s.  The firearm inspection laws required that a government official test the firing distance and barrel integrity of any firearm sold to the public.  Br. of Defs.-Appellees, *Granata v. Campbell*, No. 22-1478 (1st Cir. Jan. 30, 2023), 2023 WL 1794480, at *39–40 (citing 1804 Mass. Acts., at 111, ch. 81; 1821 Me. Laws, at 546, ch. 162).  The ammunition inspection laws generally required government officials to inspect gunpowder to ensure it met certain quality standards.  *Id.* at *42 (citing 1808 Mass. Acts, at 444, ch. 52; 1776 R.I. Pub. Laws, at 25; 1776–77 N.J. Laws, at 6–7, ch. 6; 1820 N.H. Laws, at 274, ch. 25; 1794 Pa. Laws, at 764–69, ch. 337).

---

[7] 1652 N.Y. Laws 128, Ordinance of Dir. & Council of New Netherland.
[8] 1 W.W. Hening, The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature in the Year 1619, at 174–75, Act LVI (1823).

There were also multiple restrictions on the sale and storage of gunpowder. One example was a New Hampshire law enacted in 1825—and renewed in 1891—that penalized the sale or offer for sale "by retail any gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or on parade or common." 1825 N.H. Laws, at 74, ch. 61, § 5; 1891 N.H. Laws, at 332, ch. 117, § 7. An 1821 Maine law allowed government officials to search for gunpowder in any building. 1821 Me. Laws, at 99, ch. 25, § 5. New York City enacted strict laws regulating the sale of gunpowder within the corporate limits of the city, and prohibited the sale of gunpowder in any building that was used in part as a "dwelling." 1 M. Ash, *N.Y.C. Consolidation Act*, Ordinances of N.Y.C., § 455 (1891). Other local governments were given general authority by state law to regulate the sale and storage of gunpowder. *See e.g.,* 1845 Iowa Laws, at 119, § 12; 1836 Conn. Acts, at 105, § 20.

These consumer protection laws extended to shooting galleries as such galleries proliferated in the mid-1800s. Cornell Decl., 2-ER-146–148. These regulations required licensure to open a shooting gallery or limited the location of such galleries. For example, an 1857 Rhode Island law barred any pistol or rifle gallery in the "compact part of the town of Newport." 1857 R.I. Revised Statutes, at 204–05, ch. 80, § 2. An 1863 ordinance in Memphis, Tennessee prohibited pistol shooting galleries "in the first story of any building in [the] city" and

required a license before opening such a gallery. W.H. Bridges, *Digest of Charters & Ordinances of City of Memphis*, at 147–48, Art. VI., § 1 (1863). Other nineteenth century ordinances in San Francisco and New Orleans required a license or residential consent before opening a shooting gallery. *Ordinances & Joint Resolutions of City of S.F.*, at 220, Ordinance No. 498, § 13 (1854); H.J. Leovy, *Laws & Gen. Ordinances of City of New Orleans*, at 257, § 636 (1870).

The challenged statutes fit squarely within this well-established tradition of regulating firearms commerce to promote public safety. Like these early American laws, which restricted where and which firearms and gunpowder could be sold, and where shooting galleries could be located, the challenged statutes regulate firearms-related commercial activity on state property to promote public safety— and in doing so are not more burdensome than their predecessors.

The district court conceded that "th[e]se examples may show that states exercised regulatory power over the possession and sale of firearms and ammunition," but nevertheless concluded that the challenged statutes are inconsistent with this tradition. 1-ER-029. The district court made three errors in its analysis. First, it determined that the analogues "cannot act as a self-serving carveout for states to ban the sale of firearms or otherwise to infringe Second Amendment rights that are concomitant with First Amendment protections for commercial speech." 1-ER-030. This again erroneously replaces the Second

Amendment analysis with the First Amendment analysis. And as discussed, the challenged statutes do not violate the First Amendment, *ante*, Arg. I.A., and they are also consistent with historic regulation of firearms and ammunition.

Second, the district court concluded that the State Defendants did not identify historical analogues that "ban[ned] firearm sales in disfavored forums," or regulated public forums similar to the Fairgrounds. 1-ER-030. Yet the historic regulations discussed above similarly limited firearms-related sales and commerce locations for safety purposes, and place similar burdens on the purchase of weapons as the challenged laws.[9] And, the district court acknowledged that gun shows in the United States have made a "more modern appearance" in American history. 1-ER-028.

Third, the district court placed undue emphasis on the fact that firearm and ammunition sales are otherwise lawful outside of state property. 1-ER-30 ("None

_____

[9] As the Second Circuit recently observed, the fact that a "submitted record lacks legislation from a particular place" does not mean that "legislators there deemed such a regulation inconsistent with the right to bear arms." *Antonyuk* v. *Chiumento*, -- F.4th – (2d. Cir., Dec. 8, 2023), 2023 WL 8518003 at *29. "That inference is not commanded by *Bruen*, nor is it sound." *Id.* The Court noted that "[t]here are many reasons why the historical record may not evince statutory prohibitions on a given practice." *Id.* The Supreme Court "declin[ed] to establish ironclad rules and instead not[ed] considerations which would be 'relevant evidence'" in the analysis of whether statutes are relevant historical analogues. *Id.* Although the district court acknowledged that gun shows are a modern creation, 1-ER-028, it emphasized a legislator's description of the regulation as the first gun show ban in the country, when the laws do not in fact ban gun shows. 1-ER-30.

of the laws that Defendants identify as historical analogs banned the sale of otherwise-legal firearms[.]").  As discussed, the challenged statutes address the risk of firearms-related commerce in the gun-show setting, and the government has the historic authority to limit the location for firearm-related activity without violating the Second Amendment.  And, as noted, there is no historic right to purchase a firearm, ammunition, or precursor parts at any preferred location.  *Teixeira,* 873 F.3d at 680.

### c. The Challenged Statutes Fall Within the Government's Well-Established Authority to Regulate Firearms in Sensitive Places

The Supreme Court has "assume[d] it settled" that certain areas are "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment."  *Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.").  This was so even though the historical record before the Supreme Court in *Bruen* "yield[ed] relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited— e.g., legislative assemblies, polling places, and courthouses," because the Court was "aware of no disputes regarding the lawfulness of such prohibitions."  142 S. Ct. at 2133.  The Supreme Court also acknowledged that there may be "*new and*

analogous sensitive places [that] are constitutionally permissible." *Id.* (italics in original).

As declared by the historian Patrick Charles, the sensitive places doctrine is grounded in English tradition and "made [its] way into the American Colonies and subsequent United States." 2-ER-179; *see generally id*. at 2-ER-180–185 (discussing historical background of sensitive places). Throughout the nineteenth century, laws and regulations were adopted to prohibit armed assemblies. *See* Patrick J. Charles, *The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9 Geo. J.L. & Pub. Pol'y 323, 326–27, 374–90 (2011) ("[T]he Founding Fathers did not equate a random assemblage of armed people as comprising a 'well-regulated militia,' and instead viewed this assemblage as a dangerous mob."). For example, New Orleans and New Mexico prohibited the carrying of weapons into ballrooms. J. Bayon, *Gen. Digest of Ordinances & Resolutions of Corp. of New Orleans*, at 371, Art. 1 (1831); 1852 N.M. Laws, at 67, § 3.

This trend continued after the ratification of the Fourteenth Amendment. 1-ER-6–10. Tennessee in 1869 prohibited the carrying of dangerous weapons into "any election . . . fair, race course, or other public assembly of the people." J.H. Shankland, *Pub. Statutes of Tennessee Since 1858*, at 108, ch. 22, § 2 (1871). In 1870, Texas prohibited the carrying of dangerous weapons into, among other

places, a ballroom, circus, public exhibition, or assembly of people for amusement or educational purposes. G.W. Paschal, *Digest of the Laws of Tex.*, at 1322, Art. 6511 (1875). Arizona and Oklahoma did the same. 1889 Ariz. Sess. Laws, at 17, Act No. 13, § 3; W.T. Little, *Statutes of Oklahoma 1890*, at 496, ch. 25, § 7 (1891). Georgia and Missouri also prohibited the carrying of weapons at large gatherings. *See, e.g.*, R.H. Clark, Code of State of Ga., at 818, § 4528 (1873); J.A. Hockaday, *Revised Statutes of State of Mo.*, at 224, ch. 24, § 1274 (1879). Several cities prohibited the carrying of firearms in public parks, including New York City, Chicago, and Boston. *Minutes of Proceedings of Bd. of Comm'rs of Central Park, N.Y. for Year Ending April 30, 1858,* at 166; M.F. Tuley, *Laws and Ordinances Governing City of Chi.*, at 88–89, ch. 31, § 6 (1873); *City of Boston Dep't of Parks Twelfth Ann. Report of Bd. of Comm'rs for 1886*, at 86, § 3 (1887).

This multitude of sensitive places laws are no less restrictive than the challenged statutes' prohibition on the *sale*—as opposed to the carrying—of firearms and ammunition on state property. SB 264 and SB 915 also share a similar purpose to the analogues identified—protecting the public welfare in locations where a large group of people gather—and thus is comparably justified.

Despite the district court's conclusion to the contrary, 1-ER-029, the Fairgrounds and other state property fairgrounds are sensitive places. The Fairgrounds property consists of government buildings with indoor and outdoor

spaces that are frequently rented out for events hosting large gatherings of people.[10]  The district court concluded that the Fairgrounds cannot be a sensitive place because it has hosted gun shows for the past 30 years, 1-ER-029, but that assumes that laws cannot be enacted with respect to sensitive places to address public safety concerns as they arise.  There is no authority for such a proposition. The district court also concluded that the State had not met its burden of identifying a historical analog to the proposed firearm regulation, *id.*, but this is again "an erroneous conclusion that the State's evidence was insufficiently analogous." *Antonyuk*, 2023 WL 8518003 at *45.  "Properly construed," the State's evidence "establishes a historical tradition of firearm regulation" in the same vein as the challenged statutes—"the opposite of historical silence." *Id.*

Government properties where people regularly congregate for large-scale events—implicating concerns about public safety—are necessarily sensitive places.  Indeed, at least one post-*Bruen* court has recognized that, because "thousands of people and children [are] present in often crowded conditions" at a state fair, fairgrounds property is a sensitive place. *Christopher v. Ramsey Cty.*, No. CV 21-2292 (JRT/ECW), 2022 WL 3348276, at *5 (D. Minn. Aug. 12, 2022)

---

[10] For context, the property map for the OC Fair & Event Center is  available at https://s3.us-west-1.amazonaws.com/ocfair.com/wp-content/uploads/2021/11/04082618/Property-Map-Update-2019-LetterSize-GX7587-R2.pdf.

(citing, among other cases, *Nordyke v. King*, 563 F.3d 439, 459 (9th Cir. 2009), *vacated on other grounds by* 611 F.3d 1015 (9th Cir. 2010), which similarly held that fairgrounds property is a sensitive place).

And Plaintiffs have acknowledged that the public cannot freely carry firearms at gun shows in California.  Pls.' Resp. to State Defs' Second Suppl. Br., ECF No. 32 at 12.  Any firearms brought into a gun show by a member of the public must be checked, cleared of any ammunition, secured in a manner to prevent operation, and tagged before the person is admitted to the show.  Cal. Penal Code § 27340(b).  Similarly, any ammunition brought into a gun show by a member of the public must be checked and secured in a manner that prevents the ammunition from being discharged.  Cal. Penal Code § 27340(c).  Thus, although gun shows have been held at the Fairgrounds for many years, the Fairgrounds has been treated as a sensitive place.

## II.    PLAINTIFFS HAVE NOT ESTABLISHED IRREPARABLE HARM

Plaintiffs' allege that they will suffer irreparable harm through deprivation of their constitutional rights.  However, their claims are not likely to succeed on the merits, *ante*, Argument I.  And without an injunction, Plaintiffs and the public may still gather and engage in gun-related activities and speech on state property; they still may have gun shows and engage in "firearm safety training," "admiration of guns as arts[,]" discuss "defense of self and others[,]" "hunting[,] target shooting[,]

[and] gunsmithing[,]" 2-ER-264. And, should they wish to, they may continue to purchase arms and ammunition outside of state property. 2-ER-197.

## III. THE EQUITIES FAVOR A STAY

"'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland v. King* (2012) 567 US 1301, 1303, citation omitted. That is especially true here, where the challenged laws address the State's compelling interest in public safety and reducing gun violence. *Ante*, Statement of the Case, I.B-D, Arg. I.A.2.a.

The legislative history and findings behind SB 264, SB 915, and AB 893 all highlight the concern of illegal transactions at gun shows or risks of firearms trafficking. SB 264 and AB 893's legislative findings describe several concerning incidents at gun shows— an official vendor accused of trafficking of illegal firearms, sales of firearms to individuals who are prohibited from possessing firearms, and illegal importation of large-capacity magazines. SB 264, § 1(e) (Add-011); AB 893, § 1(e) (Add-006) And from 2013 to 2017, the San Diego County Sheriff recorded 14 crimes at gun shows held by B&L at the Del Mar Fairgrounds. AB 893, § 1(f) (Add-006). The legislative history of all three bills also generally describe the risk of firearms trafficking at gun shows. *E.g.*, 2-ER-214–16, 223–224, 230–232, 237–39. Indeed, the APPS reports from 2021 and 2022 also provide specific examples of illegal commerce at gun shows in

California—a felon purchasing a gun magazine, and a firearms dealer selling assault weapons without the proper permits.[11]

Given the rationale for the challenged statutes, "[t]he costs of being mistaken[] on the issue of whether the injunction would have a detrimental effect on []gun crime, violence . . . would be grave. These costs would affect members of the public, and they would affect the Government which is tasked with managing []gun violence." *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015), *aff'd*, 637 F. App'x 401 (9th Cir. 2016). In contrast, without an injunction, the public can still engage in gun-related activities and speech, and can still purchase and bear arms.

## CONCLUSION

The State Defendants respectfully request that the Court reverse the district court's ruling granting Plaintiffs' motion for preliminary injunction.

---

[11] *Ante*, n.1.

Dated:  January 16, 2024          Respectfully submitted,


ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
MATTHEW WISE
LARA HADDAD
Supervising Deputies Attorney General

/s/ NICOLE J. KAU
NICOLE J. KAU
Deputy Attorney General
*Attorneys for Defendants-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* [http://www.ca9.uscourts.gov/forms/form17instructions.pdf](http://www.ca9.uscourts.gov/forms/form17instructions.pdf)

**9th Cir. Case Number(s)**  | 23-3793

The undersigned attorney or self-represented party states the following:

○  I am unaware of any related cases currently pending in this court.

○  I am unaware of any related cases currently pending in this court other than the
case(s) identified in the initial brief(s) filed by the other party or parties.

◉  I am aware of one or more related cases currently pending in this court. The
case number and name of each related case and its relationship to this case are:

> The related case is B&L Prods., Inc. v. Newsom, 23-55431 (9th Cir.), in
> which plaintiffs challenge a similar statute to those challenged in this
> matter, precluding the sale of firearms, precursor parts, and ammunition at
> the Del Mar Fairgrounds in San Diego County.  The main parties are the
> same in both cases.  The cases have been coordinated for oral argument.

**Signature**  | /s/ Nicole J. Kau          **Date**  | Jan 16, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 17**                                                    *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 23-3793 |

I am the attorney or self-represented party.

**This brief contains** | 13,277 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties.
- [ ] a party or parties are filing a single brief in response to multiple briefs.
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated | |.

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Nicole J. Kau | **Date** | January 16, 2024 |

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*

# CERTIFICATE OF SERVICE

Case Name:   **B&L Productions, Inc., et al. v.**   No.   **23-3793**
               **Gavin Newsom, et al. [Appeal]**

I hereby certify that on <u>January 16, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## STATE APPELLANTS' OPENING BRIEF

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>January 16, 2024</u>, at Los Angeles, California.

|  |  |
|---|---|
| J. Sissov | */s/ J. Sissov* |
| Declarant | Signature |

SA2023306200
66511148.docx