Case No. 23-3793

In the United States Court of Appeals
for the Ninth Circuit

_____

GAVIN NEWSOM,
in his official capacity as Governor of the State of California and in his personal
capacity, et al.,
*Defendants-Appellants*,

v.

B & L PRODUCTIONS, INC., et al.,
*Plaintiffs-Appellees.*

_____

On Appeal from the United States District Court
for the Central District of California
Case No. 8:22-cv-01518 JWH (JDEx)
Honorable John W. Holcomb

_____

**APPELLEES' ANSWERING BRIEF**

_____

C.D. Michel
Anna M. Barvir
Tiffany D. Cheuvront
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444
cmichel@michellawyers.com

Donald Kilmer
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Rd.
Caldwell, Idaho 83607
(408) 264-8489
don@dklawoffice.com

*Attorneys for Plaintiffs-Appellees*

January 30, 2024

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1(a) of the Federal Rules of Appellate Procedure, counsel for Plaintiffs-Appellees make these disclosures:

### B&L PRODUCTIONS, INC., DBA CROSSROADS OF THE WEST

B&L Productions, Inc., is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC.

California Rifle & Pistol Association, Inc. ("CRPA"), is a California nonprofit organization. CRPA is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION

Asian Pacific American Gun Owners Association is a California nonprofit organization, is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### SECOND AMENDMENT LAW CENTER

Second Amendment Law Center is a nonprofit organization, is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### SECOND AMENDMENT FOUNDATION

The Second Amendment Foundation ("SAF") is a nonprofit organization. SAF is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

Date: January 30, 2024

**MICHEL & ASSOCIATES, P.C.**

s/ Anna M. Barvir
_____
Anna M. Barvir
*Attorneys for Plaintiffs-Appellees B&L*
*Productions, Inc., d/b/a Crossroads of the West;*
*Gerald Clark; Eric Johnson; Chad Littrell; Jan*
*Steven Merson; California Rifle & Pistol*
*Association, Incorporated; Asian Pacific American*
*Gun Owners Association; Second Amendment Law*
*Center, Inc.*

Date: January 30, 2024

**LAW OFFICES OF DONALD KILMER, APC.**

s/ Donald Kilmer
_____
Donald Kilmer
*Attorney for Plaintiff-Appellee Second Amendment*
*Foundation*

ii

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ................................................................. i

Table of Contents ..................................................................................... iii

Table of Authorities ................................................................................. v

Jurisdictional Statement ........................................................................... 1

Statement Regarding Addendum ............................................................... 1

Statement of the Issue Presented ............................................................. 1

Statement of the Case .............................................................................. 1

I.      Factual Background ........................................................................ 1

II.     Procedural History ......................................................................... 5

III.    The Decision on Appeal ................................................................. 6

Summary of Argument .............................................................................. 7

Argument .................................................................................................. 10

I.      Standard of Review ........................................................................ 10

II.     The District Court Correctly Held that Appellees Are Likely to Succeed on the Merits of Their First Amendment Claims ............................................. 11

        A.      The Challenged Statutes violate the First Amendment's prohibition against censorship of "pure" speech. ........................................... 11

                1.      The Challenged Statutes restrict protected expression in a public forum. .................................................................................. 13

                2.      The Challenged Statutes are content-based and viewpoint-discriminatory. ....................................................................... 14

        B.      The Challenged Statutes violate First Amendment under the commercial speech doctrine. .................................................... 18

1. At minimum, the Challenged Statutes restrict commercial speech. ............................................................. 18

2. The Challenged Statutes cannot survive heightened scrutiny under the commercial speech doctrine. ........................................... 21

IV. The District Court Correctly Held That Appellees Are Likely to Succeed on the Merits of Their Second Amendment Claims ................................. 25

    A. The plain text of the Second Amendment protects Appellees' right to engage in lawful commerce in arms. ........................................... 26

    B. There is no enduring historical tradition of relevant firearm regulation. 29

        1. Under *Bruen*, the Founding Era is the relevant period, and the State identified only a single law from that time. .......................... 31

        2. The State's status as proprietor of a public marketplace does not confer the broad power to ban constitutionally protected activities. ................................................................. 33

        3. The State's proposed historical analogues are not "relevantly similar" to the Challenged Statutes. ................................. 37

            a. Regulations on the commercial sale of arms. .................... 37

            b. Restrictions on arms in "sensitive places" and other places where people gather. .................................. 44

V. The District Court Correctly Held that Appellees Are Likely To Succeed on the Merits of Their Equal Protection Claim ................................. 47

VI. The District Court Correctly Found that Appellees Would Suffer Irreparable Harm Without Injunctive Relief ............................................. 48

VII. The District Court Acted Within Its Discretion in Holding that the Public Interest and the Balance of the Equities Favor Injunctive Relief .................. 49

Conclusion ................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ...................................................... 10

*Am. Civ. Libs. Union v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) ........................................................ 49

*Am. Trucking Ass'ns v. City of Los Angeles,*
  559 F.3d 1046 (9th Cir. 2009) ...................................................... 10

*Ark. Writers' Project v. Ragland,*
  481 U.S. 221 (1987) ...................................................................... 15

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004) ...................................................................... 10

*B & L Prods., Inc. v. Newsom,*
  No. 21-cv-1718, 2023 WL 3443280 (S.D. Cal 2023) ................... 27

*B & L Prods., Inc., v. 22nd Dist. Agric. Ass'n,*
  394 F. Supp. 3d 1226 (S.D. Cal. 2019) ..................................passim

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) ........................................................................ 17

*Bolger v. Youngs Drug Prods. Corp.,*
  463 U.S. 60 (1983) ........................................................................ 25

*Bonidy v. U.S. Postal Serv.,*
  790 F.3d 1121 (10th Cir. 2015) ................................................ 35, 36

*Cent. Hudson Gas & Elec. Comm'n v. Pub. Serv. Comm'n,*
  447 U.S. 557 (1980) ...................................................................... 21

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
  __U.S.__, 142 S. Ct. 1464 (2022) .............................................. 15

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
  473 U.S. 788 (1985) ...................................................................... 12

v

*District of Columbia v. Heller*,
    554 U.S. 570 (2008).................................................................. 24, 32, 33, 44

*Doe v. Harris*,
    772 F.3d 563 (9th Cir. 2014)....................................................... 48

*Edwards v. City of Coeur D'Alene*,
    262 F.3d 856 (9th Cir. 2001)....................................................... 24

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011)....................................................... 27

*Frisby v. Schultz*,
    487 U.S. 474 (1988).................................................................... 23

*GeorgiaCarry.org, Inc. v. Georgia*,
    687 F.3d 1244 (11th Cir. 2012)................................................... 35

*Grosjean v. Am. Press Co.*,
    297 U.S. 233 (1936).............................................................. 35, 47

*Harris v. Bd. of Supervisors, L.A. Cnty.*,
    366 F.3d 754 (9th Cir. 2004).................................................. 11, 17

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*,
    452 U.S. 640 (1981).................................................................... 15

*Hernandez v. Garland*,
    47 F.4th 908 (9th Cir. 2022)....................................................... 28

*Hustler Magazine v. Falwell*,
    485 U.S. 46 (1988)...................................................................... 11

*Index Newsps. LLC v. U.S. Marshalls Serv.*,
    977 F.3d 817 (9th Cir. 2020)....................................................... 49

*Jackson v. City & Cnty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014)....................................................... 27

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009)..................................................... 49

*Konigsberg v. State Bar of Cal.*,
    366 U.S. 36 (1961)...................................................................... 26

*Kuba v. 1-A Agric. Ass'n,*
    387 F.3d 850 (9th Cir. 2004) ............................................................. 21

*Landis v. Wash. State Major League Baseball Stadium Pub. Facilities Dist.,*
    11 F.4th 1101 (9th Cir. 2021) ........................................................... 17

*Lands Council v. McNair,*
    537 F.3d 981 (9th Cir. 2008) ....................................................... 10, 11

*Lorillard Tobacco v. Reilly,*
    533 U.S. 525 (2001) ........................................................................ 11

*M&T Bank v. SFR Invs. Pool 1, LLC,*
    963 F.3d 854 (9th Cir. 2020) ........................................................... 11

*Malloy v. Hogan,*
    378 U.S. 1 (1964) ........................................................................... 32

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ................................................................... 24, 32

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) ........................................................... 48

*Miller v. Gammie,*
    335 F.3d 889 (9th Cir. 2003) ........................................................... 28

*Minn. Star & Trib. Co. v. Minn. Comm'r of Revenue,*
    460 U.S. 575 (1983) ................................................................... 35, 47

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022) ...................................................................... passim

*NAACP v. Ala. ex rel. Patterson,*
    357 U.S. 449 (1959) ........................................................................ 12

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................ 49

*Nordyke v. King,*
    681 F.3d 1041 (9th Cir. 2012) ....................................................... 9, 34

*Nordyke v. Santa Clara Cnty.,*
    110 F.3d 707 (9th Cir. 1997) ....................................................... passim

*Norfolk & W. R. Co. v. Sims*,
    191 U.S. 441 (1903) ................................................................. 19

*People v. Haney*,
    100 Cal. App. 295 (1929) ................................................... 18, 19

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
    460 U.S. 37 (1983) ..................................................................... 14

*Police Dep't of Chic. v. Mosley*,
    408 U.S. 92 (1972) ...................................................... 14, 34, 47

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ................................................................. 16

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ............................................................ 14, 15

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ................................................. 50

*Romer v. Evans*,
    517 U.S. 620 (1996) ................................................................. 34

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973) ..................................................................... 35

*Se. Promos., Ltd. v. Conrad*,
    420 U.S. 546 (1975) ................................................................. 17

*Solomon v. Cook Cnty. Bd. of Comm'rs*,
    559 F. Supp. 3d 675 (N.D. Ill. 2021) ..................................... 36

*Sorrell v. IMS Health, Inc.*,
    564 U.S. 552 (2011) ................................................................. 17

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (2017) ........................................................ passim

*United States Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973) ................................................................. 13

*United States v. Class*,
    930 F.3d 460 (D.C. Cir. 2019) ................................................ 36

*United States v. Holton*,
639 F. Supp. 3d 704 (N.D. Tex. 2022) ........................ 43

*United States v. Jones*,
565 U.S. 400 (2012) ........................................ 32

*United States v. Playboy Entm't Grp., Inc.*,
529 U.S. 803 (2000) ........................................ 13

*United States v. Serrano*,
651 F. Supp. 3d 1192 (S.D. Cal. 2023) ....................... 38

*W. F. Boardman Co. v. Petch*,
186 Cal. 476 (1921) ........................................ 19

*Yu v. Idaho State Univ.*,
15 F.4th 1236 (2021) ....................................... 17

**Statutes**

1 Mark Ash,
The New York City Consolidation Act, as in Force in 1891 § 455 (1891), *available at* https://www.google.com/books/e dition/The_New_York_City_Consolidation_ Act_as_i/8nZCAQAAMAAJ?hl=en&gbpv=1&pg=PA209&printsec= frontcover) ................................................ 42

1 William W. Hening,
*The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature in the Year 1619*, Act LVI (1823), *available at* https://babel.hathitrust. org/cgi/pt?id=nyp.33433081883302&seq=200 ..................... 33, 38, 39, 40

2 William W. Hening,
Laws of Va. from First Sess. of Legis. in 1619, (1823)................ 33, 39, 40

11A Wright and Miller,
Fed. Prac. & Proc. Civ. § 2948.1 (3d ed. 2023) .................. 48

18 U.S.C. § 922.............................................. 3

63 Proceedings and Acts of the General Assembly 338, § 5 (June 15-July 3, 1773).... 34

1652 N.Y. Laws 128, *Ordinance of Dir. & Council of New Netherland* ............... 33

1776 R.I. Pub. Laws ......................................... 43

1776-77 N.J. Laws .......................................... 43

1794 Pa. Laws, ch. 337 ............................................................................... 43

1808 Mass. Acts, ch. 52 ............................................................................... 43

1820 N.H. Laws, ch. 25 ............................................................................... 43

1821 Me. Laws 98-99, ch. 25, § 5 ................................................................ 42

1825 N.H. Laws, ch. 61, § 5 ....................................................................... 44

1836 Conn. Acts 105 (Reg. Sess.), chap. 1, § 20 ......................................... 42

1857 R.I. Revised Statutes, ch. 80, § 2 ...................................................... 40

Bridges, William H.,
    *Digest of Charters & Ordinances of City of Memphis*, art. VI, § 1 (1863) .......... 40

Browne, W.H.,
    Proc. & Acts of Gen. Assemb. of Md., Jan. 1637/8–Sept. 1664, § 5 (1883) .......... 33

Cal. Penal Code § 26805 ............................................................................. 19

Cal. Penal Code § 26815 ........................................................................ 3, 19

Cal. Penal Code § 27310 ........................................................................ 2, 19

Cal. Penal Code § 27540 ............................................................................. 19

Cal. Penal Code § 27545 ............................................................................. 19

Cal. Penal Code § 27575 ............................................................................... 3

Cal. Penal Code § 28215 ............................................................................... 2

Leovy, Henry J.,
    *Laws & Gen. Ordinances of City of New Orleans*, § 636 (1870) ........................ 41

N.H. Laws, ch. 117, § 7 ............................................................................... 44

O'Callaghan, E.B., *Laws and Ordinances of New Netherland, 1638-1674* (1868), *available at*
    https://www.google.com/books/edition/Laws_and_Ordinances_
    of_New_Netherland_16/PnYDAAAAQAAJ?hl=en&gbpv=1&pg=PA138&prints
    ec=frontcover ........................................................................................... 39

Ordinances & Joint Resolutions of City of S.F., Ordinance No. 498, § 13 (1854) ...... 40

Trumbull, James,
  *Public Records of the Colony of Conn., May 1665* (1850)..........................33, 38, 39

**Constitutional Provisions**

U.S. Cont., Amend. I..................................................................................passim

U.S. Cont., Amend. II.............................................................................32, 48

U.S. Cont., Amend. XIV ...............................................................................32

**Other Authorities**

32nd District Agricultural District,
  *Board of Directors Governing Manual*, Introduction 1, *available at* https://s3.us-west-
  1.amazonaws.com/ocfair.com/wp-content/uploads/2021/02/02141413/Policy-
  Combo-All.pdf (last visited Mar. 10, 2023) ...................................................37

Assem. Pub. Safety Committee Hrg., Mar. 16, 2021, available at
  https://www.assembly.ca.gov/media/assembly-public-safety-
  committee20210713/video (last accessed Aug. 4, 2022) .....................................16, 35

Bureau of Alcohol, Tobacco, Firearms, and Explosives,
  *Gun Shows: Brady Checks and Crime Gun Traces* (Jan. 1999), available at
  https://www.atf.gov/file/57506/download (last visited Mar. 10, 2023) ................46

Volokh, Eugene,
  *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443
  (2009) .......................................................................................................36

Thomas, Matthew E.,
  *Historic Powder Houses of New England: Arsenals of American Independence* 16-18 (2013) 42

Sen. Pub. Safety Committee Hrg.,
  Mar. 16, 2021, at 4:12:59, available at https://www.senate.ca.gov/media-
  archive/default?title=Public+Safety&startdate= 03%2F16%2F2021&enddate
  =03%2F17%2F2021 (last accessed Aug. 4, 2022)..........................................16, 35, 45

## JURISDICTIONAL STATEMENT

Appellees agree with the State's Jurisdictional Statement. A.O.B.4.

## STATEMENT REGARDING ADDENDUM

An addendum reproducing relevant constitutional and statutory provisions is bound with this brief.

## STATEMENT OF THE ISSUE PRESENTED

Whether the district court abused its discretion by preliminarily enjoining two state laws barring the sale of firearms, ammunition, and firearm parts at all state-owned venues, effectively banning gun shows and the pro-gun speech and lawful commerce in arms that takes place at such events, while leaving the venue open to practically all other manner of speech and commerce.

## STATEMENT OF THE CASE

### I.   FACTUAL BACKGROUND

B&L Productions, Inc., has operated "popular, safe, heavily regulated, legal, and family-friendly gun shows" gun shows at the Orange County Fair & Event Center ("OC Fairgrounds") every year for the past 30 years. 1-ER-006 (citing 2-ER-244, 246). B&L's gun shows bring together like-minded individuals "to engage in commerce related to, and necessary for, the lawful and regulated exercise of Second Amendment rights." 2-ER-244; 2-SER-335-79. "Although the sales of firearms [are] a major factor driving the popularity and profitability of the gun shows, participants also exchange[] information regarding hunting, target practice, firearm training and safety, gunsmithing, and political advocacy." 1-ER-006; 2-SER-335-76.

1

California has one of the most rigorous regulatory regimes for commerce in firearms and ammunition in the United States. This also true for sales at gun shows, where laws regulating commerce in firearms are in many ways at their strictest. As the district court observed:

> Only state-approved, licensed gun show producers may operate gun shows in California; a 'producer' is defined as one who holds a Certificate of Eligibility issued by the California Department of Justice. (Footnote omitted.) Gun show producers must certify that they are familiar with all California laws and regulations regarding gun shows; they must possess a minimum of $1,000,000 in liability insurance; they must provide an annual list of such shows or events to the California Department of Justice; and they must provide law enforcement with a list of all vendors that will participate in the gun show to sell, lease, or transfer firearms. Cal. Penal Code § 27200 & 27205. (Footnote omitted.) Vendors must also provide an annual event and security plan to the California Department of Justice and to local law enforcement agencies. (Footnote omitted.)

1-ER-006. "Gun shows must also follow California's Gun Show Act of 2000, Cal. Penal Code §§ 27200-27245, which places many additional regulations on gun shows in California." 1-ER-007. California gun show laws cover all manner of conduct at these events. *See* Addendum (listing the state laws regulating gun shows).

These gun-show-specific regulations are on top of California's laws governing the lawful sale of firearms and ammunition at permanent retail locations in the state—laws that apply with equal force to transactions initiated at gun shows. Cal. Penal Code § 27310. No law that applies to the lawful sale of firearms or ammunition at brick-and-mortar gun stores is excused at gun shows. Firearm purchasers at gun shows are subject to the same background checks, *id.* § 28215, the same 10-day

waiting period, *id.* § 26815(a), and the same proof of residency requirement, 18 U.S.C. § 922(a)(3), (b)(3).

As the district court found, no firearm transfer may lawfully take place at any gun show in California absent narrow exceptions applicable only to law enforcement. 1-ER-007. "Firearm sales may be initiated through an on-site licensed 'transfer dealer,' but delivery of the firearm cannot be completed at the gun show. Instead, purchasers must pick up their purchased firearm at a licensed retailer at a different location, following a 10-day waiting period and successful background check." 1-ER-007. In short, there is no "gun show loophole" in California.

Even with this comprehensive scheme in place, "Senator Dave Min, acting upon his campaign promise … "to author legislation for a ban on these gun shows at the [OC] Fairgrounds once and for all,' sponsored Senate Bill 264 ("SB 264")." 1-ER-008. The bill amended California Penal Code section 27575, and it bars any "officer, employee, operator, lessee, or licensee of the [District]" from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any firearm, firearm precursor part, or ammunition on the property or in the building that comprise the OC [Fairgrounds]." 1-ER-008; 1-SER-117. "SB 264 does not bar the possession of firearms at the [OC] Fairgrounds, and it contains exceptions for law enforcement and gun buyback programs." 1-ER-008.

"Building upon SB 264's ban on sales of firearms at the [OC Fairgrounds], Senator Min next introduced SB 915." 1-ER-009. SB 915 added section 27573 to the Penal Code and expands the ban on "contract[ing] for, authoriz[ing], or allow[ing] the

sale of any firearm, firearm precursor part, or ammunition" to *all* state-owned properties. 1-SER-152-53.

The legislative histories of SB 264 and SB 915[1] make clear that the laws were intended to end gun shows at the OC Fairgrounds (and all state-owned venues) by banning the buying and selling of firearms, ammunition, and firearm parts on such properties. 2-ER- 230-34, 38-41; 1-SER-117, 122-25, 130-31, 136-140, 145-48, 157-60, 165-66, 171-72, 175-77, 183-85. As the district court acknowledged, Senator Min, in his comments to the Senate Public Safety Committee, "stated that 'SB 264 will ensure that the state is not profiting from the sale of firearms and ammunition on state property or facilitating gun shows that would undermine California's strong firearm regulations.'" 1-ER-008 (citing 2-ER-280). "He went on to explain that even if no unlawful activities occurred at gun shows, 'there is a principal [sic] that taxpayers should not be utilized, and taxpayer venues should not be utilized to promulgate the distribution of more guns into our communities.'" 1-ER-008-09 (citing 2-ER-280).

Essentially, even though the Challenged Statutes do not expressly state that they "ban" gun shows, that is what they do. B&L had been unable to schedule or host a gun show at the OC Fairgrounds or any other state-owned property since before the Challenged Statutes took effect. 2-SER-339-41. And Senator Min issued a press release declaring that "[l]ast year we laid the foundation for this moment with a ban on gun shows at the [OC] Fairgrounds. Today, I am proud to announce that

---

[1] Appellees refer to SB 264 and SB 915 as the "Challenged Statutes."

California will become the first in the nation to enact a total ban statewide." 1-ER-009 (citing 2-ER-282).

## II.  PROCEDURAL HISTORY

Because the law effectively bans "gun shows" at the OC Fairgrounds and all other state-owned venues, B&L Productions, a gun show promoter, together with several individuals, organizations, and vendors, sued in the Central District, alleging that the Challenged Statutes violate the First Amendment, Second Amendment, and Equal Protection Clause. 2-ER-242-305.[2]

Plaintiffs-Appellees promptly filed a motion for a preliminary injunction on November 16, 2022. 2-ER-316. After it was fully briefed, at the State's request, the Honorable John W. Holcomb ordered the parties to submit simultaneous supplemental briefing on B&L's Second Amendment claim. 2-ER-316. After reviewing the parties' briefs, Judge Holcomb issued a second order for supplemental briefing. 2-ER-317. A hearing on the motion was held, and the court took the matter under submission. 2-ER-318.

On October 30, 2023, the district court granted B&L's motion for preliminary injunction, holding that B&L is likely to succeed on the merits of each of their constitutional claims and that the remaining factors for preliminary relief favored injunctive relief. 1-ER-005, 030-33. The court also denied the State's motion, made during oral argument, to stay the preliminary injunction pending appeal. 1-ER-032-33.

---

[2] This case is a companion to *B&L Productions, Inc., v Newsom*, Case No. 23-55431. Both cases challenge California's gun shows bans at public venues. The companion case relates to the Del Mar Fairgrounds in San Diego County. Appellees refer to that appeal as the *Del Mar Case* to avoid confusion.

Two weeks later, the State asked the district court to reconsider the denial of its motion for a stay. 2-ER-319. The district court denied the motion. 2-ER-320.

The State appealed to this Court on November 27, 2023. 2-ER-319.

## III. THE DECISION ON APPEAL

First, the district court held that Appellees had established a likelihood of succeeding on their First Amendment claims. The court rejected the State's arguments that, because "the act of exchanging money for a gun is not 'speech,'" the Challenged Statutes do not restrict speech. 1-ER-016 (quoting *Nordyke v. Santa Clara Cnty.*, 110 F.3d 707, 710 (9th Cir. 1997)). It did so because the Challenged Statutes "exceed the mere prohibition of 'exchanging money for a gun.'" 1-ER-016. The court then held that the laws unconstitutionally infringe on commercial speech and censor expressive conduct. 1-ER-014-19. The court also held that Appellees could likely prove that the State was engaging in viewpoint discrimination of "otherwise lawful guns shows." 1-ER-022-23.

Second, the district court held that the Challenged Statutes likely violate the Second Amendment. Unlike the district court in the *Del Mar Case*, the trial court provided the State with ample opportunities to create a historical record sufficient to justify its modern gun show ban. 1-SER-002-82 (parties' supplemental briefing and appendix of proposed historical analogues). After reviewing the parties' submissions, the court held that the State had failed to prove that history supports an arbitrary ban on the sale of arms on public property while allowing gun sales in brick-and-mortar shops to continue. 1-ER-030. In short, the court held, even though "[t]he right to sell firearms is neither freestanding nor unlimited, … neither is the state's ability to

6

impose restrictions on firearms that are inconsistent 'with the Second Amendment's text and historical understanding.'" 1-ER-030 (citing *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 26 (2022)).

Third, because the trial court found that Appellees are likely to succeed on their viewpoint discrimination claims, it concluded that Appellees were also likely to prevail on their Equal Protection claims. 1-ER-30-31. It was thus unnecessary for the court to reach the question of whether Appellees could prevail under a "class-of-one" theory. 1-ER-031.

Finally, the court held that Appellees had suffered and would continue to suffer irreparable harm if preliminary relief were denied and that the balance of equities and the public interest tip in Appellees' favor. 1-ER-30-31.

## SUMMARY OF ARGUMENT

Gun shows are public gatherings where people assemble and engage in lawful expressive activity. Thousands of these shows take place in towns throughout the United States every year, in community centers, public auditoriums, and fairground exposition halls. At these events, licensed gun dealers—who must comply with all applicable gun laws—display and sell firearms and related products. Other vendors sell rare coins, military memorabilia, jewelry, home décor, camping equipment, and books. Still other vendors market services like gunsmithing, self-defense courses, and guided hunting trips. Second Amendment commerce may be the main attraction, but patrons are also there to engage in protected speech about firearms and the preservation of their rights, and to enjoy the fellowship of like-minded people.

California objects to these commercial and cultural events taking place on public property. California thus passed several laws banning any event on state-owned properties if firearms, ammunition, or "firearm precursor parts" are to be sold. The stated purpose of these laws is to ban gun shows on state-owned property. But the government cannot establish that its ban is necessary to stop a known safety problem. There is no evidence that California's gun shows—already well regulated—pose some unique threat to public safety. California has identified no constitutionally valid interest that might justify its ban. Nor has it identified an American tradition of restricting the sales (or speech related to sales) of legal arms on public property. Instead, the legislative history reveals the legislators' bare desire to make a symbolic value statement about guns and gun shows.

The district court thus preliminarily enjoined the Challenged Statutes, holding that Appellees were likely to succeed on their constitutional claims. Although preliminary injunction orders are generally reviewed for an abuse of discretion, California urges this Court to review this matter de novo because, the State claims, it concerns only issues of law. The State should be careful what it wishes for. Reviewing this case de novo, based on existing case law, heavily favors affirmance.

Gun show litigation has been kicking around the Ninth Circuit for decades. In 1995, Santa Clara County tried to ban gun shows at its fairgrounds by using a lease provision to ban the sale—but not the possession— of firearms at that facility. The Ninth Circuit held that a ban on the "sale" of firearms at the fairgrounds was overbroad because it abridges commercial speech associated with the sale of lawful products. *Nordyke 1997*, 110 F.3d at 713. In 1999, Alameda County banned

possession—but not sales—of guns at gun shows. After more than a decade of litigation, the county reversed its interpretation of its own ordinance to allow the possession of "properly secured" guns as commercial products at gun shows. *Nordyke v. King*, 681 F.3d 1041, 1045-46 (9th Cir. 2012). In 2018, the 22nd DAA, at the urging of Governor Newsom, imposed a moratorium on gun shows at the Del Mar Fairgrounds. That ban was struck down by the Southern District on First Amendment and equal protection grounds. *B&L Productions, Inc., v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226, 1249 (S.D. Cal. 2019).

If banning possession of firearms at gun shows at fairgrounds is a bridge too far (*Nordyke 2012*), if banning sales implicates commercial speech (*Nordyke 1997*), and if gun shows are themselves imbued with activities protected by the First Amendment and Equal Protection Clause (*B&L 2019*), then the district court's order below can be affirmed (and the companion *Del Mar Case* summarily reversed) based on existing circuit precedent. The only new wrinkle—which also dictates affirmance—is the Supreme Court's latest directive to analyze Second Amendment claims under the doctrines articulated in *Bruen*.

Even before *Bruen*, California should have been on notice that—without an intervening constitutional amendment or superseding case law from the Supreme Court or this circuit—further attempts to ban the lawful commerce at gun shows at public venues open to all for commercial purposes, is beyond the power of government. The state of the law after *Bruen* only solidified the preexisting and well-developed state of the law in this circuit on this issue.

The essence of this case is that firearms are still lawful (constitutionally protected) products, and the commercial speech associated with their sale is still protected by the First Amendment and the Equal Protection Clause. The *Bruen* decision mandates the same outcome, on stronger grounds. The decision below must be affirmed.

## ARGUMENT

### I. STANDARD OF REVIEW

Applicants seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). On appeal, this Court must give the lower court substantial deference in its decision to grant a preliminary injunction; the decision is reviewed on appeal only for abuse of discretion. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); *see also Ashcroft v. ACLU*, 542 U.S. 656, 664 (2004) (noting that the Supreme Court, "like other appellate courts, has always applied the abuse of discretion standard on the review of a preliminary injunction").

"An abuse of discretion will [only] be found if the district court based its decision 'on an erroneous legal standard or clearly erroneous finding of fact.'" *All. for Wild Rockies*, 632 F.3d at 1131 (quoting *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc)). This Court has thus explained that it "will not reverse the district court where it 'got the law right,' even if [it] 'would have arrived at a different

result,' so long as the district court did not clearly err in its factual determinations." *Id.* (quoting *Lands Council*, 537 F.3d at 987).

Only when the district court's ruling rests *solely* on a premise of law and the facts are either established or undisputed, is de novo review appropriate. *Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 760 (9th Cir. 2004). The State's argument that the entire order granting the preliminary injunction should be reviewed de novo, A.O.B.15, is thus an implied admission that the district court's findings of fact are undisputed and cannot be second-guessed by this Court unless clearly erroneous.

## II. THE DISTRICT COURT CORRECTLY HELD THAT APPELLEES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIMS

### A. The Challenged Statutes violate the First Amendment's prohibition against censorship of "pure" speech.

The district court, applying the doctrine of constitutional avoidance, passed on Appellees' "pure" speech claims because the matter could be resolved under the narrower commercial speech claim. 1-ER-9. Appellees are not prepared to abandon these "pure speech" claims for at least two reasons. First, Justice Thomas has observed "that there is no "philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech." *Lorillard Tobacco v. Reilly*, 533 U.S. 525, 575 (2001) (Thomas, J., concurring). Second, a district court's decision may be affirmed on any ground supported by the record, even if not relied upon by the district court. *See M&T Bank v. SFR Invs. Pool 1, LLC*, 963 F.3d 854, 857 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2566 (2021).

The First Amendment embodies a national commitment to "robust political debate." *Hustler Magazine v. Falwell*, 485 U.S. 46, 51 (1988). To that end, the First

Amendment protects the right to free speech. U.S. Const. amend. I. It also protects freedom of the press, religion, and "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." *Id.* "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by groups association, as the [Supreme] Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly." *NAACP v. Ala. ex rel. Patterson,* 357 U.S. 449, 460 (1959).

When speech and assembly restrictions are analyzed under the First Amendment, the court must "identify the nature of the forum [in which one seeks to engage in expressive activity], because the extent to which the [g]overnment may limit access depends on whether the forum is public or nonpublic." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). Finally, the court must "assess whether the [government's] justifications for exclusion from the relevant forum satisfy the requisite standard." *Id.* Under this analysis, the Challenged Statutes are unconstitutional.

Yet this case is not solely about the right to engage in the commerce of arms, Appellees also seek to engage in all manner of protected expression related to the lawful use of firearms—as they have done at the Fairgrounds for decades. 2-SER-339-50; *see also* 2-SER-334-36, 345-79. The State's prohibition on commerce in arms at all state-owned properties is a thinly veiled ban on Appellees' gun show events and constitutes content- and viewpoint-based censorship of Appellees' message. Moreover, the evidence shows (and will show if the case goes to trial) that the Challenged Statutes are motivated by the State's animus for Appellees and their

message. A legislature's "desire to harm a politically unpopular group cannot constitute a legitimate government interest." *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

For these reasons, the Court should apply the highest scrutiny to California's gun show ban and strike down the Challenged Statutes when the State fails to "prov[e] the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000).

### 1. The Challenged Statutes restrict protected expression in a public forum.

Gun shows bring people together to engage in all manner of protected speech. Attendees congregate to explore the lawful uses of firearms, including self-defense, hunting, target shooting, safety training, gunsmithing, and appreciation of firearms. Second Amendment groups share information, speakers give lectures, trainers hold classes, and participants engage others, including candidates for public office, in discussions about gun rights. All the while, retailers offer firearms, ammunition, and related products for sale.

While the Challenged Statutes purport to ban only the sale of firearms, ammunition, and firearm parts, the record shows that the law's intent is to ban gun shows from state-owned venues, including the OC Fairgrounds. 2-ER- 230-34, 38-41; 1-SER-117, 122-25, 130-31, 136-40, 145-48, 157-60, 165-66, 171-72, 175-77, 183-85. Having previously defended a gun show moratorium and lost, the Attorney General knows that such bans violate the First Amendment. *B&L 2019*, 394 F. Supp. 3d 1226. California's scheme to knock out the commercial cornerstone of gun shows, is a

camouflaged attempt to destroy the pro-Second Amendment cultural experience these events are known for.

The OC Fairgrounds is a state-owned property maintained for public use. 2-SER-235-40, 245. It hosts all manner of expressive events, including concerts, festivals, and fairs, and the DAA actively promotes public use of the property. 2-SER-245. Having been "opened [by the State] for use by the public as a place for expressive activity," it is, at minimum, a "designated public forum." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983); *see also B&L 2019*, 394 F. Supp. 3d at 1246. In such forums, content-based speech prohibitions must survive strict scrutiny, meaning that they must be "necessary [and narrowly drawn] to serve a compelling state interest." *Perry*, 460 U.S. at 45-46.

### 2. The Challenged Statutes are content-based and viewpoint-discriminatory.

"[A]bove all else, the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chic. v. Mosley*, 408 U.S. 92, 95-96 (1972) (collecting cases). Government restrictions that selectively ban speech based on its "particular subject matter" or "its function or purpose" are "content-based regulations." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Relatedly, "the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination'" known as viewpoint discrimination. *Id.* at 168. Content- and viewpoint-based speech restrictions are presumed invalid and subject to the highest judicial scrutiny. *Id.* Indeed, a finding that

14

a government restriction on speech that is content- or viewpoint-based is often determinative. *See, e.g.*, *Ark. Writers' Project v. Ragland*, 481 U.S. 221, 231-32 (1987).

The Supreme Court recently revisited *Reed* (without overruling it) in *City of Austin v. Reagan National Advertising of Austin*, *LLC*, __U.S.__, 142 S. Ct. 1464 (2022). The *Reagan* Court clarified that *Reed* does not stand for the broad holding that "*any* classification that considers function or purpose is *always* content based." *Id.* at 1474 (emphasis added). But it did not disturb the rule that the government may "not discriminate based on topic, subject matter, or viewpoint." *Id.* (quoting *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981)). Indeed, the Supreme Court noted that its finding in *Reagan* that "the City's ordinance is facially content neutral does not end the First Amendment inquiry. If there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction, for instance, that restriction may be content based." *Id.* at 1475-76 (citing *Reed*, 576 U.S. at 164).

Though the Challenged Statutes purport to ban only the sales of firearms, ammunition, and firearm parts, the law's censorship is plainly content-based and viewpoint-discriminatory. The laws target gun shows and the protected conduct that takes place at such events for banishment, while leaving virtually all other manner of expressive conduct untouched. California is plainly treating gun shows differently from other events, like auto shows, home shows, and beer and wine shows. This suggests that the Challenged Statutes are about animus for "gun culture" and not a genuine concern for public safety.

The record plainly shows that animus for gun shows and gun culture that motivated California to adopt the Challenged Statutes. Governor Newsom's 2018

15

letter of support for AB 893 (Gloria), which ended gun shows at the Del Mar

Fairgrounds is a good example. He wrote: "Permitting the sale of firearms and

ammunition on state-owned property *only perpetuates America's gun culture* at a time when

73% of Californians support gun reform measures and 73% of California [sic] cite

concern about the threat of mass shootings in our schools." 2-SER-269. So is

Senator's Min's testimony before the Senate Public Safety Committee that SB 264 is

"symbolic" and makes a statement that the state does not endorse "our taxpayer

venues being used to sell more guns in our communities."[3] And in his remarks to the

Assembly Committee on Public Safety, where he argued that ending gun shows on

state-owned property is a value statement that California must make.[4]

      California is virtue signaling. It is not engaged in effective or competent public

policymaking. "[B]ecause the speech at gun shows is likely to be predominantly, if not

exclusively, favorable to guns and gun rights, in their "'practical operation,' the

[Challenged Statutes go] 'beyond mere content discrimination, to actual viewpoint

discrimination.'" *B&L 2019*, 394 F. Supp. 3d at 1246 (quoting *R.A.V. v. City of St.

Paul*, 505 U.S. 377, 391 (1992)). When, as here, "the government targets not [just the]

subject matter, but particular views taken by speakers on a subject, the violation of the

---

     [3] Sen. Pub. Safety Committee Hrg., Mar. 16, 2021, at 4:12:59, available at https://www.senate.ca.gov/media-archive/default?title=Public+Safety&startdate= 03%2F16%2F2021&enddate=03%2F17%2F2021 (last accessed Aug. 4, 2022).

     [4] *See* Assem. Pub. Safety Committee Hrg., Mar. 16, 2021, at 4:01:22, available at https://www.assembly.ca.gov/media/assembly-public-safety-committee20210713/video (last accessed Aug. 4, 2022).

First Amendment is all the more blatant." *Id.* at 829. Normally, this conclusion is all but dispositive. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 571 (2011)).[5]

California is engaged in content- and viewpoint-based censorship of expressive conduct when it seeks to expel gun culture from public property,. The district court agreed. After noting that "the parties agreed that the [OC] Fairgrounds is at least a limited public forum," 1-ER-020, the court (exercising its broad discretion) concluded that Appellees had presented

> Sufficient evidence that SB 264 and SB 915 have a viewpoint discriminatory purpose. Legislative history shows that the goal of the two statutes is to end gun shows in California…. In view of the above authorities and evidence, as well as the [OC] Fairgrounds' status as a limited public forum, the Court concludes that Defendants are engaging in viewpoint discrimination by prohibiting otherwise-lawful gun shows.

1-ER-022-023. This evidentiary finding can be reviewed only for clear error. *See Yu v. Idaho State Univ.*, 15 F.4th 1236, 1241 (2021); *Landis v. Wash. State Major League Baseball Stadium Pub. Facilities Dist.*, 11 F.4th 1101, 1105 (9th Cir. 2021). And because the State advocates for de novo review of the entire order, it has conceded that these facts are either established or undisputed. *See Harris*, 366 F.3d at 760.

---

[5] When a government refuses to allow some groups to use a designated public forum based on disapproval of the message, courts often consider the government action a "prior restraint" on free speech. *Se. Promos., Ltd. v. Conrad*, 420 U.S. 546 (1975). "Prior restraints" abridge the freedom of speech and are thus "particularly suspect." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

### B.    The Challenged Statutes violate First Amendment under the commercial speech doctrine.

Because the Challenged Statutes are content-based restrictions on protected speech in a public forum, strict scrutiny must apply. But even if the Court holds that the Challenged Statutes ban *only* commercial speech, the result is the same.

#### 1.    At minimum, the Challenged Statutes restrict commercial speech.

At oral argument in the district court, the court and the parties explored, at length, precisely what conduct the laws restrict. The task was complicated by the fact that the Challenged Statutes do not define what constitutes a "sale" forbidden by the law. An analysis of the Challenged Statutes—their purpose and effect—may simplify the issue for this Court.

The district court conducted a textual analysis, noting that the laws expressly forbid only the "sale" of firearms on state-owned properties. 1-ER-15. There is no language in either statute forbidding the possession of firearms on state land. So California essentially argues that gun shows (where firearms may be possessed) may take place as long as no one engages in speech or conduct constituting a "sale." But the Challenged Statutes do not define what constitutes a "sale" under the law, and California so heavily regulates all firearms transactions that to apply a common cash-and-carry understanding of the term would be a gross error. Neither the plain text nor the legislative history of the Challenged Statutes provide insight on exactly what conduct associated with a sale is forbidden. But California case law is helpful.

In *People v. Haney*, 100 Cal. App. 295 (1929), the California Court of Appeal upheld a defendant's conviction for selling intoxicating liquor to minors. On appeal,

the court had to resolve whether a "sale" included "delivery" of the liquor. The court observed that "[t]he word 'sale' is not of 'fixed and invariable meaning.'" *Id.* at 297-98 (quoting *W. F. Boardman Co. v. Petch*, 186 Cal. 476, 482 (1921)). Sometimes, as in the sale of liquor, a sale requires delivery. *Id.* (citing *Norfolk & W. R. Co. v. Sims*, 191 U.S. 441 (1903)). Other times, it does not. *Norfolk & W.R. Co. v. Sims*, the Supreme Court case quoted in *Haney*, provides greater context:

> A sale really consists of two separate and distinct elements: first, a contract of sale, which is completed when the offer is made and accepted; and, second, a delivery of the property which may precede, be accompanied by, or follow the payment of the price, as may have been agreed upon between the parties. **The substance of the sale is the agreement to sell and its acceptance.** That possession shall be retained until payment of the price may or may not have been a part of the original bargain, but in substance it is a mere method of collection, and we have never understood that a license could be imposed upon this transaction, except in connection with the prior agreement to sell, **although in certain cases arising under the police power it has been held that the sale is not complete until delivery, and sometimes not until payment.**

*Norfolk*, 191 U.S. at 447 (double emphasis added).

Using its police power, California bifurcates the "sale" of firearms. It is illegal to simultaneously exchange money for a firearm without a ten-day waiting period and a background check. Cal. Penal Code §§ 26815, 27540. This is true no matter where the transaction is initiated, and it applies to sales between private individuals and by licensed dealers. Cal. Penal Code § 27310 (requiring all firearm transfers at gun shows to comply with state and federal law); *id.* § 26805 (prohibiting the sale and transfer of a firearm by a licensed dealer at any location except the dealer's licensed premises but allowing dealer to prepare documents at a gun show); *id.* § 27545 (requiring all

19

transactions to be processed through a licensed dealer). In With or without the Challenged Statutes, it remains illegal to exchange a gun for money at any gun show in California.

The district court aptly described how the bifurcation of firearm sales applies here. In response to the State's insistence that the mere "act of exchanging money for a gun is not 'speech,'" *Nordyke 1997*, 110 F.3d at 710, the district court held that the Challenged Statutes must, at minimum, "implicate commercial speech by restricting the sale of otherwise legal firearms at the [OC] Fairgrounds." 1-ER-016. Otherwise, the Challenged Statutes do nothing at all. Indeed, "assuming that merely exchanging money for a firearm is not speech, the *sales* regulated by [the Challenged Statutes] do not involve the physical exchange of a weapon." 1-ER-016. That is because, even without the Challenged Statutes, "sales made at California gun shows must be completed both temporally and physically removed from the show itself." 1-ER-016. The trial court thus found that the Challenged Statutes "exceed the mere prohibition of 'exchanging money for a gun,'" and concluded that they "unmistakably regulate commercial speech." 1-ER-016.

The State's concessions, made during oral argument, support the district court's findings on this point. At the hearing, the State explained that the Challenged Statutes bar both the "consummation" of firearm sales at gun shows and the "offers and acceptances of firearm sales." 1-ER-016 (citing 2-ER-043, 046). All of this, the court correctly held, "directly implicate[s] commercial speech." 1-ER-016.

### 2. The Challenged Statutes cannot survive heightened scrutiny under the commercial speech doctrine.

Commercial speech receives First Amendment protection if it is not misleading and concerns a lawful activity. *Cent. Hudson Gas & Elec. Comm'n v. Pub. Serv. Comm'n*, 447 U.S. 557, 563-64 (1980). Burdens on such speech are constitutional *only* if they directly advance a substantial government interest and are not broader than necessary to serve that interest. *Id.* at 564. The Challenged Statutes are *far* broader than necessary. They ban the commercial speech necessarily associated with sales of arms—instead of simply enforcing California's laws regulating sales without restricting speech at all. This defies common sense and circuit precedent. *See Nordyke 1997*, 110 F.3d 707.

California's professed interest in restricting gun shows is already addressed by the state's *extensive* regulatory regime that already applies to *all* firearm transactions. The government claims that the Challenged Statutes promote public safety. A.O.B.20-22. But the government's interest must be authentic and sincerely invoked. "[M]erely invoking interests ... is insufficient. The government must also show that the proposed communicative activity endangers those interests." *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 859 (9th Cir. 2004) (citation omitted). The government's mere recital of classic "substantial" interests does not outweigh Appellees' evidence of California's well-documented disdain for the "gun culture" and those who participate in it at gun shows.

Neither SB 264 nor SB 915 cite any peer reviewed studies for their public safety pretexts. 1-SER-116-18, 89-90. They put forth no admissible evidence that California gun shows are the source of "grave danger to the community." 1-SER-117. At most,

21

SB 264 makes vague claims that "dangerous incidents" have taken place at gun shows, including "an official vendor accused of trafficking illegal firearms, sales of firearms to individuals registered in the [DOJ] Bureau of Firearms Armed Prohibited Persons System, and illegal importation of large-capacity magazines." 1-SER-117. But the legislature made no effort to show that such incidents are common or unique to gun shows in California—where gun shows are regulated at least as heavily as retailers operating out of brick-and-mortar stores. Nor does California explain how speech associated with the sale of a firearm (when uttered on public property) somehow threatens public safety, when the laws for firearm sales at both gun shows and brick-and-mortar stores are identical.[6]

Instead, the legislative history reveals only generalized concerns about gun violence occurring all over the country and legislators' beliefs that the state should not profit from sales of firearms and ammunition. *See, e.g.*, 2-ER-231-32, 238-39; 1-SER-088-89, 116-17.[7] Indeed, SB 264 opens with a list of tragedies—none of which were carried out with firearms traced to gun show events at the Fairgrounds. 1-SER-116-17. And while a bill analysis did cite a 13-year-old study identifying gun shows as a source of illegally trafficked firearms, 1-ER-130, the study links no illegally trafficked

---

[6] Appellees present this as part of their argument for balancing government interests under their First Amendment theory of the case. As noted below, such tests have no place in Second Amendment analysis. *Bruen*, 597 U.S. at 18-20.

[7] *See also* 1-ER-008-09 (quoting Min's remarks that, even if there were zero unlawful acts at gun shows, "there is a principal that taxpayers should not be utilized, and taxpayer venues should not be utilized to promulgate the distribution of more guns in our communities").

firearm to gun shows at the OC Fairgrounds (or to any gun show in California). This is unsurprising because, as the study itself finds, "[m]uch of the concern about gun shows as a source of crime guns focuses on private party gun sales, since no background checks are conducted and no records are kept." 2-SER-309. Such concerns are irrelevant in California where *all* private party transfers—even those started at gun shows—must be processed by a licensed firearm dealer and are subject to background checks and registration under state law.

The same study also tries to implicate licensed retailers operating at gun shows as sources of crime guns in America. 2-SER-309-10. But it expressly recognizes that "in California, where both gun shows themselves and gun commerce generally are regulated, *sales at gun shows are not a risk factor among licensed retailers for disproportionate sales of crime guns.*" 2-SER-310 (emphasis added). Appellees could go on for pages establishing that the State's "evidence" supporting the Challenged Statutes' public safety interests is mere window dressing.

While the district court did not formally find that the State's "actual interest" was animus for America's gun culture and those who take part in it, it did conclude that California had a viewpoint-discriminatory purpose. 1-ER-022-23. The evidentiary record more than supports that finding, so it is not "clearly erroneous." Even if the State could point to some legitimate interest in public safety, it cannot prove that its means are also legitimate. To meet the requirement of narrow tailoring, the government must target the exact wrong it seeks to remedy, and no more. *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy."). In

analyzing public safety regulations designed to mitigate concrete public safety concerns, a ban is *necessarily* overbroad. *See Edwards v. City of Coeur D'Alene*, 262 F.3d 856, 863-66 (9th Cir. 2001).

B&L has operated safe and legal gun shows in California for decades. 2-SER-339. The record shows that the events are largely incident-free, and there is no evidence that they create a unique risk to public safety. 2-SER-339; 276-80. Indeed, in September 2018, the Public Safety Director for the 22nd DAA reported that the B&L gun shows in Del Mar are "in complete compliance with all the local, State and Federal laws that govern gun shows and that there have not been any violations of law." 2-SER-279.

On the other hand, the Challenged Statutes' "evidence" of lawlessness at California's gun shows is borderline frivolous. It consists of vague references to a handful of non-violent crimes related to firearm acquisition, including the presence of a single vendor accused of trafficking illegal firearms. 1-ER-116-17. These unsupported examples are all the State can marshal in support of banning all future lawful commerce in arms at state-owned venues. It is not enough.

Complete prohibition is starkly disproportionate to and unnecessarily restrictive of the vast amounts of First Amendment protected activity that take place at gun shows. This is especially so because such activity is the predicate to exercising another fundamental civil right. *See District of Columbia v. Heller*, 554 U.S. 570, 770 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Bruen*, 597 U.S. 1. In short, a restriction of this magnitude is undeniably "more extensive than the Constitution

permits" because the "degree of protection" the law might achieve is so "marginal."

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 73 (1983).

The district court correctly arrived at exactly this conclusion. After examining the text of the Challenged Statutes for their plain meaning, the court held that:

> Defendants' attempt here to use the legislative history of SB 264 and SB 915 in support of California's asserted interest in stopping illegal firearm sales fails to survive intermediate scrutiny.... The legislative findings of SB 264 do not identify any specific harms at the [OC] Fairgrounds, nor do they indicate that gun shows present any particular risk that exceeds those of lawful gun sales accomplished at brick-and-mortar stores.... Likewise, the legislative findings of SB 915 do not examine the [OC] Fairgrounds—or any other California gun shows—but, instead, they generalize the risks from other gun shows conducted across the United States, even though the legislative findings acknowledge that existing California law applies equally to all gun shows in the state.

1-ER-018-19.

Because the State did not meet its burden even under intermediate scrutiny, the district court held that Appellees are likely to succeed on the merits of their First Amendment claims.

## IV. THE DISTRICT COURT CORRECTLY HELD THAT APPELLEES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR SECOND AMENDMENT CLAIMS

Under the Supreme Court's recent authorities, including *Bruen*, it is not appropriate for courts to subject Second Amendment claims to multi-step, interest-balancing tests. Instead, the correct analysis begins and ends with an analysis of the Second Amendment's text and history. *Bruen*, 597 U.S. at 19. So when faced with a Second Amendment claim, courts must first ask if the restricted conduct is within the Second Amendment's "plain text." *Id.* at 17, 24. If it is, "the Constitution presumptively protects that conduct," *id.* at 24, and "the government must

affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *id.* at 19.

This requires the State to show that its modern policies were common during the relevant time period or "identify a well-established and representative historical *analogue*" to the laws it seeks to defend. *Id.* at 30. It is not enough for the State to present a handful of laws from "outlier jurisdictions." It must instead present evidence of "an enduring American tradition of state regulation." *Id.* at 69. "Only then may [this C]ourt conclude that" the conduct Appellees wish to engage in "falls outside the Second Amendment's 'unqualified command.'" *Id.* at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

The State did not meet this burden below, and its arguments on appeal fare no better. This Court should affirm the district court's finding that Appellees are likely to succeed on the merits of their Second Amendment claim.

### A. The plain text of the Second Amendment protects Appellees' right to engage in lawful commerce in arms.

Under *Bruen*, the threshold question is whether the law implicates conduct covered by "the Second Amendment's plain text." 597 U.S. at 17. If it does "the Constitution presumptively protects that conduct," full stop. *Id.* Appellees are law-abiding citizens seeking engage in lawful (well-regulated) commerce at gun shows at the OC Fairgrounds—as they have done (safely and legally) for over 30 years. The record shows that the individual plaintiffs attend gun shows to buy firearms, ammunition, and related products. 2-SER-346-69. The vendor appellees participate in gun shows to sell them. 2-SER-356-69. And B&L produces gun shows so that

vendors and attendees may come together to engage in these lawful transactions. 2-SER-339-43.

There can be no question that this conduct comes within the "plain text" of the Second Amendment. Indeed, any argument that commerce in arms does *not* implicate the Second Amendment's "plain text" is unfaithful to *Bruen* and well-established authority in this circuit and beyond. Without question, acquiring arms is a predicate activity necessary to keeping and bearing them. For that reason, this Court has repeatedly held that the Second Amendment extends to the right to acquire the arms, ammunition, and accessories necessary for exercising Second Amendment rights. *See, e.g.*, *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677-78 (2017) (discussing authorities acknowledging the right to acquire arms, including *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014) (hollow-point ammunition). By barring all commerce in arms at the OC Fairgrounds (and all state-owned venues), the Challenged Statutes implicate that right.

California, like the district court in the *Del Mar Case*, tries to narrow the "plain text" question to whether the Second Amendment protects a right to acquire "'firearms and ammunition at a gun show' *on state property*." A.O.B.36 (quoting *B&L Prods., Inc. v. Newsom*, No. 21-cv-1718, 2023 WL 3443280, at *4-5 (S.D. Cal 2023)) (emphasis added). As noted above, there is no cash-and-carry of firearms at gun shows. 1-ER-016. To obscure the conduct at issue is pure artifice. The conduct in which Appellees seek to engage is simply the speech necessary to initiate a transaction for firearms, conduct that is indisputably protected.

California's argument is that the Challenged Statutes do not implicate the Second Amendment because they do not "meaningfully constrain[] Plaintiffs' ability to acquire firearms" since the public is free to "purchase firearms elsewhere." A.O.B.36-37. The State cites *Teixeira*, a pre-*Bruen* challenge to a zoning ordinance that effectively barred a gun store from opening in the county. A.O.B.35-38. The *Teixeira* court upheld the law, holding that (1) there is no "freestanding right" "to sell a firearm unconnected to the rights of citizens to 'keep and bear' arms," 873 F.3d at 686-87, and (2) the plaintiffs had not shown that the law "meaningfully restricted" the ability to acquire firearms, *id.* at 687.

Assuming *Teixeira* was correct when it was decided, *Bruen* has left the *Teixeira* decision on life support. That decision should be expressly overruled to prevent its misapplication in future cases.[8] The *Teixeira* court consulted text, history, and tradition to hold that there is no independent right to sell arms. 873 F.3d at 683-86. But, in a post-*Bruen* world, *Teixeira*'s demand that a plaintiff prove that the law "meaningfully restricts" the right to acquire firearms is precisely the sort of standardless adjudication of Second Amendment rights that the *Bruen* Court overruled when it rejected the two-step approach applied in that case. While the appropriate framework for analyzing

---

[8] Even though *Teixeira* was decided en banc, this panel may still reconsider its precedential value given the complete overhaul of Second Amendment jurisprudence announced in *Bruen*. "[T]he issues decided by the higher court need not be identical in order to be controlling. Rather, the [Supreme Court] must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003), *overruled in part on other grounds by Hernandez v. Garland*, 47 F.4th 908 (9th Cir. 2022). *Teixeira* is clearly "irreconcilable" with *Bruen*'s rejection of its analytical underpinning.

restrictions on commerce in arms might not have been settled when this Court decided *Teixeira*, there is no longer any room for debate: Talk of substantial burdens, meaningful restrictions, or alternative channels for exercising the right has no place in a post-*Bruen* analysis.[9]

Because the Challenged Statutes implicate a Second Amendment right to acquire arms—the government bears the burden of justifying them by demonstrating that they are consistent with "history and tradition." *Bruen*, 597 U.S. at 24. It is manifestly *not* Appellees' burden to prove they cannot buy or sell firearms elsewhere.

### B. There is no enduring historical tradition of relevant firearm regulation.

To save the Challenged Statutes, the State must "identify a well-established and representative historical analogue." *Bruen*, 597 U.S. at 30. In the proceedings below, California did not claim that the Challenged Statutes address an "unprecedented societal concern" or a "dramatic technological change" that might justify the "more nuanced approach" of analogical reasoning. *Id.* at 27. That simplifies the inquiry. As *Bruen* instructs, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26 (emphasis added).

Therefore, this Court need only ask whether the State has presented evidence

---

[9] The district court simply distinguished this case from *Teixeira*, noting that "there is no alternative gun show in Orange County, let alone within '600 feet' of the [OC] Fairgrounds." 1-ER-027 (distinguishing *Teixeira*, 873 F.3d at 679). The district court's observations about the reasons *Teixeira* is inapposite are spot on. And this Court can likewise dispose of the State's arguments without overruling *Teixeira*.

of "distinctly similar" laws from the relevant historical period—here, Founding-era laws banning law-abiding people from contracting for the sale of lawful arms on public property. If the State's evidence makes it past that threshold, the Court must consider whether such laws are constitutionally relevant: Do they evidence an "enduring American tradition" of banning public sales of arms or are they merely outliers that existed for a short time or in a handful of jurisdictions? At best, the State has provided evidence of only the latter.

California arguably waived the "more nuanced approach" under *Bruen*, *id.* at 27, by not raising it below. But under that approach, the State would have had to present genuine analogues that are "relevantly similar" to the modern restrictions it seeks to defend, *id.* at 28-29. The *Bruen* Court did not establish all the ways a proposed analogue may be "relevantly similar," but it did "point toward at least two metrics: *how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29 (emphasis added). When looking at the "how," courts should ask whether a proposed analogue imposes a "comparable burden." *Id.* To prevent this analysis from devolving into just another way to balance burdens and benefits—a test *Bruen* explicitly rejected—this Court should ask whether the Challenged Statutes and the proposed historical analogue impose a similar *type* of burden (not just a similarly *severe* burden). When looking at the "why," this Court should consider "whether th[e] burden is comparably justified," mindful that historical laws enacted for one purpose cannot be used as a pretext to justify a modern law enacted for different reasons. *Id.*

California failed to carry this burden. There is no American tradition dating to the Founding Era of "relevantly similar" laws banning the sale (much less speech as a

prelude to a sale) of arms on public property. Nor did it present evidence of a well-established tradition of laws banning the sale of firearms or firearm components in general (the absolute minimal requirement for an analogous historical law here). Instead, focusing on largely irrelevant laws from colonial America and the Nineteenth Century, the State tries to establish that the government has historically enjoyed broad authority to (1) restrict activities on its own property, A.O.B.40-44, (2) regulate the commercial sale of arms, A.O.B.44-50, and (3) regulate arms in "sensitive places," A.O.B.50-54. The State fails because exceedingly few of its purported analogues are from the relevant historical period, and not one is a genuine historical analogue that is "relevantly similar" to the Challenged Statutes.

### 1. Under *Bruen*, the Founding Era is the relevant period, and the State identified only a single law from that time.

Save for a single law from 1773 and a handful of laws pre-dating the Founding by 100 years, the State relies almost exclusively on Nineteenth Century laws from antebellum and Reconstruction Era America. But laws from this period, *Bruen* instructs, are of limited analytical value if they do not have some historical relative from the post-Revolution, Founding Era. This is because they were adopted far too late to provide valuable insight into the original understanding of the Second Amendment.

Indeed, *Heller* made clear that the Founding Era was the relevant time for determining the original public understanding, noting that the "Constitution was written to be understood by the voters," and that "[n]ormal meaning … excludes secret or technical meanings that would not have been known to ordinary citizens *in*

31

*the founding generation*." 554 U.S. at 576-77 (emphasis added). *Bruen* affirmed this holding, reasoning that the Constitution's "meaning is fixed according to the understandings of those who ratified it," although it "can, and must, apply to circumstances beyond those *the Founders* specifically anticipated." 597 U.S. at 28 (citing *United States v. Jones*, 565 U.S. 400, 404-05 (2012)).

*Bruen* also made clear that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 597 U.S. at 37. In other words, the Bill of Rights, including the Second Amendment, cannot have one meaning when applied against the federal government and a different meaning when incorporated against the states. *Id.*; *see also McDonald*, 561 U.S. at 763 (citing *Malloy v. Hogan*, 378 U.S. 1 (1964)). So whatever the Second Amendment meant in 1791 about the restraints on the federal government, it must mean the same thing when applied to restrain the states in 1868 and later. And whatever the ratifiers of the Fourteenth Amendment may have understood about the meaning of the Second Amendment in 1868 cannot change the 1791 meaning.

While both *Heller* and *Bruen* did examine limited evidence from the mid-to-late-Nineteenth Century, they did so merely to *confirm* the original public understanding of the Second Amendment in 1791. *Bruen* notes that "we made clear in *Gamble [v. United States*, 139 S. Ct. 1960 (2019)] that *Heller*'s interest in mid- to late-19th-century commentary was secondary." *Bruen*, 597 U.S. at 37. The Court treated it as "mere confirmation of what the Court thought had already been established." *Id.*

Furthermore, *Bruen* expressly cautioned "against giving postenactment history

more weight than it can rightly bear." 597 U.S. at 35. And, citing *Heller*, *Bruen* also observed that because post-Civil War discussions of the right to keep and bear arms "took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources." *Id.* at 36 (citing *Heller*, 554 U.S. at 614). Evidence from the Nineteenth and Twentieth Centuries, the Court held, simply does "not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 66, n.28.

* * * *

The Second Amendment's meaning is fixed according to the understanding at the Founding, so the laws of that period should guide this Court's analysis. In its briefing in the district court and on appeal, the State has identified dozens of proposed historical analogues, but ***just one*** of them is from the Founding. A handful were adopted too early. A.O.B.45-46 (citing 1652 N.Y. Laws 128, *Ordinance of Dir. & Council of New Netherland*; James Trumbull, *Public Records of the Colony of Conn., May 1665* (1850), 1 W.W. Hening, Laws of Va. from First Sess. of Legis. in 1619, at 403 (1823); 2 W.W. Hening, Laws of Va. from First Sess. of Legis. in 1619, at 403 (1823); W.H. Browne, Proc. & Acts of Gen. Assemb. of Md., Jan. 1637/8–Sept. 1664, at 273–74, § 5 (1883)); 1-SER-29-30. But most were adopted far too late, having been adopted during the Civil War period or later. 1-SER-30-53. Such can hardly be characterized as evidence of the enduring American tradition of regulation that *Bruen* demands.

### 2. The State's status as proprietor of a public marketplace does not confer the broad power to ban constitutionally protected activities.

California cited just one Founding-era law to justify the Challenged Statutes—a

Maryland law that banned the carry of arms in the House of Assembly while the legislative body was sitting. A.O.B.42 (citing 63 Proceedings and Acts of the General Assembly 338, § 5 (June 15-July 3, 1773). From this, State claims it has unfettered authority as the proprietor of the fairgrounds to dictate what activities take place there. While the government may have some authority to restrict activities on its own property, the State's citation to just one irrelevant Founding-era law (buttressed by the Nineteenth Century laws of just two more states and a handful of pre-*Bruen* circuit court decisions) is not enough to justify the State's modern ban on commerce in firearms at California's fairgrounds.

The State's authority to ban constitutionally protected activities on government-owned property that is open to the public for commercial use has long been circumscribed. For instance, in the First Amendment context, the State cannot ban the use of government facilities otherwise open to the public for expressive activities, assembly, or association based on the content or viewpoint of the participants. *See, e.g.*, *Mosley*, 408 U.S. at 96; *B&L Prods. 2019*, 394 F. Supp. 3d at 1249. Nor can it ban commercial speech associated with the sale of otherwise lawful products—including constitutionally protected arms. *Nordyke 1997*, 110 F.3d at 713. In the Second Amendment context, the government cannot ban the possession of firearms carried for lawful purposes in non-sensitive places. *Nordyke 2012*, 681 F.3d at 1045-46. And finally, the Equal Protection Clause bars the State from discriminating against people exercising fundamental rights. *See, e.g.*, *Mosley*, 408 U.S. at 96.

The Supreme Court applies a species of equal protection analysis to regulations that discriminate against "disfavored groups." *Romer v. Evans*, 517 U.S. 620 (1996).

The same analysis applies when unequal treatment occurs in the context of exercising a fundamental right or when the government is motivated by animus toward a disfavored group, where courts apply heightened scrutiny. *See generally Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973); *Minn. Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983).

Here, the record shows that the State's real interest is in banning gun shows and the constitutionally protected conduct that takes place at those events—based on political animus for America's gun culture and those who take part in it. *See, e.g.*, 2-SER-269; Sen. Pub. Safety, *supra* note 3, at 4:12:59; Assem. Pub. Safety, *supra* note 4, at 4:01:22. Such irrational discrimination cannot survive strict scrutiny or *any* level of judicial review. Yet the State presses on with an almost frivolous argument that it can engage in irrational discrimination because it is a "property owner" with the power "'to exercise exclusive dominion and control over its land.'" A.O.B.40-41 (quoting *GeorgiaCarry.org, Inc. v. Georgia*, 687 F.3d 1244, 1265 (11th Cir. 2012)). But the out-of-circuit, pre-*Bruen* "government as proprietor" authorities are unpersuasive.

First, even though *Bruen* abrogated *GeorgiaCarry.org, Inc.*, the State relies on the case for the broad principle that "the Second Amendment, 'whatever its full scope, certainly must be limited by the equally fundamental right of a *private property owner* to exercise exclusive dominion and control over its land.'" A.O.B.41 (quoting *GeorgiaCarry.org*, 687 F.3d at 1256) (emphasis added). Citing only a law review article and two pre-*Bruen* decisions, the State claims that the "right of a [private] property owner to control conduct on its own land applies to the government when it operates as a proprietor." *Id.* (citing *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015);

*United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019), *abrogated by Bruen*, 142 S. Ct. 2111);

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L.

Rev. 1443, 1474-75 (2009)).

The State mainly relies on the Tenth Circuit's *Bonidy* decision, which upheld a

restriction on carrying firearms in post office parking lots and the D.C. Circuit's *Class*

decision, which upheld a similar restriction on carry in U.S. Capitol parking lots.

A.O.B.41-42. To be sure, both circuits recognized that the government has some

managerial authority to restrict the activities on its property. *Bonidy*, 790 F.3d at 1126;

*Class*, 930 F.3d at 464. But as the Northern District of Illinois observed in *Solomon v.*

*Cook Cnty. Bd. of Comm'rs*, 559 F. Supp. 3d 675, 694 (N.D. Ill. 2021), these holdings

were predicated not on the fact that the government owned the property but on the

fact that parking lots for post offices and the U.S. Capitol are areas "immediately

around a sensitive place." *Id.* (citing *Bonidy*, 790 F.3d at 1123). Post *Bruen*, that

assumption might be in doubt.[10] In any event, because California's fairgrounds are *not*

sensitive places, *Bonidy* and *Class* are unpersuasive.

The State's citation to this duo of cases is also inapt because firearms,

ammunition, and firearm components are not present at California's fairgrounds as

tools for self-defense during gun shows.[11] They are strictly items of commerce. Fatal

---

[10] In *United States v. Ayala*, No. 22-cr-369, 2024 WL 132624 (M.D. Fl. Jan. 12, 2024), the district court dismissed a charge of violating 18 U.S.C. § 930(a)(possession of a firearm in a post office) on Second Amendment grounds under the *Bruen* methodology.

[11] In fact, state law bans the carry of firearms and ammunition together at gun shows, even by holders of valid carry permits. *See* Cal. Penal Code §§ 27330, 27340.

to the State's "government as proprietor" argument is that the very purpose of the OC Fairgrounds is "to hold fairs, expositions and exhibitions in Orange County to exhibit the industries and industrial enterprises, resources, and *products of every kind or nature of the state*, with a view toward improving, exploiting, encouraging, and stimulating them." 32nd District Agricultural District, *Board of Directors Governing Manual*, Introduction 1, *available at* https://s3.us-west-1.amazonaws.com/ocfair.com/wp-content/uploads/2021/02/02141413/Policy-Combo-All.pdf (last visited Mar. 10, 2023) (emphasis added).

The State cannot open its fairgrounds to the public to use as marketplaces for all kinds of lawful products but shut the door to one kind of lawful product and the people who buy and sell that product just because it does not approve of that product—*even when acting as a property owner.*

### 3. The State's proposed historical analogues are not "relevantly similar" to the Challenged Statutes.

#### a. *Regulations on the commercial sale of arms.*

The State next argues that the government has, historically, enjoyed broad authority to regulate the commercial sale of arms. A.O.B.44-50. But the laws the State relies on for that premise do not justify the specific sales restriction here because they are not "relevantly similar" (in kind or in justification) to the Challenged Statutes. The State's "commercial sales" regulations generally fall into one of three categories, (1) restrictions on who could buy or sell arms, (2) zoning and licensing of shooting galleries, and (3) gunpowder quality regulations. Appellees address each in turn.

<u>Restrictions on Who Could Buy and Sell Guns</u>: On appeal, the State introduces four Seventeenth-century restrictions that it claims were "designed to combat illegal

arms and ammunition trafficking and to ensure that individuals considered dangerous did not obtain firearms." A.O.B.45 (quoting *United States v. Serrano*, 651 F. Supp. 3d 1192, 1212 (S.D. Cal. 2023)).[12] Setting aside the fact that these laws pre-date the Founding by over 100 years and do not appear to have survived the Revolution, the State mischaracterizes each of these laws and obscures the fact that none of them is comparable to the Challenged Statutes.

First, the State cites a 1665 Connecticut order that the State describes as a ban on "the sale of firearms by its residents outside the colony," A.O.B.45.[13] The restriction, however, was on the sale of "powder, shot[], ammunition, etc. to any out of the Jurisdiction, without the [license] of two Magistrates, or one Magistrat[e] and 2 [deputies]." Trumbull, *supra* note 13, at 145. In other words, the law simply required those seeking to do business with non-residents to obtain a license. Such a requirement is not similar in kind to the Challenged Statutes, which are not about licensing at all. Moreover, the gun show promoters and vendors are *already* licensed by state and federal agencies. The law was not similarly justified either. The 1665 restriction was merely "confirmatory of that made in 1644," which was, in turn,

---

[12] These laws were not part of the record in the trial court, nor did the State ask this Court to judicially notice them. And, as it did below, the State failed to provide the text of these newly discovered laws, requiring Appellees to search for these 400-year-old sources to confirm their existence and relevance. To aid this Court, Appellees provide internet citations to the State's new evidence where they are available.

[13] J. Hammond Trumbull, *The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony, May 1665*, at 138-39, 145-46 (1850), *available at* https://www.google.com/books/edition/The_Public_Records_of_the_Colony_of_C onn/X8VSAAAAcAAJ?hl=en&gbpv=1.

adopted to prevent the trade of arms with the Indians. Trumbull, *supra* note 13, at 145 (citing *id.* at 113). It should go without saying that racist laws enacted to disarm classes of marginalized people provide no legitimate analogue for modern day arms bans.

The State also asks this Court to consider a "1652 New York law [that] outlawed illegal trading of guns, gun powder, and lead by private individuals." A.O.B.45-46.[14] But that law was "not among the Records[] and seems ... not to have been very strictly enforced." E.B. O'Callaghan, *supra* note 14, at 128. Indeed, the Directors of the colony themselves advised using a "sparing hand" when enforcing the edict, implying that the law aimed to prevent Indians from amassing more ammunition than they needed for their defense. *Id.* Like the Connecticut law above, this rarely enforced restriction on sales to marginalized persons is not a legitimate historical analogue.

Next, the State cites a 1619 Virginia law that it describes as limiting "the sale of firearms and ammunition to *only* 'his majesties loyal[] subjects inhabiting this colony.'" A.O.B.45 (quoting *Teixeira*, 873 F.3d at 685, 685 n.18).[15] But again, the State engages in sleight of hand. The full text of the law reads: "I[t] is ordered that all persons have hereby liberty to sell [arms] and ammunition to any of his majesties loyal[] subjects

---

[14] E.B. O'Callaghan, *Laws and Ordinances of New Netherland, 1638-1674*, at 128 (1868), *available at* https://www.google.com/books/edition/Laws_and_Ordinances_ of_New_Netherland_16/PnYDAAAAQAAJ?hl=en&gbpv=1&pg=PA138&printsec =frontcover (also cited as 1652 N.Y. Laws 128, Ordinance of Director & Council of New Netherland).

[15] 2 William W. Hening, Laws of Va. from First Sess. of Legis. in 1619, at 403 (1823), *available at* https://babel.hathitrust.org/cgi/pt?id=hvd.hxh5u4&seq=469.

inhabiting this colony, and that the Indians of the Eastern[] shore have like and equal[] liberty of trade or otherwayes with any other our friends and neighbouring Indians." 2 Hening, *supra* note 15, at 403. In other words, the law *authorizes* the sale of firearms to subjects within the colony. It does not *limit* the sale of firearms to anyone else. *Id.*

Finally, the State makes a passing reference to a "1631 Virginia law [that] required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" A.O.B.45.[16] Upon closer review, it is hard to see why the State included the law at all. It was no more than a periodic census of the inhabitants and their property, including arms, corn, cattle, hogs, and goats. 1 Hening, *supra* note 16, at 175. It was not a firearm regulation "designed to combat illegal arms and ammunition trafficking [or] to ensure that individuals considered dangerous did not obtain firearms." A.O.B.45.

<u>Indoor Shooting Galleries</u>: The State also cites a few laws that regulated the location of, or required a license or consent to operate, indoor shooting galleries. A.O.B.46-47 (discussing 1857 R.I. Revised Statutes, at 204-05, ch. 80, § 2 )(restricting shooting galleries in the "compact part of the town of Newport"); William H. Bridges, *Digest of Charters & Ordinances of City of Memphis*, at 147-48, art. VI., § 1 (1863)(requiring a license and barring shooting galleries "in the first story of any building); Ordinances & Joint Resolutions of City of S.F., at 220, Ordinance No. 498, § 13 (1854)(license);

---

[16] 1 William W. Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature in the Year 1619*, at 174-75, Act LVI (1823), *available at* https://babel.hathitrust.org/cgi/pt?id=nyp.33433081883302&seq=200.

Henry J. Leovy, *Laws & Gen. Ordinances of City of New Orleans*, at 257, § 636 (1870)(consent of residents).

These early zoning and licensing regulations may be vaguely similar to the Challenged Statutes insofar as they regulate commercial activities related to firearms. But that is where the similarities end. They are not like California's modern gun show ban in kind. They regulated the operation of businesses where firearms were discharged; the Challenged Statutes do not restrict discharge of firearms on state property (or anywhere). Nor are they comparably justified. The State claims that early shooting gallery restrictions were adopted to promote public safety. A.O.B.48. But that characterization is far too broad. Historical shooting gallery laws were adopted because of the *specific* threat posed by indoor shooting galleries in heavily populated areas. The Challenged Statutes are not concerned with such threats.

<u>Gunpowder Regulations</u>: Finally, the State cites a handful of laws regulating the storage, quality, and sale of gunpowder. A.O.B.47. To begin with, only *one* of the gunpowder laws the State cites were in effect at the Founding. That solitary law is thus a marginally relevant outlier that offers no insight into the original understanding of the Second Amendment. *See Bruen*, 597 U.S. at 30. But even if the State had shown that such laws were commonplace when the Second Amendment was ratified, they are not analogous to the Challenged Statutes.

The first category of gunpowder regulations the State cites regulated only the *manner* of keeping gunpowder, usually by limiting the storage of large quantities. For instance, in 1836, Connecticut incorporated the cities of Hartford, New Haven, New London, Norwich, and Middletown, and authorized the towns to regulate "the

41

bringing in, and conveying out, or storing of gun-powder" over 25 pounds. A.O.B.47 (citing 1836 Conn. Acts 105 (Reg. Sess.), chap. 1, § 20). In 1821, Maine adopted a law authorizing local "selectmen," with a search warrant, to search for gunpowder reasonably suspected to be stored in violation of local law. A.O.B.47 (citing 1821 Me. Laws 98-99, ch. 25, § 5). And a New York City law limited the quantity of gunpowder and other explosive materials that could be kept or sold in the city, but expressly provided that a license could be obtained by anyone "desiring to sell gunpowder" or similar products at retail.[17] These laws are not comparable to the Challenged Statutes in either purpose or execution.

*How* these laws regulated bears no similarity to California's modern gun show ban. They simply barred people from stockpiling excessive quantities of gunpowder and other explosives in their homes. They did not ban the sale of common arms anywhere—let alone only on government-owned property open to the public for commercial use. The *why* behind these laws is also completely different. Gunpowder storage laws were often enacted to prevent catastrophic explosions and fires in town limits and near powder houses. *See* Matthew E. Thomas, *Historic Powder Houses of New England: Arsenals of American Independence* 16-18, 144 (2013). They were necessary because of the highly combustible and unstable nature of loose gunpowder in early America, which is not a modern concern. *Id.* Nor could the State credibly argue that

---

[17] A.O.B.47 (citing 1 Mark Ash, The New York City Consolidation Act, as in Force in 1891, at 209, § 455 (1891), *available at* https://www.google.com/books/e dition/The_New_York_City_Consolidation_Act_as_i/8nZCAQAAMAAJ?hl=en&g bpv=1&pg=PA209&printsec=frontcover).

sales of firearms and ammunition at state-run venues (where possession remains legal) poses a unique risk of fire.

The second breed of historical gunpowder regulations the State cites set quality standards for gunpowder manufactured in the state for sale. A.O.B.46 (citing 1808 Mass. Acts, at 444, ch. 52; 1776 R.I. Pub. Laws, at 25; 1776-77 N.J. Laws, at 6-7, ch. 6; 1820 N.H. Laws, at 274, ch. 25; 1794 Pa. Laws, at 764-69, ch. 337). Such laws differ in kind because they do not restrict the sale of lawful arms anywhere, they restrict only sales of gunpowder that does not meet minimum standards. The arms Appellees sell at California gun shows meet all standards set by law, yet the Challenged Statutes banish their sale from the public property anyway. What's more, these historical regulations were concerned with the specific public safety risks posed by defective gunpowder, not with "controlling and tracing the sale of firearms" or "ensuring dangerous individuals d[o] not obtain firearms." A.O.B.3 (quoting *United States v. Holton*, 639 F. Supp. 3d 704, 711-12 (N.D. Tex. 2022) (describing the goals of the Challenged Statutes and the State's proposed historical analogues).[18]

---

[18] On appeal, the State introduced for the first time two "proving" laws authorizing the inspection of any *firearm* sold to the public. A.O.B.46 (citing 1804 Mass. Acts., at 111, ch. 81; 1821 Me. Laws, at 546, ch. 162). "These laws were about ensuring that the barrel—the part of a firearm that conducts the projectile and receives the high-pressure and high-temperature flow of combusting gunpowder—is fit for that important purpose." Plaintiffs' Post-Hearing Supplemental Memorandum 18, *Boland v. Bonta*, 662 F. Supp. 3d 1077 (C.D. Cal. Feb. 24, 2023); *see also Boland*, 662 F. Supp. 3d at 1087 ("The goal behind proving laws, on the other hand, was to ensure that a firearm was adequately manufactured."). In short, they were adopted to ensure the safety and integrity of arms manufactured for sale.

The State comes closest to finding a genuine historical analogue in its citation to an 1825 New Hampshire law that restricted the retail sale of gunpowder on "any highway, or in any street, lane, or alley, or on any wharf, or on parade or common." A.O.B.47 (citing 1825 N.H. Laws, at 74, ch. 61, § 5; N.H. Laws, at 332, ch. 117, § 7). But aside from being adopted more than a quarter century after the Second Amendment's ratification, it is the only law the State could identify that restricted the sale of a common arm in certain public spaces that might resemble today's fairgrounds. It is a marginally relevant outlier that provides no insight into the original meaning of the Second Amendment. To paraphrase *Heller*, "we would not stake our interpretation of the Second Amendment upon a single law, in effect in a single [jurisdiction], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms." 554 U.S. at 632.

### b. Restrictions on arms in "sensitive places" and other places where people gather.

Finally, the State relies on nearly a dozen historical restrictions on the carry of arms in "sensitive places" and other public places where people regularly gather. A.O.B.50-53. The State groups these laws together as if public gathering spaces are "sensitive places" per se. But, as explained above, laws restricting public carry were not adopted until the mid- to late-Nineteenth Century. They were thus adopted far too late—often by more than a century—to be of much use to this Court. Indeed, such laws *contradict* the broad historical tradition of *not* broadly restricting the public carry of arms except for in truly sensitive places, like courthouses, legislative buildings, and polling places.

What's more, the State's historical "sensitive places" and public carry laws are not genuine analogues that are "relevantly similar" to California's modern ban on selling (or engaging in commercial speech about) firearms on state properties. They are vastly different in kind because they restrict the possession of firearms in certain public places. The Challenged Statutes ban the sale of lawful firearms and firearm components (and the speech necessary for those sales), *while deliberately leaving possession unregulated.* And they are vastly different in justification because those historical laws were adopted to minimize the potential for violent disruption of the legal, electoral, and legislative processes ("sensitive places") and the specific risk to the public when large groups of people gather with weapons (other places where people regularly gather). The Challenged Statutes, on the other hand, were adopted to make a symbolic statement that the State should not profit from the sales of guns. *See, e.g.*, Sen. Pub. Safety, *supra* note 3, at 4:12:59. But even if the purpose of the Challenged Statutes were to promote public safety, a ban on the sale of arms at the fairgrounds without likewise banning their possession is clearly not about the potential danger to groups of people gathering at gun shows. These are not similar justifications.

This Court does not have to take Appellees' word for it. In the court below, the State repeatedly claimed that it is not banning gun shows or the possession of guns at the State's fairgrounds. It makes similar claims on appeal. *See, e.g.*, A.O.B.29, 37. This means that historical laws banning public carry of firearms are irrelevant unless the State can make the case that fairgrounds are "sensitive places"—i.e., that they are analogous to courthouses, polling places, and legislative buildings. This, the State did not and cannot prove.

45

Gun shows have been taking place, largely without incident, at California's fairgrounds for more than 30 years. 2-SER-339. And they have taken place in public venues all over the country, including "public arenas, civic centers, *fairgrounds*, and armories," for generations. Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Gun Shows: Brady Checks and Crime Gun Traces* (Jan. 1999), available at https://www.atf.gov/file/57506/download (last visited Mar. 10, 2023). What's more, the types of activities that take place at state fairgrounds are not like the official activities of the courts, legislatures, and polling places that have historically made those places subject to greater regulation. In short, any argument that the OC Fairgrounds, or any fairgrounds for that matter, is too sensitive for the presence of guns, whether for self-defense or items of commerce, borders on frivolous. Indeed, it can hardly be argued with a straight face that California's fairgrounds are so sensitive that the State must ban the *sale* of guns and ammunition, but it is fine to possess them.

\* \* \* \*

Respecting the now-controlling *Bruen* test for Second Amendment rights, the district court simply performed its ordinary task of putting the State to its burden to produce historically and functionally relevant laws from the ratification period. The State failed to carry that burden. As the court explained below, the State's proposed analogues are all "inapposite": "No law that [the State] cite[s] permitted the state arbitrarily to ban firearm sales in disfavored forums, nor did those laws discriminate between gun vendors based upon whether the sales took place on public or private land." 1-ER-30. And even though "[t]he right to sell firearms is neither freestanding nor unlimited, *Teixeira*, 873 F.3d at 684, … neither is the state's ability to impose

46

restrictions on firearms that are inconsistent 'with the Second Amendment's text and historical understanding.'" 1-ER-30 (quoting *Bruen*, 597 U.S. at 36).

## V. THE DISTRICT COURT CORRECTLY HELD THAT APPELLEES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EQUAL PROTECTION CLAIM

The Supreme Court, long ago, recognized that both the Equal Protection Clause and the First Amendment forbid the government from granting "the use of a forum to people whose views it finds acceptable, but deny[ing] use to those wishing to express less favored or more controversial views." *Mosley*, 408 U.S. at 96. The Court held, the government "may not select which issues are worth discussing or debating in public facilities." *Id.* "*Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say.*" *Id.* (emphasis added). If unequal treatment occurs in the context of exercising a fundamental right, or the government is motivated by animus toward a disfavored group, courts apply heighted scrutiny. *See generally, Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936); *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983).

The Challenged Statutes target only members of the "gun culture" who attend gun shows. These laws are thus undeniably infused with the State's desire to harm this politically unpopular group. And if California cannot justify its censorship under either strict or intermediate scrutiny for purposes of the First Amendment, then it cannot justify it under the Equal Protection Clause either. Because neither statute was narrowly tailored to serve some compelling government interest, the district court correctly held that Appellees were likely to succeed on the merits of their claim that the laws violate equal protection. This Court should affirm.

## VI. THE DISTRICT COURT CORRECTLY FOUND THAT APPELLEES WOULD SUFFER IRREPARABLE HARM WITHOUT INJUNCTIVE RELIEF

After the district court held that Appellees were likely to prevail on their constitutional claims, it applied the well-established rule "that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" 1-ER-031 (citing *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). In *Doe v. Harris*, this Court held that "even a 'colorable First Amendment claim' suffices to constitute irreparable injury." 772 F.3d 563, 583 (9th Cir. 2014). And the Ninth Circuit is in good company. "When an alleged deprivation of a constitutional right is involved … most courts hold that no further showing of irreparable injury is necessary." 11A Wright and Miller, Fed. Prac. & Proc. Civ. §2948.1 (3d ed. 2023). The Challenged Statutes thus work an immediate and irreparably injury as to all citizens to whom they deny rights protected by the First and Second Amendments, and the Equal Protection Clause.

This is so even if Appellees have or could have engaged in other pro-gun speech at the OC Fairgrounds, held gun shows at private venues, or acquired firearms and ammunition at brick-and-mortar retailers. The State's claim that Appellees have identified no irreparable harm because they may buy arms "elsewhere" sounds an awful lot like the argument that, because people can exercise their rights in another place or in another manner, the law does not burden the Second Amendment at all. This Court should reject the State's invitation to subject the Second Amendment to sneak this now-forbidden interest-balancing argument into the irreparable harm analysis. The "go exercise your rights somewhere else" arguments have no place in modern civil rights litigation.

48

VII. **THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN HOLDING THAT THE PUBLIC INTEREST AND THE BALANCE OF THE EQUITIES FAVOR INJUNCTIVE RELIEF**

When the government is a party, the last two factors—the balance of equities and the public interest—merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The inquiry thus weighs the interests of Appellees, the government, and the public, balancing the relative harms to each should preliminary relief be granted or denied. The Ninth Circuit has long held that when challenging government action that affects the exercise of constitutional rights—especially First Amendment freedoms—"[t]he balance of equities and the public interest … tip *sharply* in favor of enjoining the" law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (emphasis added). For "[i]t is always in the public interest to prevent the violation of a party's constitutional rights. *Index Newsps. LLC v. U.S. Marshalls Serv.*, 977 F.3d 817 (9th Cir. 2020). Indeed, there is a "'significant public interest' in upholding free speech principles, as the 'ongoing enforcement of the potentially unconstitutional [law] … would infringe not only the free expression interests of plaintiffs, but also the interests of other people' subjected to the same restrictions." *Id.* (citation omitted). On the other hand, "the public interest is not harmed by preliminarily enjoining … a law that is probably unconstitutional." *Am. Civ. Libs. Union v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012).

Enjoining the enforcement of the Challenged Statutes has stopped the harm Appellees suffered while their preliminary injunction motion was pending, including the violation of their fundamental rights. These interests far outweigh whatever burden the State might trot out. For the state "cannot suffer harm from an injunction

that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

## CONCLUSION

For these reasons, this Court should affirm.

Date: January 30, 2024

MICHEL & ASSOCIATES, P.C.

s/ Anna M. Barvir
Anna M. Barvir
*Attorneys for Plaintiffs-Appellees B&L Productions, Inc., d/b/a Crossroads of the West; Gerald Clark; Eric Johnson; Chad Littrell; Jan Steven Merson; California Rifle & Pistol Association, Incorporated; Asian Pacific American Gun Owners Association; Second Amendment Law Center, Inc.*

Date: January 30, 2024

LAW OFFICES OF DONALD KILMER, APC.

s/ Donald Kilmer
Donald Kilmer
*Attorney for Plaintiff-Appellee Second Amendment Foundation*

50

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)**  | 23-3793

The undersigned attorney or self-represented party states the following:

○  I am unaware of any related cases currently pending in this court.

○  I am unaware of any related cases currently pending in this court other than the
case(s) identified in the initial brief(s) filed by the other party or parties.

◉  I am aware of one or more related cases currently pending in this court. The
case number and name of each related case and its relationship to this case are:

> B & L Productions, Inc., v. Newsom, Case No. 23-55431
>
> On December 22, 2023, this Court issued an Order coordinating the cases
> for oral argument, which is scheduled for March 6, 2024.

**Signature** | s/Anna M. Barvir  **Date** | Jan 30, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 17** *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-3793

I am the attorney or self-represented party.

**This brief contains** 13,873 **words,** including ⬚ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated ⬚.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Anna M. Barvir **Date** January 30, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2024, an electronic PDF of APPELLEES' ANSWERING BRIEF was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

Date: January 30, 2024

s/ Anna M. Barvir
Anna M. Barvir

# ADDENDUM

# ADDENDUM
# TABLE OF CONTENTS

Cal Pen Code § 26805...................................................................3

Cal Pen Code § 27200...................................................................5

Cal Pen Code § 27205...................................................................7

Cal Pen Code § 27210...................................................................9

Cal Pen Code § 27215.................................................................11

Cal Pen Code § 27220.................................................................12

Cal Pen Code § 27225.................................................................14

Cal Pen Code § 27230.................................................................16

Cal Pen Code § 27235.................................................................17

Cal Pen Code § 27240.................................................................19

Cal Pen Code § 27245.................................................................21

Cal Pen Code § 27305.................................................................23

Cal Pen Code § 27310.................................................................24

Cal Pen Code § 27315.................................................................26

Cal Pen Code § 27320.................................................................27

Cal Pen Code § 27325.................................................................28

Cal Pen Code § 27335.................................................................29

Cal Pen Code § 27340.................................................................30

Cal Pen Code § 27345.................................................................32

Cal Pen Code § 27350.................................................................33

Cal Pen Code § 27400.................................................................34

Cal Pen Code § 27405.................................................................35

Cal Pen Code § 27410.................................................................36

Cal Pen Code § 27415.................................................................37

Cal Pen Code § 27545................................................................38

Cal Pen Code § 27573................................................................40

Cal Pen Code § 27575................................................................41

Cal Pen Code § 30347................................................................42

Cal Pen Code § 30348................................................................43

Cal Pen Code § 30350................................................................44

Cal Pen Code § 30352................................................................45

Cal Pen Code § 30360................................................................48

First Amendment to the Constitution of the United States.....................49

Second Amendment to the Constitution of the United States .................50

Fourteenth Amendment to the Constitution of the United States............51

# Cal Pen Code § 26805

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 2 Issuance, Forfeiture, and Conditions of License to Sell, Lease, or Transfer Firearms at Retail (Arts. 1 — 6)**
- **Article 2 Grounds for Forfeiture of License (§§ 26800 — 26915)**

## § 26805. Business of licensee conducted only in buildings designated on license; Gun show or event or specified events; Delivery

**(a)** Except as provided in subdivisions (b) and (c), the business of a licensee shall be conducted only in the buildings designated in the license.

**(b)**

**(1)** A person licensed pursuant to Sections 26700 and 26705 may take possession of firearms and commence preparation of registers for the sale, delivery, or transfer of firearms at any gun show or event, as defined in Section 478.100 of Title 27 of the Code of Federal Regulations, or its successor, if the gun show or event is not conducted from any motorized or towed vehicle. A person conducting business pursuant to this subdivision shall be entitled to conduct business as authorized herein at any gun show or event in the state, without regard to the jurisdiction within this state that issued the license pursuant to Sections 26700 and 26705, provided the person complies with all applicable laws, including, but not limited to, the waiting period specified in subdivision (a) of Section 26815, and all applicable local laws, regulations, and fees, if any.

**(2)** A person conducting business pursuant to this subdivision shall publicly display the person's license issued pursuant to Sections 26700 and 26705, or a facsimile thereof, at any gun show or event, as specified in this subdivision.

**(c)**

**(1)** A person licensed pursuant to Sections 26700 and 26705 may engage in the sale and transfer of firearms other than handguns, at events specified in Sections 27900 and 27905, subject to the prohibitions and restrictions contained in those sections.

**(2)** A person licensed pursuant to Sections 26700 and 26705 may also accept delivery of firearms other than handguns, outside the building designated in the license, provided the firearm is being donated for the purpose of sale or transfer at an auction, raffle, or similar event specified in Section 27900.

**(d)** The firearm may be delivered to the purchaser, transferee, or person being loaned the firearm at one of the following places:

**(1)** The building designated in the license.

**(2)** The places specified in subdivision (b) or (c).

**(3)** The place of residence of, the fixed place of business of, or on private property owned or lawfully possessed by, the purchaser, transferee, or person being loaned the firearm.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amended Stats 2011 ch 745 § 7 (AB 809), effective January 1, 2012; Stats 2019 ch 738 § 16 (SB 376), effective January 1, 2020.

# Cal Pen Code § 27200

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 1 Gun Show or Event (§§ 27200 — 27245)**

## § 27200. Requirement of certificate of eligibility to organize gun show

**(a)** No person shall produce, promote, sponsor, operate, or otherwise organize a gun show or event, as specified in subdivision (b) of Section 26805, unless that person possesses a valid certificate of eligibility from the Department of Justice.

**(b)** Unless the department's records indicate that the applicant is a person prohibited from possessing firearms, a certificate of eligibility shall be issued by the Department of Justice to an applicant provided the applicant does all of the following:

**(1)** Certifies that the applicant is familiar with the provisions of this article and Article 2 (commencing with Section 27300).

**(2)** Ensures that liability insurance is in effect for the duration of an event or show in an amount of not less than one million dollars ($1,000,000).

**(3)** Provides an annual list of the gun shows or events that the applicant plans to promote, produce, sponsor, operate, or otherwise organize during the year for which the certificate of eligibility is issued, including the date, time, and location of the gun shows or events.

**(c)** If during that year the information required by paragraph (3) of subdivision (b) changes, or additional gun shows or events will be promoted, produced, sponsored, operated, or otherwise organized by the applicant, the producer shall notify the Department of Justice no later than 30 days prior to the gun show or event.

**(d)** The Department of Justice shall adopt regulations to administer the certificate of eligibility program under this section.

**(e)** The Department of Justice shall recover the full costs of administering the certificate of eligibility program by fees assessed applicants who apply for certificates. A licensed gun show producer shall be assessed an annual fee of eighty-five dollars ($85) by the department.

**(f)** It is the intent of the Legislature that the certificate of eligibility program established pursuant to this section be incorporated into the certificate of eligibility program established pursuant to Section 26710 to the maximum extent practicable.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012.

▼Annotations

| Commentary |
| --- |

**Law Revision Commission Comments:**

**2010—**

Subdivision (a) of Section 27200 continues the first sentence of former Section 12071.1(a) without substantive change.

Subdivision (b) continues the second sentence of former Section 12071.1(a) without substantive change.

Subdivision (c) continues former Section 12071.1(b) without substantive change.

Subdivisions (d) and (e) continue former Section 12071.1(d) without substantive change.

Subdivision (f) continues former Section 12071.1(q) without substantive change.

For exceptions to provisions in this article and Article 2 (commencing with Section 27300), see Article 3 (commencing with Section 27400).

For the consequences of violating this article, see Section 27245 (punishment).

See Sections 16520 ("firearm"), 16800 ("licensed gun show producer").

# Cal Pen Code § 27205

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 1 Gun Show or Event (§§ 27200 — 27245)**

## § 27205. List of entities renting or intending to rent space at gun show or event

**(a)** Before commencement of a gun show or event, the producer thereof shall, upon written request from a law enforcement agency with jurisdiction over the facility, make available to that agency, within 48 hours or a later time specified by the agency, a complete and accurate list of all persons, entities, and organizations that have leased or rented, or are known to the producer to intend to lease or rent, any table, display space, or area at the gun show or event for the purpose of selling, leasing, or transferring firearms, or processing the sale or transfer of ammunition.

**(b)** The producer shall thereafter, upon written request, for every day the gun show or event operates, within 24 hours or a later time specified by the requesting law enforcement agency, make available to that agency an accurate, complete, and current list of the persons, entities, and organizations that have leased or rented, or are known to the producer to intend to lease or rent, any table, display space, or area at the gun show or event for the purpose of selling, leasing, or transferring firearms, or processing the sale or transfer of ammunition.

**(c)** Subdivisions (a) and (b) apply to any person, entity, or organization, regardless of whether that person, entity, or organization participates in the entire gun show or event, or only a portion thereof.

**(d)** The information that may be requested by the law enforcement agency with jurisdiction over the facility, and that shall be provided by the producer upon request, includes, but is not limited to, the following information relative to a vendor who offers for sale any firearms manufactured after December 31, 1898, or any ammunition:

**(1)** The vendor's complete name.

**(2)** A driver's license or identification card number.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amended Stats 2019 ch 736 § 1 (AB 1669), effective January 1, 2020.

▼Annotations

A7

Notes

**Amendments:**
**2019 Amendment (ch 736):**

Added ", or processing the sale or transfer of ammunition" in (a) and (b); and in the introductory language of (d), substituted "includes," for "may include,", added "any" and added ", or any ammunition".

Commentary

**Law Revision Commission Comments:**
**2010—**
Subdivision (a) of Section 27205 continues the first paragraph of former Section 12071.1(f) without substantive change.
Subdivision (b) continues the second paragraph of former Section 12071.1(f) without substantive change.
Subdivision (c) continues the third paragraph of former Section 12071.1(f) without substantive change.
Subdivision (d) continues former Section 12071.1(g) without substantive change.
For exceptions to provisions in this article and Article 2 (commencing with Section 27300), see Article 3 (commencing with Section 27400).
For the consequences of violating this article, see Section 27245 (punishment).
See Section 16520 ("firearm").

A8

# Cal Pen Code § 27210

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 1 Gun Show or Event (§§ 27200 — 27245)**

## § 27210. Event and security plan and schedule

**(a)** The producer and facility's manager of a gun show or event shall prepare an annual event and security plan and schedule that shall include, at a minimum, the following information for each show or event:

**(1)** The type of show or event, including, but not limited to, antique or general firearms and ammunition.

**(2)** The estimated number of vendors offering firearms or ammunition for sale or display.

**(3)** The estimated number of attendees.

**(4)** The number of entrances and exits at the gun show or event site.

**(5)** The location, dates, and times of the show or event.

**(6)** The contact person and telephone number for both the producer and the facility.

**(7)** The number of sworn peace officers employed by the producer or the facility's manager who will be present at the show or event.

**(8)** The number of nonsworn security personnel employed by the producer or the facility's manager who will be present at the show or event.

**(b)** The annual event and security plan shall be submitted by either the producer or the facility's manager to the Department of Justice and the law enforcement agency with jurisdiction over the facility.

**(c)** If significant changes have been made since the annual plan was submitted, the producer shall, not later than 15 days before commencement of the gun show or event, submit to the department, the law enforcement agency with jurisdiction over the facility site, and the facility's manager, a revised event and security plan, including a revised list of vendors that the producer knows, or reasonably should know, will be renting tables, space, or otherwise participating in the gun show or event.

**(d)** The event and security plan shall be approved by the facility's manager before the event or show, after consultation with the law enforcement agency with jurisdiction over the facility.

**(e)** A gun show or event shall not commence unless the requirements of subdivisions (b), (c), and (d) are met.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amended Stats 2014 ch 103 § 9 (AB 1798), effective January 1, 2015; Stats 2015 ch 303 § 415 (AB 731), effective January 1, 2016; Stats 2019 ch 736 §

[2 (AB 1669)](), effective January 1, 2020.

---

▼Annotations

---

Notes

---

- ⬇**Amendments:**

⬆**Amendments:**

**2014 Amendment:**

Substituted (1) "facility's manager" for "facility manager" in the introductory clause of subd (a); and (2) "facility's manager" for "facilities manager" in subd (a)(7).

**2015 Amendment:**

(1) Added the comma after "show or event" in subd (a)(1); and (2) amended subd (e) by (a) substituting "A" for "No"; and (b) adding "not".

**2019 Amendment (ch 736):**

Added "and ammunition" in (a)(1); and added "or ammunition" in (a)(2).

---

Commentary

---

**Law Revision Commission Comments:**
**2010—**
Subdivision (a) of [Section 27210]() continues former Section 12071.1(h) without substantive change.
Subdivision (b) continues the first sentence of former Section 12071.1(i) without substantive change.
Subdivision (c) continues the second sentence of former Section 12071.1(i) without substantive change.
Subdivision (d) continues the third sentence of former Section 12071.1(i) without substantive change.
Subdivision (e) continues the fourth sentence of former Section 12071.1(i) without substantive change.
For exceptions to provisions in this article and Article 2 (commencing with [Section 27300]()), see Article 3 (commencing with [Section 27400]()).
For the consequences of violating this article, see [Section 27245]() (punishment).
See [Section 16520]() ("firearm").
**2014—**
[Section 27210]() is amended to standardize the references to the facility's manager for the site of the gun show or event.

# Cal Pen Code § 27215

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 1 Gun Show or Event (§§ 27200 — 27245)**

## § 27215. Notification to vendors

The producer of a gun show or event shall be responsible for informing prospective gun show vendors of the requirements of this article and of Article 2 (commencing with Section 27300) that apply to vendors.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012.

▼Annotations

Commentary

**Law Revision Commission Comments:**
**2010—**
Section 27215 continues former Section 12071.1(j) without substantive change.
For exceptions to provisions in this article and Article 2 (commencing with Section 27300), see Article 3 (commencing with Section 27400).
For the consequences of violating this article, see Section 27245 (punishment).

A11

# Cal Pen Code § 27220

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 1 Gun Show or Event (§§ 27200 — 27245)**

## § 27220. Submission of prospective vendor and designated firearms transfer agent lists

**(a)** Within seven calendar days of the commencement of a gun show or event, but not later than noon on Friday for a show or event held on a weekend, the producer shall submit a list of all prospective vendors and designated firearms transfer agents who are licensed firearms dealers or ammunition vendors to the Department of Justice for the purpose of determining whether these prospective vendors and designated firearms transfer agents possess valid licenses and are thus eligible to participate as licensed dealers or ammunition vendors at the show or event.

**(b)** The department shall examine its records and if it determines that a dealer's or vendor's license is not valid, it shall notify the show or event producer of that fact before the show or event commences.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amended Stats 2019 ch 736 § 3 (AB 1669), effective January 1, 2020.

▼Annotations

Notes

**Amendments:**
**2019 Amendment (ch 736):**

Added "or ammunition vendors" twice in (a); and added "or vendor's" in (b).

---

Commentary

---

**Law Revision Commission Comments:**
**2010—**
Subdivision (a) of Section 27220 continues the first sentence of former Section 12071.1(k) without substantive change.
Subdivision (b) continues the second sentence of former Section 12071.1(k) without substantive change.
For exceptions to provisions in this article and Article 2 (commencing with Section 27300), see Article 3 (commencing with Section 27400).
For the consequences of violating this article, see Section 27245 (punishment).
See Sections 16520 ("firearm"), 26700 ("dealer," "licensee," or "person licensed pursuant to Sections 26700 to 26915, inclusive").

A13

# Cal Pen Code § 27225

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 1 Gun Show or Event (§§ 27200 — 27245)**

## § 27225. Failure to cooperate by vendor

If a licensed firearms dealer or ammunition vendor fails to cooperate with a producer of a gun show or event, or fails to comply with the applicable requirements of this article or Article 2 (commencing with Section 27300), that person shall not be allowed to participate in that show or event.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amended Stats 2019 ch 736 § 4 (AB 1669), effective January 1, 2020.

# Cal Pen Code § 27230

### Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 1 Gun Show or Event (§§ 27200 — 27245)**

## § 27230. Failure to cooperate by producer

If a producer fails to comply with Section 27215 or 27220, the gun show or event shall not commence until those requirements are met.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012.

▼Annotations

Commentary

**Law Revision Commission Comments:**
**2010—**
Section 27230 continues former Section 12071.1(m) without substantive change.
For exceptions to provisions in this article and Article 2 (commencing with Section 27300), see Article 3 (commencing with Section 27400).
For the consequences of violating this article, see Section 27245 (punishment).

# Cal Pen Code § 27235

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 1 Gun Show or Event (§§ 27200 — 27245)**

## § 27235. Written contracts required

Every producer of a gun show or event shall have a written contract with each gun show vendor selling firearms or ammunition at the show or event.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amended Stats 2019 ch 736 § 5 (AB 1669), effective January 1, 2020.

▼ Annotations

Notes

**Amendments:**
**2019 Amendment (ch 736):**

Added "or ammunition".

Commentary

**Law Revision Commission Comments:**
**2010—**

Section 27235 continues former Section 12071.1(n) without substantive change.

For exceptions to provisions in this article and Article 2 (commencing with Section 27300), see Article 3 (commencing with Section 27400).

For the consequences of violating this article, see Section 27245 (punishment).

See Section 16520 ("firearm").

A18

# Cal Pen Code § 27240

## Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 1 Gun Show or Event (§§ 27200 — 27245)**

## § 27240. Posting of signs required

**(a)** The producer of a gun show or event shall require that signs be posted in a readily visible location at each public entrance to the show containing, but not limited to, the following notices:

**(1)** This gun show follows all federal, state, and local firearms, ammunition, and weapons laws, without exception.

**(2)** Any firearm carried onto the premises by any member of the public will be checked, cleared of any ammunition, and secured in a manner that prevents it from being operated, and an identification tag or sticker will be attached to the firearm before the person is allowed admittance to the show.

**(3)** No member of the public under the age of 18 years shall be admitted to the show unless accompanied by a parent, grandparent, or legal guardian.

**(4)** All firearms transfers between private parties at the show shall be conducted through a licensed dealer in accordance with applicable state and federal laws.

**(5)** Persons possessing firearms of ammunition at this facility shall have in their immediate possession government-issued photo identification, and display it upon request to any security officer or any peace officer, as defined in Section 830.

**(6)** All ammunition transfers between private parties at the show shall be conducted through a licensed dealer or ammunition vendor in accordance with applicable state and federal laws.

**(b)** The show producer shall post, in a readily visible location at each entrance to the parking lot at the show, signage that states: "The transfer of firearms or ammunition on the parking lot of this facility is a crime."

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amended Stats 2019 ch 736 § 6 (AB 1669), effective January 1, 2020.

▼Annotations

Notes

**Amendments:**
**2019 Amendment (ch 736):**

Added ", ammunition," in (a)(1); in (a)(5), added "of ammunition" and substituted "shall" for "may"; added (a)(6); and added "or ammunition" in (b).

Commentary

**Law Revision Commission Comments:**
**2010—**
Subdivision (a) of Section 27240 continues former Section 12071.1(o) without substantive change.
Subdivision (b) continues former Section 12071.1(p) without substantive change.
For exceptions to provisions in this article and Article 2 (commencing with Section 27300), see Article 3 (commencing with Section 27400).
For the consequences of violating this article, see Section 27245 (punishment).
See Sections 16520 ("firearm"), 26700 ("dealer," "licensee," or "person licensed pursuant to Sections 26700 to 26915, inclusive").

A20

# Cal Pen Code § 27245

### Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 1 Gun Show or Event (§§ 27200 — 27245)**

## § 27245. Willful failure to comply; Penalty

**(a)** A willful failure by a gun show producer to comply with any of the requirements of this article, except for the posting of required signs, shall be a misdemeanor punishable by a fine not to exceed two thousand dollars ($2,000), and shall render the producer ineligible for a gun show producer license for one year from the date of the conviction.

**(b)** A willful failure of a gun show producer to post signs as required by this article shall be a misdemeanor punishable by a fine not to exceed one thousand dollars ($1,000) for the first offense and not to exceed two thousand dollars ($2,000) for the second or subsequent offense, and with respect to the second or subsequent offense, shall render the producer ineligible for a gun show producer license for one year from the date of the conviction.

**(c)** Multiple violations charged pursuant to subdivision (a) arising from more than one gun show or event shall be grounds for suspension of a producer's certificate of eligibility pending adjudication of the violations.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012.

▼Annotations

### Commentary

Law Revision Commission Comments:
2010—
Subdivision (a) of Section 27245 continues former Section 12071.1(e)(1) without substantive change.
Subdivision (b) continues former Section 12071.1(e)(2) without substantive change.
Subdivision (c) continues former Section 12071.1(e)(3) without substantive change.
A violation of the predecessor of this article (former Section 12071.1) counts as a prior offense in determining the appropriate punishment under this section. See Section 16015 (determining existence of prior conviction).

For exceptions to provisions in this article and Article 2 (commencing with Section 27300), see Article 3 (commencing with Section 27400).

# Cal Pen Code § 27305

## Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 2 Gun Show Enforcement and Security Act of 2000 (§§ 27300 — 27350)**

## § 27305. Written certification by vendors

All gun show or event vendors shall certify in writing to the producer that they:

**(a)** Will not display, possess, or offer for sale any firearms, ammunition, knives, or weapons for which possession or sale is prohibited.

**(b)** Acknowledge that they are responsible for knowing and complying with all applicable federal, state, and local laws dealing with the possession and transfer of firearms or ammunition.

**(c)** Will not engage in activities that incite or encourage hate crimes.

**(d)** Will process all transfers of firearms through licensed firearms dealers as required by state law.

**(e)** Will process all sales or transfers of ammunition through licensed firearms dealers or ammunition vendors as required by state law.

**(f)** Will verify that all firearms in their possession at the show or event will be unloaded, and that the firearms will be secured in a manner that prevents them from being operated except for brief periods when the mechanical condition of a firearm is being demonstrated to a prospective buyer.

**(g)** Have complied with the requirements of Section 27320.

**(h)** Will not display or possess black powder, or offer it for sale.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amended Stats 2019 ch 736 § 7 (AB 1669), effective January 1, 2020.

# Cal Pen Code § 27310

## Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 2 Gun Show Enforcement and Security Act of 2000 (§§ 27300 — 27350)**

## § 27310. Firearm and ammunition transfer or sale requirements

**(a)** All firearms and ammunition transfers or sales at a gun show or event shall be conducted in accordance with applicable state and federal laws.

**(b)** Commencing July 1, 2022, the Department of Justice may inspect any firearm dealers, ammunition vendors, or manufacturers participating in a gun show or event in order to ensure compliance with subdivision (a). The department may adopt regulations to administer the application and enforcement provisions of this chapter.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amended Stats 2019 ch 736 § 8 (AB 1669), effective January 1, 2020; Stats 2020 ch 273 § 1 (AB 2061), effective January 1, 2021.

▼Annotations

┌──────────┐
│  Notes   │
└──────────┘

- ⬇**Amendments:**

⬆**Amendments:**

**2019 Amendment (ch 736):**

Substituted "and ammunition transfers or sales" for "transfers".

**2020 Amendment (ch 273):**

Added designation (a) and inserted "conducted" following "shall be"; and added (b).

Commentary

**Law Revision Commission Comments:**
**2010—**
Section 27310 continues former Section 12071.4(c) without substantive change.

For exceptions to provisions in this article and Article 1 (commencing with Section 27200), see Article 3 (commencing with Section 27400).

For the consequences of violating this article, see Section 27350 (punishment).

See Section 16520 ("firearm").

# Cal Pen Code § 27315

### Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 2 Gun Show Enforcement and Security Act of 2000 (§§ 27300 — 27350)**

## § 27315. Sales of ammunition

Sales of ammunition at a gun show or event shall comply with all applicable laws, including Sections 30347, 30348, 30350, 30352, and 30360.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amended Stats 2019 ch 736 § 9 (AB 1669), effective January 1, 2020.

# Cal Pen Code § 27320

### Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 2 Gun Show Enforcement and Security Act of 2000 (§§ 27300 — 27350)**

## § 27320. Information required from vendor

**(a)** Before commencement of a gun show or event, each vendor who will offer for sale any firearms manufactured after December 31, 1898, or any ammunition, shall provide to the producer all of the following information relative to the vendor, the vendor's employees, and other persons, compensated or not, who will be working or otherwise providing services to the public at the vendor's display space:

**(1)** The person's complete name.

**(2)** The person's driver's license or state-issued identification card number.

**(3)** The person's date of birth.

**(4)** The person's certificate of eligibility number pursuant to Section 26915 or 30347 of the Penal Code.

**(b)** The producer shall keep the information at the onsite headquarters of the show or event for the duration of the show or event, and at the producer's regular place of business for two weeks after the conclusion of the show or event. The producer shall make the information available upon request to any sworn peace officer for purposes of the officer's official law enforcement duties.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amended Stats 2019 ch 736 § 10 (AB 1669), effective January 1, 2020.

# Cal Pen Code § 27325

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 2 Gun Show Enforcement and Security Act of 2000 (§§ 27300 — 27350)**

## § 27325. Name tag required

At any gun show or event, each vendor and each employee of a vendor shall wear a name tag indicating first and last name.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012.

# Cal Pen Code § 27335

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 2 Gun Show Enforcement and Security Act of 2000 (§§ 27300 — 27350)**

## § 27335. Minors prohibited unless accompanied by parent or guardian

No member of the public who is under the age of 18 years shall be admitted to, or be permitted to remain at, a gun show or event unless accompanied by a parent or legal guardian. Any member of the public who is under the age of 18 years shall be accompanied by that person's parent, grandparent, or legal guardian while at the show or event.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012.

# Cal Pen Code § 27340

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 2 Gun Show Enforcement and Security Act of 2000 (§§ 27300 — 27350)**

## § 27340. Persons bringing firearms or ammunition to gun show or event

**(a)** Persons other than show or event security personnel, sworn peace officers, or vendors, who bring any firearm or any ammunition that is separate from a firearm onto the gun show or event premises shall sign in ink the tag or sticker that is attached to the firearm prior to being allowed admittance to the show or event, as provided for in subdivision (b) and (c).

**(b)** All firearms carried onto the premises of a gun show or event by members of the public shall be checked, cleared of any ammunition, secured in a manner that prevents them from being operated, and an identification tag or sticker shall be attached to the firearm, prior to the person being allowed admittance to the show. The identification tag or sticker shall state that all firearms transfers between private parties at the show or event shall be conducted through a licensed dealer in accordance with applicable state and federal laws. The person possessing the firearm shall complete the following information on the tag before it is attached to the firearm:

**(1)** The gun owner's signature.

**(2)** The gun owner's printed name.

**(3)** The identification number from the gun owner's government-issued photo identification.

**(c)** Any ammunition carried onto the premises of a gun show or event by members of the public shall be checked and secured in a manner that prevents the ammunition from being discharged. An identification tag or sticker shall be attached to the ammunition prior to the person being allowed admittance to the show. The identification tag or sticker shall state that all ammunition transfers between private parties at the show or event shall be conducted through a licensed dealer or ammunition vendor in accordance with applicable state and federal laws. The person possessing the ammunition shall complete the following information on the tag before it is attached to the ammunition:

**(1)** The ammunition owner's signature.

**(2)** The ammunition owner's printed name.

**(3)** The identification number from the ammunition owner's government-issued photo identification.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amended Stats 2019 ch 736 § 11 (AB 1669), effective January 1, 2020.

# Cal Pen Code § 27345

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 2 Gun Show Enforcement and Security Act of 2000 (§§ 27300 — 27350)**

## § 27345. Persons possessing firearms or ammunition carrying identification

Any person who possesses a firearm or ammunition at a gun show or event shall have government-issued photo identification in immediate possession, and shall display it upon request to any security officer or peace officer.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amended Stats 2019 ch 736 § 12 (AB 1669), effective January 1, 2020.

# Cal Pen Code § 27350

## Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 2 Gun Show Enforcement and Security Act of 2000 (§§ 27300 — 27350)**

## § 27350. Violations of article

**(a)** Unless otherwise specified, a first violation of this article is an infraction.

**(b)** Any second or subsequent violation of this article is a misdemeanor.

**(c)** Any person who commits an act the person knows to be a violation of this article is guilty of a misdemeanor for a first offense.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012.

# Cal Pen Code § 27400

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 3 Exceptions Relating to Law Enforcement (§§ 27400 — 27415)**

## § 27400. Exceptions for transfers to authorized law enforcement representative

**(a)** Article 1 (commencing with Section 27200) and Article 2 (commencing with Section 27300) do not apply to any sale, delivery, or transfer of firearms made to an authorized law enforcement representative of any city, county, city and county, or state, or of the federal government, for exclusive use by that governmental agency if, prior to the sale, delivery, or transfer of these firearms, written authorization from the head of the agency authorizing the transaction is presented to the person from whom the purchase, delivery, or transfer is being made.

**(b)** Proper written authorization is defined as verifiable written certification from the head of the agency by which the purchaser or transferee is employed, identifying the employee as an individual authorized to conduct the transaction, and authorizing the transaction for the exclusive use of the agency by which that person is employed.

**(c)** Within 10 days of the date a handgun, and commencing January 1, 2014, any firearm, is acquired by the agency, a record of the same shall be entered as an institutional weapon into the Automated Firearms System (AFS) via the California Law Enforcement Telecommunications System (CLETS) by the law enforcement or state agency. Any agency without access to AFS shall arrange with the sheriff of the county in which the agency is located to input this information via this system.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amended Stats 2011 ch 745 § 23 (AB 809), effective January 1, 2012.

# Cal Pen Code § 27405

## Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 3 Exceptions Relating to Law Enforcement (§§ 27400 — 27415)**

## § 27405. Exceptions for loans of firearms in specified circumstances

Article 1 (commencing with Section 27200) and Article 2 (commencing with Section 27300) do not apply to the loan of a firearm if all of the following conditions are satisfied:

**(a)** The loan is made by an authorized law enforcement representative of a city, county, or city and county, or of the state or federal government.

**(b)** The loan is made to a peace officer employed by that agency and authorized to carry a firearm.

**(c)** The loan is made for the carrying and use of that firearm by that peace officer in the course and scope of the officer's duties.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012.

# Cal Pen Code § 27410

## Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 3 Exceptions Relating to Law Enforcement (§§ 27400 — 27415)**

## § 27410. Exceptions for transfer of firearms from law enforcement agency to peace officer

**(a)** Article 1 (commencing with Section 27200) and Article 2 (commencing with Section 27300) do not apply to the sale, delivery, or transfer of a firearm by a law enforcement agency to a peace officer pursuant to Section 10334 of the Public Contract Code.

**(b)** Within 10 days of the date that a handgun, and commencing January 1, 2014, any firearm, is sold, delivered, or transferred pursuant to Section 10334 of the Public Contract Code to that peace officer, the name of the officer and the make, model, serial number, and other identifying characteristics of the firearm being sold, delivered, or transferred shall be entered into the Automated Firearms System (AFS) via the California Law Enforcement Telecommunications System (CLETS) by the law enforcement or state agency that sold, delivered, or transferred the firearm, provided, however, that if the firearm is not a handgun and does not have a serial number, identification number, or identification mark assigned to it, that fact shall be noted in AFS. Any agency without access to AFS shall arrange with the sheriff of the county in which the agency is located to input this information via this system.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amended Stats 2011 ch 745 § 24 (AB 809), effective January 1, 2012.

# Cal Pen Code § 27415

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 3 Gun Show or Event (Arts. 1 — 3)**
- **Article 3 Exceptions Relating to Law Enforcement (§§ 27400 — 27415)**

## § 27415. Exceptions for transfers of firearms from law enforcement agency to retiring peace officer

**(a)** Article 1 (commencing with Section 27200) and Article 2 (commencing with Section 27300) do not apply to the sale, delivery, or transfer of a firearm by a law enforcement agency to a retiring peace officer who is authorized to carry a firearm pursuant to Chapter 5 (commencing with Section 26300) of Division 5.

**(b)** Within 10 days of the date that a handgun, and commencing January 1, 2014, any firearm, is sold, delivered, or transferred to that retiring peace officer, the name of the officer and the make, model, serial number, and other identifying characteristics of the firearm being sold, delivered, or transferred shall be entered into the Automated Firearms System (AFS) via the California Law Enforcement Telecommunications System (CLETS) by the law enforcement or state agency that sold, delivered, or transferred the firearm, provided, however, that if the firearm is not a handgun and does not have a serial number, identification number, or identification mark assigned to it, that fact shall be noted in AFS. Any agency without access to AFS shall arrange with the sheriff of the county in which the agency is located to input this information via this system.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amended Stats 2011 ch 745 § 25 (AB 809), effective January 1, 2012.

# Cal Pen Code § 27545

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 6 Sale, Lease, or Transfer of Firearms (Chs. 1 — 6)**
- **Chapter 4 Crimes Relating to Sale, Lease, or Transfer of Firearms (Arts. 1 — 7)**
- **Article 1 Crimes Relating to Sale, Lease, or Transfer of Firearms (§§ 27500 — 27590)**

## § 27545. Transaction where neither party holds a dealer's license

Where neither party to the transaction holds a dealer's license issued pursuant to Sections 26700 to 26915, inclusive, the parties to the transaction shall complete the sale, loan, or transfer of that firearm through a licensed firearms dealer pursuant to Chapter 5 (commencing with Section 28050).

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012.

▼Annotations

Commentary

**Law Revision Commission Comments:**
**2010—**
Section 27545 continues former Section 12072(d) without substantive change.
For exceptions to this provision, see Article 2 (commencing with Section 27600) and Article 6 (commencing with Section 27850). See also Section 28000 (circumstances that may be reported to Department of Justice in prescribed format).
For the consequences of violating this section, see Section 27590 (punishment for violation of article).
See Sections 16520 ("firearm"), 26700 ("dealer," "licensee," or "person licensed pursuant to Sections 26700 to 26915, inclusive").

## Notes to Decisions

**1. Generally**

To prove a violation of former Pen C § 12072(d), the People need not prove a defendant knew or should have known that the other party to the firearms transaction was unlicensed. Thus, in a prosecution of defendant for unlawfully transferring a firearm under former Pen C § 12072(d), the prosecution was not required to prove that defendant, who was not a licensed dealer, knew that the person who purchased a firearm from him was also unlicensed. People v. Vaughn (Cal. App. 1st Dist. Oct. 3, 2014), 230 Cal. App. 4th 322, 178 Cal. Rptr. 3d 595, 2014 Cal. App. LEXIS 892.

# Cal Pen Code § 27573

Current through the 2023 Legislative Session.

Section 27573 - Sale of firearms, firearm precursor parts, or ammunition prohibited on state property or buildings

**(a)** A state officer or employee, or operator, lessee, or licensee of any state property, shall not contract for, authorize, or allow the sale of any firearm, firearm precursor part, or ammunition on state property or in the buildings that sit on state property or property otherwise owned, leased, occupied, or operated by the state.

**(b)** This section does not apply to any of the following:

> **(1)** A gun buyback event held by a law enforcement agency.

> **(2)** The sale of a firearm by a public administrator, public conservator, or public guardian within the course of their duties.

> **(3)** The sale of a firearm, firearm precursor part, or ammunition on state property that occurs pursuant to a contract that was entered into before January 1, 2023.

> **(4)** The purchase of firearms, firearm precursor parts, or ammunition on state property by a law enforcement agency in the course of its regular duties.

> **(5)** The sale or purchase of a firearm pursuant to subdivision (b) or (c) of Section 10334 of the Public Contract Code.

*Ca. Pen. Code § 27573*

Added by Stats 2022 ch 145 (SB 915),s 1, eff. 1/1/2023.

A40

# Cal Pen Code § 27575

Current through the 2023 Legislative Session.

Section 27575 - Sales related to firearms and ammunition prohibited in the OC Fair and Event Center, in the County of Orange, and the City of Costa Mesa

**(a)** Notwithstanding any other law, an officer, employee, operator, lessee, or licensee of the 32nd District Agricultural Association, as defined in Section 3884 of the Food and Agricultural Code, shall not contract for, authorize, or allow the sale of any firearm, firearm precursor part, or ammunition on the property or in the buildings that comprise the OC Fair and Event Center, in the County of Orange, the City of Costa Mesa, or any successor or additional property owned, leased, or otherwise occupied or operated by the district.

**(b)** This section does not apply to any of the following:

    **(1)** A gun buyback event held by a law enforcement agency.

    **(2)** The sale of a firearm by a public administrator, public conservator, or public guardian within the course of their duties.

    **(3)** The sale of a firearm, firearm precursor part, or ammunition on state property that occurs pursuant to a contract that was entered into before January 1, 2022.

    **(4)** The purchase of ammunition on state property by a law enforcement agency in the course of its regular duties.

*Ca. Pen. Code § 27575*

Added by Stats 2021 ch 684 (SB 264),s 2, eff. 1/1/2022.

# Cal Pen Code § 30347

### Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 10 Special Rules Relating to Particular Types of Firearms or Firearm Equipment (Chs. 1 — 10)**
- **Chapter 1 Ammunition (Arts. 1 — 5)**
- **Article 3 Ammunition Vendors (§§ 30342 — 30365)**

### § 30347. Ammunition vendor's agents and employees; Certificate of eligibility from Department of Justice; Limitation on scope of employment for specified persons

**(a)** An ammunition vendor shall require any agent or employee who handles, sells, delivers, or has under his or her custody or control any ammunition, to obtain and provide to the vendor a certificate of eligibility from the Department of Justice issued pursuant to Section 26710. On the application for the certificate, the agent or employee shall provide the name and address of the ammunition vendor with whom the person is employed, or the name and California firearms dealer number of the ammunition vendor if applicable.

**(b)** The department shall notify the ammunition vendor in the event that the agent or employee who has a certificate of eligibility is or becomes prohibited from possessing ammunition under subdivision (a) of Section 30305 or federal law.

**(c)** An ammunition vendor shall not permit any agent or employee who the vendor knows or reasonably should know is a person described in Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of this title or Section 8100 or 8103 of the Welfare and Institutions Code to handle, sell, deliver, or have under his or her custody or control, any ammunition in the course and scope of employment.

# Cal Pen Code § 30348

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 10 Special Rules Relating to Particular Types of Firearms or Firearm Equipment (Chs. 1 — 10)**
- **Chapter 1 Ammunition (Arts. 1 — 5)**
- **Article 3 Ammunition Vendors (§§ 30342 — 30365)**

## § 30348. Sale of ammunition by licensed vendor; Licensed premises requirement; Gun shows and events

**(a)** Except as provided in subdivision (b), the sale of ammunition by a licensed vendor shall be conducted at the location specified in the license.

**(b)** A vendor may sell ammunition at a gun show or event if the gun show or event is not conducted from any motorized or towed vehicle.

**(c)** For purposes of this section, "gun show or event" means a function sponsored by any national, state, or local organization, devoted to the collection, competitive use, or other sporting use of firearms, or an organization or association that sponsors functions devoted to the collection, competitive use, or other sporting use of firearms in the community.

**(d)** Sales of ammunition at a gun show or event shall comply with all applicable laws including Sections 30347, 30350, 30352, and 30360.

## History

Adopted by voters, Prop. 63 § 8.11, effective November 9, 2016.

# Cal Pen Code § 30350

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 10 Special Rules Relating to Particular Types of Firearms or Firearm Equipment (Chs. 1 — 10)**
- **Chapter 1 Ammunition (Arts. 1 — 5)**
- **Article 3 Ammunition Vendors (§§ 30342 — 30365)**

## § 30350. Transfer of ammunition without assistance of vendor or employee

An ammunition vendor shall not sell or otherwise transfer ownership of, offer for sale or otherwise offer to transfer ownership of, or display for sale or display for transfer of ownership of any ammunition in a manner that allows that ammunition to be accessible to a purchaser or transferee without the assistance of the vendor or an employee of the vendor.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amendment approved by voters, Prop. 63 § 8.12, effective November 9, 2016.

# Cal Pen Code § 30352

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 10 Special Rules Relating to Particular Types of Firearms or Firearm Equipment (Chs. 1 — 10)**
- **Chapter 1 Ammunition (Arts. 1 — 5)**
- **Article 3 Ammunition Vendors (§§ 30342 — 30365)**

## § 30352. Information necessary for transfer of ammunition

**(a)** Commencing July 1, 2019, an ammunition vendor shall not sell or otherwise transfer ownership of any ammunition without, at the time of delivery, legibly recording the following information on a form to be prescribed by the Department of Justice:

**(1)** The date of the sale or other transfer.

**(2)** The purchaser's or transferee's driver's license or other identification number and the state in which it was issued.

**(3)** The brand, type, and amount of ammunition sold or otherwise transferred.

**(4)** The purchaser's or transferee's full name and signature.

**(5)** The name of the salesperson who processed the sale or other transaction.

**(6)** The purchaser's or transferee's full residential address and telephone number.

**(7)** The purchaser's or transferee's date of birth.

**(b)**

**(1)** Commencing July 1, 2019, an ammunition vendor shall electronically submit to the department the information required by subdivision (a) for all sales and transfers of ownership of ammunition. The department shall retain this information in a database to be known as the Ammunition Purchase Records File. Except as provided in paragraph (2), this information shall remain confidential and may be used by the department and those entities specified in, and pursuant to, subdivision (b) or (c) of Section 11105, through the California Law Enforcement Telecommunications System, only for law enforcement purposes. The ammunition vendor shall not use, sell, disclose, or share the information for any other purpose other than the submission required by this subdivision without the express written consent of the purchaser or transferee.

**(2)** The information collected by the department as provided in paragraph (1) shall be available to researchers affiliated with the California Firearm Violence Research Center at UC Davis following approval by the institution's governing institutional review board, when required. At the department's discretion, and subject to Section 14240, the data may be provided to any other nonprofit bona fide research institution accredited by the United States Department of Education or the Council for Higher

Education Accreditation for the study of the prevention of violence, following approval by the institution's governing institutional review board or human subjects committee, when required, for academic and policy research purposes. Material identifying individuals shall only be provided for research or statistical activities and shall not be transferred, revealed, or used for purposes other than research or statistical activities, and reports or publications derived therefrom shall not identify specific individuals. Reasonable costs to the department associated with the department's processing of that data may be billed to the researcher. If a request for data or letter of support for research using the data is denied, the department shall provide a written statement of the specific reasons for the denial.

**(c)** Commencing on July 1, 2019, only those persons listed in this subdivision, or those persons or entities listed in subdivision (e), shall be authorized to purchase ammunition. Prior to delivering any ammunition, an ammunition vendor shall require bona fide evidence of identity to verify that the person who is receiving delivery of the ammunition is a person or entity listed in subdivision (e) or one of the following:

**(1)** A person authorized to purchase ammunition pursuant to Section 30370.

**(2)** A person who was approved by the department to receive a firearm from the ammunition vendor, pursuant to Section 28220, if that vendor is a licensed firearms dealer, and the ammunition is delivered to the person in the same transaction as the firearm.

**(d)** Commencing July 1, 2019, the ammunition vendor shall verify with the department, in a manner prescribed by the department, that the person is authorized to purchase ammunition. If the person is not listed as an authorized ammunition purchaser, the vendor shall deny the sale or transfer.

**(e)** Subdivisions (a) and (d) shall not apply to sales or other transfers of ownership of ammunition by ammunition vendors to any of the following, if properly identified:

**(1)** An ammunition vendor.

**(2)** A person who is on the centralized list of exempted federal firearms licensees maintained by the department pursuant to Article 6 (commencing with Section 28450) of Chapter 6 of Division 6 of Title 4 of Part 6.

**(3)** A person who purchases or receives ammunition at a target facility holding a business or other regulatory license, provided that the ammunition is at all times kept within the facility's premises.

**(4)** A gunsmith.

**(5)** A wholesaler.

**(6)** A manufacturer or importer of firearms or ammunition licensed pursuant to Chapter 44 (commencing with Section 921) of Part I of Title 18 of the United States Code, and the regulations issued pursuant thereto.

**(7)** An authorized law enforcement representative of a city, county, city and county, or state or federal government, if the sale or other transfer of ownership is for exclusive use by that government agency, and, prior to the sale, delivery, or transfer of the handgun ammunition, written authorization from the head of the agency authorizing the transaction is presented to the person from whom the purchase, delivery, or transfer is being made. Proper written authorization is defined as verifiable written certification from the head of the agency by which the purchaser, transferee, or person otherwise acquiring ownership is employed, identifying the employee as an individual authorized to conduct the transaction, and authorizing the transaction for the exclusive use of the agency by which that individual is employed.

**(8)**

**(A)** A properly identified sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, or properly identified sworn federal law enforcement officer, who is authorized to carry a firearm in the course and scope of the officer's duties.

**(B)**

**(i)** Proper identification is defined as verifiable written certification from the head of the agency by which the purchaser or transferee is employed, identifying the purchaser or transferee as a full-time paid peace officer who is authorized to carry a firearm in the course and scope of the officer's duties.

**(ii)** The certification shall be delivered to the vendor at the time of purchase or transfer and the purchaser or transferee shall provide bona fide evidence of identity to verify that the purchaser transferee is the person authorized in the certification.

**(iii)** The vendor shall keep the certification with the record of sale and submit the certification to the department.

**(f)** The department is authorized to adopt regulations to implement the provisions of this section.

## History

Added Stats 2010 ch 711 § 6 (SB 1080), effective January 1, 2011, operative January 1, 2012. Amendment approved by voters, Prop. 63 § 8.13, effective November 9, 2016; Amended Stats 2016 ch 55 § 12, effective January 1, 2017; Stats 2021 ch 253 § 11 (AB 173), effective September 23, 2021.

# Cal Pen Code § 30360

Copy Citation

Deering's California Codes are current through all 770 Chapters of the 2021 Regular Session.

- **Deering's California Codes Annotated**
- **PENAL CODE (§§ 1 — 34370)**
- **Part 6 Control of Deadly Weapons (Titles 1 — 4)**
- **Title 4 Firearms (Divs. 1 — 12)**
- **Division 10 Special Rules Relating to Particular Types of Firearms or Firearm Equipment (Chs. 1 — 10)**
- **Chapter 1 Ammunition (Arts. 1 — 5)**
- **Article 3 Ammunition Vendors (§§ 30342 — 30365)**

## §  30360. False entries in records

Commencing February 1, 2011, a vendor shall not knowingly make a false entry in, fail to make a required entry in, fail to obtain the required thumbprint, or otherwise fail to maintain in the required manner, records prepared in accordance with Section 30352. If the right thumbprint is not available, then the vendor shall have the purchaser or transferee use the left thumb, or any available finger, and shall so indicate on the form.

## History

Added Stats 2010 ch 711 §  6 (SB 1080), effective January 1, 2011, operative January 1, 2012.

A48

# Constitution of the United States

**First Amendment**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

# Constitution of the United States

**Second Amendment**

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

# Constitution of the United States

**Fourteenth Amendment**

Section 1

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Section 2

Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice-President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

Section 3

No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

Section 4

The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing

insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

Section 5

The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.