No. 23-3793

In the

United States Court of Appeals
for the Ninth Circuit

◆

GAVIN NEWSOM, in his official capacity as Governor of
the State of California and in his personal capacity, et al.,

*Defendants-Appellants*,

v.

B & L PRODUCTIONS, INC., et al.,

*Plaintiffs-Appellees*.

◆

Appeal from the United States District Court
for the Central District of California
No. 8:22-cv-01518 JWH (JDEx)
(Hon. John W. Holcomb)

◆

**BRIEF OF *AMICI CURIAE* CITIZENS COMMITTEE FOR THE
RIGHT TO KEEP AND BEAR ARMS AND INDEPENDENCE
INSTITUTE IN SUPPORT OF APPELLEES AND AFFIRMANCE**

◆

DAVID B. KOPEL
INDEPENDENCE INSTITUTE
727 East 16th Avenue
Denver, CO 80203
(303) 279-6536
david@i2i.org

JOSEPH G.S. GREENLEE
GREENLEE LAW, PLLC
PO Box 4061
McCall, ID 83638
(208) 271-2494
joseph@greenlee.law
*Counsel of Record*

Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* make the following statements:

**Citizens Committee for the Right to Keep and Bear Arms** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**Independence Institute** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES .................................................................iv

STATEMENT OF *AMICI CURIAE* .........................................................1

CONSENT TO FILE ...........................................................................2

SUMMARY OF ARGUMENT ................................................................3

ARGUMENT ....................................................................................5

  I.   This Court has held that the Second Amendment protects the right to acquire arms. .......................................................5

  II.  Early Americans' vast freedom to buy and sell arms was infringed by Britain's ban on arms commerce, which precipitated the Revolutionary War. ..........................................7

     A.   Great Britain prevented domestic arms commerce. ..................9

     B.   Great Britain banned the import of arms. ...............................11

     C.   Americans viewed arms commerce restrictions as an effort to enslave them. .........................................................14

     D.   Americans used force to thwart the restrictions. ......................16

     E.   Americans smuggled arms imports. .........................................18

     F.   Americans encouraged domestic arms manufacture and commerce. ...............................................................19

  III. The State failed to justify its restriction with analogous historical regulations. ........................................................25

     A.   17th-century laws restricting firearm sales to hostile foreign nations cannot justify California's ban. ........................26

     B.   The State's two 19th-century proving laws did not restrict where, when, or to whom functional firearms could be sold. ...31

     C.   Gunpowder storage laws were enacted to prevent fires. ..........32

     D.   The Fairgrounds cannot be a "sensitive place" simply because large numbers of people congregate there. ................33

     E.   Government property is not automatically "sensitive." ...........34

CONCLUSION ................................................................................38

CERTIFICATE OF COMPLIANCE..........................................................39

CERTIFICATE OF SERVICE...............................................................40

# TABLE OF AUTHORITIES

**Cases**

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ............................................................ 8, 34, 35, 36

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ............................................................. 5

*Jackson v. City & Cnty. of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) ........................................................ 5, 6, 7

*Kyllo v. United States,*
    533 U.S. 27 (2001) .......................................................................... 24

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ........................................................................ 25

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022) ..................................................................... *passim*

*Teixeira v. Cnty. of Alameda,*
    873 F.3d 670 (9th Cir. 2017) (en banc) ...................................... *passim*

*United States v. Holton,*
    639 F. Supp. 3d 704 (N.D. Tex. 2022) ............................................. 30

**Constitutional Provisions**

U.S. CONST. amend. II ........................................................................ 5, 7

**Statutes and Regulations**

1870 Ga. Laws 421 ................................................................... 35, 36, 37

1804 Mass. Acts 111 ......................................................................... 31

1805 Mass. Acts 588-89 ..................................................................... 31

1809 Mass. Acts 444-47 ..................................................................... 31

iv

1821 Me. Laws 546 ................................................................ 31, 32

1825 N.H. Laws 73-74 ................................................................ 32

1827 N.H. Laws 211 ................................................................... 32

1891 N.H. Laws 332 ................................................................... 32

22 U.S.C. § 2778 ...................................................................... 29

## Other Authorities

A Watchman, *To the Inhabitants of British America* (Dec. 24, 1774)....15

ACTS OF THE PRIVY COUNCIL OF ENGLAND, COLONIAL SERIES,
A.D. 1766–1783, vol. 5 (2005) (James Munro & Almeric
Fitzroy eds., 1912) ................................................................. 11

AMERICAN ARCHIVES, vol. 1 (4th Ser., Peter Force ed., 1837) ..... 10, 11, 15

Andrews, John, LETTERS OF JOHN ANDREWS, ESQ., OF BOSTON
(Winthrop Sargent ed., 1866) ........................................... 9, 10

ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE
GENERAL ASSEMBLY OF MARYLAND, JANUARY 1637/38–
SEPTEMBER 1664 (William Hand Browne ed., 1883) .................... 35, 36

ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE
GENERAL ASSEMBLY OF MARYLAND, 1762–1763 (J. Hall
Pleasants ed., 1941) ..................................................... 35, 36

Atkinson, Rick, THE BRITISH ARE COMING (2019) ................................. 19

Brown, M.L., FIREARMS IN COLONIAL AMERICA (1980) ...................... 20, 22

CATALOGUE OF MANUSCRIPTS AND RELICS IN WASHINGTON'S HEAD-
QUARTERS, NEWBURGH, N.Y. (E.M. Ruttenber ed., 1890)................... 20

Clark, Charles Hopkins, *The 18th Century Diary of Ezra Stiles*,
208 N. AM. REV. 410 (Sept. 1918) ........................................ 11

CONNECTICUT JOURNAL, Dec. 28, 1774 ....................................... 12

DOCUMENTS RELATIVE TO THE COLONIAL HISTORY OF THE STATE OF
NEW YORK, vol. 8 (1857) ........................................................ 12

Drayton, John, MEMOIRS OF THE AMERICAN REVOLUTION (1821) ........... 16

FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND
OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND
COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES
OF AMERICA, vols. 3, 7 (Francis Thorpe ed., 1909) ................................ 8

Fischer, David Hackett, PAUL REVERE'S RIDE (1994) ............................ 14

Gill, Jr., Harold B., THE GUNSMITH IN COLONIAL VIRGINIA (1974) .......... 8

Greenlee, Joseph G.S., *The American Tradition of Self-Made
Arms*, 54 ST. MARY'S L.J. 35 (2023) ......................................... 8, 21, 23

Halbrook, Stephen P., THE FOUNDERS' SECOND AMENDMENT:
ORIGINS OF THE RIGHT TO KEEP AND BEAR ARMS (2008) ............. 13, 19

JOURNALS OF THE CONTINENTAL CONGRESS, vol. 1 (1904) ................. 14, 15

Kopel, David B. & Greenlee, Joseph G.S., *The "Sensitive
Places" Doctrine*, 13 CHARLESTON L. REV. 205 (2018) ............. 34, 36, 37

Kopel, David B., *How the British Gun Control Program
Precipitated the American Revolution*, 6 CHARLESTON
L. REV. 283 (2012) ........................................................ 12, 23

LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674 (E. B.
O'Callaghan ed., 1868) ........................................................ 30

Letter from Earl of Dartmouth to the Governors in America
(Oct. 19, 1774) ........................................................ 12

Letter from Gov. Gage to Lieut. Col. Smith (Apr. 18, 1775) ................. 22

Letter from Gov. Wentworth to Gov. Gage (Dec. 14, 1774) .................. 17

Letter from Thomas Gage to Earl of Dartmouth (Nov. 2, 1774) ........... 11

Letter from Thomas Jefferson to George Hammond (May 15, 1793) .... 24

LETTERS OF HUGH EARL PERCY FROM BOSTON AND NEW YORK, 1774–1776 (Charles Knowles Bolton ed., 1902) .................................. 17

MacKenzie, Frederick, A BRITISH FUSILIER IN REVOLUTIONARY BOSTON: DIARY OF LIEUTENANT FREDERICK MACKENZIE (Allen French ed., 1926) .................................................................................. 21

Miller, Daniel A., SIR JOSEPH YORKE AND ANGLO-DUTCH RELATIONS 1774–1780 (1970) ................................................... 12, 18, 19

MINUTES OF THE PROVINCIAL CONGRESS OF PENNSYLVANIA, FROM THE ORGANIZATION TO THE TERMINATION OF THE PROPRIETARY GOVERNMENT, vol. 10 (1852) ......................................... 20

Moore, Frank, DIARY OF THE AMERICAN REVOLUTION, vol. 1 (1860) ....... 13

NAVAL DOCUMENTS OF THE AMERICAN REVOLUTION, vol. 1 (William Bell Clark ed., 1964) ............................................................................. 13

Neumann, George C., *American Made Muskets in the Revolutionary War*, AM. RIFLEMAN, Mar. 29, 2010 ............................. 22

*New England Confederation*, BRITANNICA.COM ..................................... 28

NEW YORK IN THE REVOLUTION AS COLONY AND STATE SUPPLEMENT (Frederic G. Mather ed., 1901) ............................................................ 20

PA. GAZETTE, Dec. 21, 1774 .................................................................... 13

PARLIAMENTARY HISTORY OF ENGLAND, FROM THE EARLIEST PERIOD TO THE YEAR 1803, vol. 18 (1813) ......................................................... 17

PROVIDENCE GAZETTE, Jan. 14, 1775 ....................................................... 13

Report of the Pennsylvania Committee of Safety (Jan. 3, 1776) .......... 19

Richmond, Robert P., POWDER ALARM (1971) ......................................... 18

Rowe, John, LETTERS AND DIARY OF JOHN ROWE (Anne Rowe Cunningham ed., 1903) ......................................................................... 10

Salay, David L., *The Production of Gunpowder in Pennsylvania During the American Revolution*, 99 PENN. MAG. HIST. & BIOGRAPHY 422 (Oct. 1975) ............................................................ 18, 20

SOURCES OF AMERICAN INDEPENDENCE: SELECTED MANUSCRIPTS FROM THE COLLECTIONS OF THE WILLIAM L. CLEMENTS LIBRARY (Howard Peckham ed., 1978) ............................................................ 24

Stephenson, O.W., *The Supply of Gunpowder in 1776*, 30 AM. HIST. REV. 271 (1925) ............................................................ 17, 19

THE BOOK OF ABIGAIL & JOHN: SELECTED LETTERS OF THE ADAMS FAMILY 1762–1784 (L.H. Butterfield et al. eds., 2002) ........................ 16

THE GENERAL STATUTES OF THE STATE OF NEW-HAMPSHIRE (1867) ........ 32

THE HISTORY OF CONNECTICUT, FROM ITS EARLIEST SETTLEMENT TO THE PRESENT TIME (W. H. Carpenter & T. S. Arthur eds., 1872) ....... 28

THE JOURNALS OF EACH PROVINCIAL CONGRESS OF MASSACHUSETTS IN 1774 AND 1775 AND OF THE COMMITTEE OF SAFETY (William Lincoln ed., 1838) ...................... 14, 15

THE NEW YORK CITY CONSOLIDATION ACT, AS IN FORCE IN 1891 (Mark Ash ed., 1891) ............................................................ 33

THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO THE UNION WITH NEW HAVEN COLONY, MAY, 1665 (J. Hammond Trumbull ed., 1850) ............................................... 26, 27

THE REVISED STATUTES OF THE STATE OF MISSOURI, 1879, vol. 1 (1879) ............................................................ 36, 37

THE REVISED STATUTES OF THE STATE OF NEW HAMPSHIRE, PASSED DECEMBER 23, 1842 (1843) ...................................... 32

THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, vols. 1, 2 (William Waller Hening ed., 1823) ......................................... 29, 30, 31

THE WRITINGS OF THOMAS JEFFERSON, vol. 7 (Paul Ford ed., 1904)....... 24

Tourtellot, Arthur B., LEXINGTON AND CONCORD: THE BEGINNING OF THE WAR OF THE AMERICAN REVOLUTION (1959) ............................ 23

Unsigned report, Sept. 5, 1774 ............................................................... 10

VA. GAZETTE, Apr. 22, 1775 .................................................................... 18

Winthrop, John, THE HISTORY OF NEW ENGLAND FROM 1630 TO 1649, vol. 2 (James Savage ed., 1826) ................................................. 27

ix

## STATEMENT OF *AMICI CURIAE*[1]

**Citizens Committee for the Right to Keep and Bear Arms** (CCRKBA), a nonprofit organization, seeks to preserve Second Amendment rights through education and advocacy. It strives to ensure that the Second Amendment is not misinterpreted in derogation of the people's right to keep and bear arms for self-defense and other constitutional purposes. CCRKBA's programs are designed to help all Americans understand the importance of the Second Amendment and its role in keeping Americans free.

Founded in 1985 on the eternal truths of the Declaration of Independence, the **Independence Institute** is a 501(c)(3) public policy research organization based in Denver, Colorado. The briefs and scholarship of Research Director David Kopel have been cited in seven Supreme Court opinions, including *Bruen*, *McDonald* (under the name of lead *amicus* Int'l Law Enforcement Educators & Trainers Association (ILEETA)), and *Heller* (same). Kopel has also been cited in over one hundred opinions of lower courts, including 14 by this Court. The

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. No person other than *Amici* and their members contributed money intended to fund its preparation or submission.

1

Institute's Senior Fellow in Constitutional Studies, law professor Robert Natelson, has been cited in a dozen Supreme Court opinions.

This case concerns *Amici* because arms commerce is essential to the right to keep and bear arms.

## CONSENT TO FILE

All parties consented to the filing of this brief.

## SUMMARY OF ARGUMENT

This Court has held that the Second Amendment protects the right to acquire arms. The State's prohibition on arms commerce at state-owned venues thus burdens protected conduct. The State, therefore, must demonstrate that its prohibition is consistent with America's historical tradition of firearm regulation.

Arms commerce has been a protected right since the first permanent English settlements in America, when King James I granted colonists the right to import and transfer arms. For nearly 170 years thereafter, colonial Americans freely engaged in arms commerce.

In 1774-75, Britain turned a political crisis into war when it prevented arms commerce within the colonies and banned the importation of arms into the colonies. The British planned to make the arms commerce prohibition permanent to perpetually subdue the Americans.

Had the Founders not managed to circumvent the violations of their right to buy and sell arms, they would have lost their war for independence. Therefore, under the protections of the government the

Founders designed, citizens were, as Secretary of State Thomas Jefferson explained to the British ambassador, always free to sell arms.

Unsurprisingly, the State failed to provide a single founding-era restriction on firearms commerce. Instead, the State relied on two 17th-century laws preventing sales to hostile foreign nations, a Dutch law, a 1631 census law, proving laws, and fire-prevention laws. None of these historical laws shares an analogous "how" and "why" with the State's restrictions on arms commerce.

The prohibited venues are not "sensitive places." The Supreme Court has already rejected the State's argument that the places are "sensitive" simply because large numbers of people congregate there. And the Supreme Court has demonstrated that property is not "sensitive" simply because the government operates as a proprietor.

Because the State's burden on protected conduct is not historically justified, this Court should affirm the district court's decision.

## ARGUMENT

**I.  This Court has held that the Second Amendment protects the right to acquire arms.**

In a Second Amendment challenge, the initial inquiry is whether "the Second Amendment's plain text covers" the desired conduct. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). Here, Appellees desire to engage in lawful firearms commerce, Appellees' Br. 26-27, which the plain text covers.

This Court has already held that the Second Amendment protects the right to acquire arms: "[P]rohibitions on the sale of ammunition do not fall outside the historical understanding of the scope of the Second Amendment right," because "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014), *abrogated on other grounds by Bruen*, 597 U.S. at 19 (quotation marks and brackets omitted). Indeed, the "Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)).

5

The State argues that because Appellees "may purchase firearms at numerous other locations," Appellants' Br. 37 (capitalization altered), its prohibition on firearms commerce at the Orange County Fair & Event Center (the Fairgrounds) and other state property does not "'meaningfully constrain[]' [Appellees'] ability to acquire firearms," *id.* at 38 (quoting *Teixeira*, 873 F.3d at 680), and thus the plain text does not cover Appellees' desired conduct.

While prior decisions have considered the availability of alternative locations to determine the severity of a regulation's burden, *see Teixeira*, 873 F.3d at 679 (considering the number of other firearms retailers in the county); *Jackson*, 746 F.3d at 968 (considering that ammunition prohibited for sale in a city may be purchased outside of the city), the Supreme Court has invalidated such rationales. *See Bruen*, 597 U.S. at 19. The *only* concern under *Bruen*'s initial inquiry is whether the Plaintiffs' desired conduct—*i.e.*, engaging in lawful firearms commerce—is conduct that "the Second Amendment's plain text covers." *Id.* at 24. This Court has held that it is.

Therefore, under *Bruen*, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm

6

regulation." *Id.* at 17. The government's proposed analogies from historical tradition will be examined in Part III.

Before that, Part II will explain the fundamental nature of firearms commerce in the Second Amendment. It is true, as *Jackson* and *Teixeira* held, that firearms commerce is an inescapable implication of the Second Amendment's text. Indeed, as described next, firearms commerce was so central to Americans' understanding of their rights that British infringements on such commerce precipitated the American Revolution.

## II. Early Americans' vast freedom to buy and sell arms was infringed by Britain's ban on arms commerce, which precipitated the Revolutionary War.

To appreciate the absence of historical restrictions on arms commerce, it is helpful to understand the robust tradition that existed prior to the Revolutionary War, and to understand Britain's attempts to disarm the Americans by prohibiting arms commerce.

Arms commerce in America was a protected right from the beginning. Binding his "Heirs and Successors," King James I in 1606 granted the "Southern Colony" (today's Virginia and the entire South) the perpetual right to import from Great Britain, "the Goods, Chattels,

7

Armour, Munition, and Furniture, needful to be used by them, for their said Apparel, Food, Defence or otherwise." 7 FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES 3787-88 (Francis Thorpe ed., 1909).[2] The 1620 Charter of New England (originally the entire North) similarly guaranteed the right "att all and every time and times hereafter, out of our Realmes or Dominions whatsoever, to take, load, carry, and transports in … Shipping, Armour, Weapons, Ordinances, Munition, Powder, Shott, Victuals … and all other Things necessary for the said Plantation, and for their Use and Defense, and for Trade with the People there." 3 *id.* at 1834-35.

Over the next 150 years, Americans freely engaged in arms commerce. *See, e.g.*, Joseph Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35, 45-48 (2023). "Gunsmiths were found nearly everywhere: in port towns along the coast, in settled inland areas, and … on the frontier." Harold Gill, THE GUNSMITH IN COLONIAL VIRGINIA 1 (1974). This tradition came to an abrupt halt, however, when

---

[2] "Armour" included all equipment for fighting, including firearms. *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008).

the British attempted to disarm America by forbidding arms commerce, which led to the Revolutionary War.

## A. Great Britain prevented domestic arms commerce.

In 1774, Massachusetts royal governor Thomas Gage attempted to disarm the colonists by blocking gunpowder commerce. In colonial towns, large quantities of gunpowder were stored in central "powder houses" or "magazines." Unlike modern smokeless gunpowder, the black powder of the 18th century was volatile, so merchants' and government reserves were often stored in reinforced brick buildings. Boston merchant John Andrews wrote on July 22nd that "the Governor has order'd the Keeper of the Province's Magazine not to deliver a kernel of powder (without his express order) of either public or private property[.]" John Andrews, LETTERS OF JOHN ANDREWS, ESQ., OF BOSTON, 1772–1776, at 19 (Winthrop Sargent ed., 1866) (July 22, 1774). On September 2nd, Andrews reported, "A Guard of Soldiers is set upon the Powder house at the back of ye. Common, so that people are debar'd from selling their own property." *Id.* at 39. Andrews noted, "it's now five or six weeks since the Governor has allow'd any [powder] to be taken

out of the magazine here, whereby for some weeks there has not been a pound to be sold or bought in town." *Id.* at 52.

Even more provocatively, on September 1, 1774, Gage "sent a Party of Two hundred men" to the Charlestown powder house. John Rowe, LETTERS AND DIARY OF JOHN ROWE 283-84 (Anne Cunningham ed., 1903). They seized "two hundred and fifty half barrels of powder, the whole store there." Unsigned report, Sept. 5, 1774, *in* 1 AMERICAN ARCHIVES 762 (4th Ser., Peter Force ed., 1837).

Rumors that the British had shot colonists while confiscating gunpowder set off the "Powder Alarm" throughout New England. The colonists "began to collect in large bodies, with their arms, provisions, and ammunition, determining by some means to give a check to a power which so openly threatened their destruction, and in such a clandestine manner rob them of the means of their defence." *Id.* Andrews reported that "at least a hundred thousand men were equipt with arms, and moving towards us from different parts of the country." Andrews, LETTERS, at 52. A patriot in Litchfield, Connecticut, wrote:

> all along were armed men rushing forward, some on foot, some on horseback; at every house women and children making cartridges, running bullets, making wallets, baking biscuit, crying and bemoaning, and at the same time

10

> animating their husbands and sons to fight for their liberties
> tho not knowing whether they should ever see them again.

Charles Clark, *The 18th Century Diary of Ezra Stiles*, 208 N. AM. REV. 410, 419 (Sept. 1918).

In November, General Gage wrote his superior in London, explaining his "order to the Storekeeper not to deliver out any Powder from the Magazine, where the Merchants deposite it, which I judged a very necessary and prudent measure in the present circumstances, as well as removing the Ammunition from the Provincial Arsenal at Cambridge." Letter from Thomas Gage to Earl of Dartmouth (Nov. 2, 1774), *in* 1 AMERICAN ARCHIVES, at 951.

## B. Great Britain banned the import of arms.

King George's government already favored the same policy. On October 19, 1774, King George issued an order-in-council prohibiting the importation of arms and ammunition into America. 5 ACTS OF THE PRIVY COUNCIL OF ENGLAND, COLONIAL SERIES, A.D. 1766–1783, at 401 (2005) (James Munro & Almeric Fitzroy eds., 1912). Secretary of State Lord Dartmouth sent a letter that day "to the Governors in America," announcing "His Majesty's Command that [the governors] do take the most effectual measures for arresting, detaining and securing any

11

Gunpowder, or any sort of arms or ammunition, which may be attempted to be imported into the Province under your Government." Letter from Earl of Dartmouth to the Governors in America (Oct. 19, 1774), *in* 8 DOCUMENTS RELATIVE TO THE COLONIAL HISTORY OF THE STATE OF NEW YORK 509 (1857). The embargo proclamation was initially for six months, but was "repeatedly renewed, remaining in effect until the Anglo-American peace treaty in 1783." David Kopel, *How the British Gun Control Program Precipitated the American Revolution*, 6 CHARLESTON L. REV. 283, 297 (2012).

The king's "proclamation, it is said, was occasioned by intelligence received from Sheffield and Birmingham of amazing quantities of fire arms, &c. being nearly ready to be sent to America." CONNECTICUT JOURNAL, Dec. 28, 1774, at 1.

The embargo was swiftly enforced. In October 1774, an armed British cutter near Amsterdam blockaded a Rhode Island vessel that "had been sent expressly to load different sorts of firearms, and had already taken on board forty small pieces of cannon." Daniel Miller, SIR JOSEPH YORKE AND ANGLO-DUTCH RELATIONS 1774–1780, at 39 (1970). Then, "Two vessels, laden with gun-powder and other military utensils,

bound for the other side of the Atlantick, were stopped at Gravesend …
by the out clearers, in consequence of the King's proclamation." PA.
GAZETTE, Dec. 21, 1774, at 2.

The British deployed "several capital ships of war, and six cutters" in
the Atlantic "to obstruct the American trade, and prevent all European
goods from going there, particularly arms and ammunition." 1 Frank
Moore, DIARY OF THE AMERICAN REVOLUTION 61 (1860) (entry of Apr. 4,
1775). A December 26, 1774, letter from Bristol, England, observed
"several frigates to be fitted out immediately to sail for America, to be
stationed there in order to cruise along the coasts, to prevent any
ammunition or arms being sent to the Americans by any foreign power."
Stephen Halbrook, THE FOUNDERS' SECOND AMENDMENT: ORIGINS OF
THE RIGHT TO KEEP AND BEAR ARMS 64 (2008); *see also* PROVIDENCE
GAZETTE, Jan. 14, 1775, *reprinted in* 1 NAVAL DOCUMENTS OF THE
AMERICAN REVOLUTION 62 (William Bell Clark ed., 1964) ("Orders have
been given for the seizing every Ship, of what Nation soever, employed
in conveying Arms or Ammunition to the Americans.").

Additionally, "[s]tocks of powder and arms in the possession of merchants were forcibly purchased by the Crown." David Hackett Fischer, PAUL REVERE'S RIDE 50 (1994)

## C. Americans viewed arms commerce restrictions as an effort to enslave them.

Defying a ban on public meetings, residents of Suffolk County (including Boston) convened in September 1774 and adopted the Suffolk Resolves: General Gage's "hostile intention" was demonstrated when "in a very extraordinary manner" he confiscated the Charlestown powder, and forbade "the keeper of the magazine at Boston to deliver out to the owners the powder which they had lodged in said magazine." THE JOURNALS OF EACH PROVINCIAL CONGRESS OF MASSACHUSETTS IN 1774 AND 1775 AND OF THE COMMITTEE OF SAFETY 603 (William Lincoln ed., 1838).

The Suffolk Resolves "were sent express to [the Continental] Congress by Paul Revere," and the Congress unanimously denounced "these wicked ministerial measures." 1 JOURNALS OF THE CONTINENTAL CONGRESS 39 & 39 n.1 (1904). The Suffolk Resolves were reprinted verbatim in the Journals of the Continental Congress, and the Congress had the Resolves disseminated in newspapers throughout

14

America. *Id.* at 40. The Massachusetts Provincial Congress—also meeting in defiance of Gage—twice condemned him for "unlawfully seizing and retaining large quantities of ammunition." JOURNALS OF EACH PROVINCIAL CONGRESS, at 31 (Oct. 25, 1774), 47 (Oct. 29, 1774).

"A Watchman," writing in the *New Hampshire Gazette*, called the arms embargo a violation of the right to self-defense. A Watchman, *To the Inhabitants of British America* (Dec. 24, 1774), *in* 1 AMERICAN ARCHIVES, at 1063-65. So "when we are by an arbitrary decree prohibited the having Arms and Ammunition by importation … the law of self-preservation" includes "a right to seize upon those within our power, in order to defend the liberties which God and nature have given to us." *Id.* at 1065. A Watchman reminded readers that the Carthaginians' "surrender of Arms" to the Romans "proved the destruction of that City." *Id.* at 1064.

After a British seizure of imported arms in New York, a handbill "secretly conveyed into almost every house in town," asked, "when Slavery is clanking her infernal chains, … will you supinely fold your arms, and calmly see your weapons of defence torn from you?" 1 AMERICAN ARCHIVES, at 1071.

15

South Carolina's legislature, now operating independently of British control as the General Committee, declared: "by the late prohibition of exporting arms and ammunition from England, it too clearly appears a design of disarming the people of America, in order the more speedily to dragoon and enslave them." 1 John Drayton, MEMOIRS OF THE AMERICAN REVOLUTION 166 (1821).

### D. Americans used force to thwart the restrictions.

Americans emptied their own powder houses before the British could. For example, Abigail Adams wrote on September 17, 1774, that about 200 patriots had seized gunpowder from the powder house in the Adams' hometown of Braintree, Massachusetts, "in consequence of the powders being taken from Charlstown." THE BOOK OF ABIGAIL & JOHN: SELECTED LETTERS OF THE ADAMS FAMILY 1762–1784, at 72 (L.H. Butterfield et al. eds., 2002). Knowing her to be a patriot, the men offered her gunpowder on their way past the Adams home. *Id.*

Americans also recaptured arms the British had confiscated. After learning that a New Hampshire fort contained seized arms, around 400 patriots "attacked, overpowered, wounded and confined the captain, and thence took away all the King's powder." Letter from Gov. Wentworth to

16

Gov. Gage (Dec. 14, 1774), *in* 18 PARLIAMENTARY HISTORY OF ENGLAND, FROM THE EARLIEST PERIOD TO THE YEAR 1803, at 146-47 (1813). The patriots took "upwards of 100 barrels of powder, 1500 stand of small arms, and several pieces of light cannon." Letter from Hugh Percy to Grey Cooper, *in* LETTERS OF HUGH EARL PERCY FROM BOSTON AND NEW YORK, 1774–1776, at 46 (Charles Bolton ed., 1902).

New Hampshire's royal governor, John Wentworth, understood that "this mischief originates from the … order … prohibiting the exportation of military stores from Great Britain." Letter from Wentworth to Gage, at 146. He bemoaned "the imbecility [incapability] of this government to carry into execution his Majesty's order in council, for seizing and detaining arms and ammunition imported into this province, without some strong ship in this harbour." *Id.* at 145.

Similarly, "In May, 1775, the 'Liberty Boys' in Savannah, Georgia, seized 600 pounds [of gunpowder] stored in the magazine of that town, and, July 10, one of the king's ships was boarded and something like 12,700 pounds were carried away." O.W. Stephenson, *The Supply of Gunpowder in 1776*, 30 AM. HIST. REV. 271, 272 (1925).

17

### E. Americans smuggled arms imports.

The Continental Congress established secret committees and agents to procure arms from overseas. Miller, YORKE AND ANGLO-DUTCH RELATIONS, at 42-43. Benjamin Franklin was the mastermind of smuggling arms from the Spanish, French, and Dutch. Robert Richmond, POWDER ALARM 95 (1971). The Continental Congress's agents "made contracts which totaled about $2,000,000.00." Miller, YORKE AND ANGLO-DUTCH RELATIONS, at 43. "From May to June alone, in 1775, the Pennsylvania Committee spent £20,300 (plus £4,000 for freight) to procure arms, ammunition, and medicine from Europe[.]" David Salay, *The Production of Gunpowder in Pennsylvania During the American Revolution*, 99 PENN. MAG. HIST. & BIOGRAPHY 422, 423 (Oct. 1975).

The *Virginia Gazette* in April 1775 published a report from London that "six large ships sailed lately, three from Holland, and the rest from France, with arms, ammunition, and other implements of war, for our colonies, and more are absolutely preparing for the same place." VA. GAZETTE, Apr. 22, 1775, at 1. In May 1776, "eighteen Dutch ships … left Amsterdam … with powder and ammunition for America," in addition

18

to "powder shipments disguised as tea chests, rice barrels, *et cetera*." Miller, YORKE AND ANGLO-DUTCH RELATIONS, at 41. The French covertly increased gunpowder exports to America in the face of the British blockade. *See* Stephenson, *The Supply of Gunpowder*, at 279-80.

## F. Americans encouraged domestic arms manufacture and commerce.

Besides stepping up imports, Americans encouraged domestic production and commerce in arms and ammunition. Paul Revere, in August 1774, "engraved a plate diagramming how to refine saltpeter, an essential component in the making of gunpowder," and had his instructions published in the *Royal American Magazine*. Halbrook, FOUNDERS' SECOND AMENDMENT, at 33. "Saltpeter recipes … appeared in American newspapers and pamphlets[.]" Rick Atkinson, THE BRITISH ARE COMING 127-28 (2019). Pennsylvania's Committee of Safety initiated a program to "instruct the inhabitants of the different Counties in the manufactory of Salt Petre"; the Committee's handbills were "printed & distributed in the English & German Languages, setting forth the process for extracting and refining Salt Petre." Report of the Pennsylvania Committee of Safety (Jan. 3, 1776), *in* 10 MINUTES OF THE PROVINCIAL CONGRESS OF PENNSYLVANIA, FROM THE

19

ORGANIZATION TO THE TERMINATION OF THE PROPRIETARY GOVERNMENT 443 (1852). "A number of [Pennsylvania] counties responded by establishing model works and providing demonstrations." Salay, *The Production of Gunpowder*, at 427. And on March 14, 1776, New York's Provincial Congress printed 3,000 copies of Henry Wisner's forty-page *Essays Upon the Making of Salt-Petre and GunPowder*. NEW YORK IN THE REVOLUTION AS COLONY AND STATE SUPPLEMENT 58 (Frederic Mather ed., 1901); *see also* CATALOGUE OF MANUSCRIPTS AND RELICS IN WASHINGTON'S HEAD-QUARTERS, NEWBURGH, N.Y. 55 (E.M. Ruttenber ed., 1890) (listing "Essays upon the making of Salt-Petre and Gun-Powder Published by order of the Committee of Safety of the Colony of New York" among the literature present in Washington's headquarters). "Printing presses throughout the colonies worked overtime, making and distributing broadsides and pamphlets with explicit instructions for manufacturing gunpowder and locating and preparing the ingredients." M.L. Brown, FIREARMS IN COLONIAL AMERICA 301 (1980).

The patriot governments likewise encouraged domestic production and sale of firearms. Massachusetts's Provincial Congress,

20

Massachusetts's House of Representatives, Maryland's Council of Safety, New Hampshire's House of Representatives, Pennsylvania's Committee of Safety, South Carolina's Provincial Congress, New York's Provincial Congress, North Carolina's Provincial Congress, and Connecticut's General Assembly all solicited arms manufactured and sold by private citizens throughout the war, guaranteeing money and often militia exemptions for anyone willing to provide them arms. Greenlee, *American Tradition of Self-Made Arms*, at 54-61. As British Lieutenant Frederick MacKenzie recorded in his diary: "Arms of all kinds are so much sought after by the Country people, that they use every means of procuring them." Frederick MacKenzie, A BRITISH FUSILIER IN REVOLUTIONARY BOSTON: DIARY OF LIEUTENANT FREDERICK MACKENZIE, at 39-40 (Allen French ed., 1926).

Of the 300,000 muskets used by American line troops in the Revolutionary War, America's 2,500 to 3,000 gunsmiths manufactured over 80,000, often by repairing and combining mixed parts from

damaged firearms. *See* George Neumann, *American Made Muskets in the Revolutionary War*, AM. RIFLEMAN, Mar. 29, 2010.[3]

The Revolutionary War had almost begun with the September 1774 (inaccurate) Powder Alarm reports that Governor Gage's redcoats had shot people when seizing gunpowder. And the "War almost began in Virginia in April 1775 when Governor Dunmore ordered the Royal Marines to remove the colony gunpowder supply from the magazine" in Williamsburg. Brown, FIREARMS IN COLONIAL AMERICA, at 298. Upon learning of the nonviolent seizure, the Virginia militia assembled to fight, but Governor Dunmore "placated the irate populace by making immediate restitution for the powder." *Id.*

The War did begin on April 19, 1775, at Lexington and Concord, Massachusetts, when Governor Gage, ruling Boston under martial law, dispatched his army to Concord to "seize and destroy all artillery, ammunition, provisions, tents, small arms, and all military stores whatever." Letter from Gov. Gage to Lieut. Col. Smith (Apr. 18, 1775), *in* Arthur Tourtellot, LEXINGTON AND CONCORD: THE BEGINNING OF THE

---

[3] https://www.americanrifleman.org/content/american-made-muskets-in-the-revolutionary-war/ (last visited Feb. 5, 2024).

22

WAR OF THE AMERICAN REVOLUTION 103 (1959). This time, the Americans were forewarned and forearmed.

At the Lexington Green and the Concord Bridge, the British demonstrated they were willing to kill Americans to take their arms. Coercive disarmament initiated the war. *See* Kopel, *How the British Gun Control Program Precipitated the American Revolution*, at 308-12.

During the War, both sides agreed that the suppression of arms commerce and the disarmament of the Americans was the *sine qua non* of what the Americans called the British plan to "enslave" them. *See* Greenlee, *American Tradition of Self-Made Arms*, at 48-62.

To the Americans, being "enslaved" included being under the absolute will of another, as they would be if they could not defend themselves. Instead of saying "enslave," the British called their objective "due subordination," but it meant the same thing. It depended on terminating arms commerce in the colonies. A 1777 British plan for what to do with America after winning the war urged:

> The Militia Laws should be repealed and none suffered to be re-enacted, [and] the Arms of all the People should be taken away … nor should any Foundery or manufactuary of Arms, Gunpowder, or Warlike Stores, be ever suffered in America, nor should any Gunpowder, Lead, Arms or Ordnance be imported into it without Licence.

23

William Knox, *Considerations on the Great Question, What Is Fit to be Done with America* (1777), *in* 1 SOURCES OF AMERICAN INDEPENDENCE: MANUSCRIPTS FROM THE COLLECTIONS OF THE WILLIAM L. CLEMENTS LIBRARY 176 (Howard Peckham ed., 1978).

The Bill of Rights protects against abuses that the Founders never suffered and could not foresee, such as warrantless thermal imaging of homes. *See, e.g., Kyllo v. United* States, 533 U.S. 27 (2001). The Bill of Rights also protects against the abuses the Founders *did* suffer— including obstructions to firearms commerce. Thomas Jefferson, when serving as America's first Secretary of State, wrote to the British Ambassador, "Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Letter from Thomas Jefferson to George Hammond (May 15, 1793), *in* 7 THE WRITINGS OF THOMAS JEFFERSON 326 (Paul Ford ed., 1904) (rejecting British demand that the U.S. forbid individuals from selling arms to the French).

### III. The State failed to justify its restriction with analogous historical regulations.

Considering the Founders' experience with Britian's abusive restrictions on firearms commerce, it is unsurprising that the State was unable to provide a single founding-era restriction on firearms commerce. The State's laws from other periods are insufficiently analogous to justify the challenged ban.

When considering whether a historical law is analogous, *Bruen* instructs courts to consider "how and why the [historical and challenged] regulations burden a law-abiding citizen's right to armed self-defense," because "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." 597 U.S. at 29 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) and *Heller*, 554 U.S. at 599) (quotation marks omitted).

The "how" of the challenged regulation is by prohibiting arms commerce at the Fairgrounds and other state property. As for the "why," the State asserts that its goals are "(1) controlling and tracing the sale of firearms and (2) ensuring dangerous individuals d[o] not

obtain firearms[.]" Appellants' Br. 40 (quotation marks omitted). No historical law shares an analogous "how" and "why."

### A. 17th-century laws restricting firearm sales to hostile foreign nations cannot justify California's ban.

The State offers only four "regulations restricting where and to whom individuals could sell guns." Appellants' Br. 45 (quotation marks omitted). The State first cites a 1646 "Connecticut law that 'banned the sale of firearms by its residents outside the colony.'" *Id.* (quoting *Teixeira*, 873 F.3d at 685, 685 n.18). The State's description is misleading. First, the law was not a ban, but rather required a license to sell arms "to any out of the Jurisdiction." THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO THE UNION WITH NEW HAVEN COLONY, MAY, 1665, at 145 (J. Hammond Trumbull ed., 1850). Second, the "Jurisdiction" did not refer to "the colony," as the State contends, but rather to "the confederate jurisdictions." *Id.* "The confederate jurisdictions" was another name for the United Colonies of New England—including "the plantations under the government of the Massachusetts, the plantations under the government of New Plimouth, the plantations under the government of Connecticut and the government of New Haven, with the Plantations in combination

therewith"—which agreed upon "articles of confederation" in 1643. 2 John Winthrop, THE HISTORY OF NEW ENGLAND FROM 1630 TO 1649, at 101 (James Savage ed., 1826). Third, the law was enacted to restrict trade to hostile foreign nations. Connecticut's General Court ordered in 1644 that "no prson … shall at any tyme hereafter sell nẽther gun nor pistoll nor any Instrument of warre, nether to Dutch nor French men," because "the Dutch and French doe sell and trade to the Indeans, guns, pistolls and warlike instruments." THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, at 113-14. Next, in 1646, the General Court expressed its desire "that the Comĩssiors should be moved that noe Amũnition should be traded wth any that live out of the Jurisdictions in combinatiõ, whereby [they] might supply the Indeans[.]" *Id.* at 138. Later that year, the Court confirmed the order of the Commissioners requiring a license to sell arms "to any out of the Jurisdiction." *Id.* at 145.

At the time, the Dutch colony of New Netherland, west of New England, was "a powerful and already quarrelsome neighbor" to Connecticut. THE HISTORY OF CONNECTICUT, FROM ITS EARLIEST SETTLEMENT TO THE PRESENT TIME 77-78 (W. H. Carpenter & T. S.

Arthur eds., 1872). North of New England was the French colony of Quebec. "[T]he principal impetus" for forming the United Colonies of New England "was a concern over defense against attacks by the French, the Dutch, or the Indians." *New England Confederation*, BRITANNICA.COM.[4] In sum, Connecticut's law had a different "why"—to prevent arming hostile foreign nations (including Indian nations)—and a different "how"—by requiring a license.

The State next cites "a seventeenth century Virginia law that allowed for the sale of firearms and ammunition to only 'his majesties loyal[] subjects inhabiting this colony.'" Appellants' Br. 45 (quoting *Teixeira*, 873 F.3d at 685, 685 n.18). The State implies that this law was a restriction on sales to Englishmen from other colonies. But the law was enacted in 1619, when Virginia was the *only* English colony in America. So, the law did not restrict trade among countrymen. Rather, it ensured that "all persons have hereby liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony." 2 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE

---

[4] https://www.britannica.com/topic/New-England-Confederation (last visited Feb. 5, 2024).

LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 403 (William Waller Hening ed., 1823).

Far from a restriction analogous to California's, the law secured a broader right than buyers or venders would enjoy even at the desired gun shows. What is more, the law also ensured that "the Indians of the Easterne shore have like and equall liberty of trade or otherwayes with any other our friends and neighbouring Indians." *Id.* Thus, Virginia's law had a different "how"—by ensuring an unrestricted right to sell arms to all Englishmen on the continent—and a different "why"—to prevent arming hostile foreign nations, most notably the Spanish colony in Florida and unfriendly Indian nations.

Today, the "why" of Connecticut's and Virginia's laws is accomplished by the federal Arms Export Control Act. 22 U.S.C. § 2778.

The State cites—albeit incorrectly[5]—"a '1652 New York law that outlawed illegal trading of guns, gun powder, and lead by private individuals.'" Appellants' Br. 45-46 (quoting *United States v. Serrano*, 651 F. Supp. 3d 1192, 1211 (S.D. Cal. Jan. 17, 2023)) (brackets omitted). In fact, the text of this law no longer exists. LAWS AND ORDINANCES OF

---

[5] The State cites 1652 N.Y. Laws 128, but no session laws exist prior to 1691.

NEW NETHERLAND, 1638–1674, at 128 (E. B. O'Callaghan ed., 1868). But it seems to have echoed a 1639 law, which forbade the sale of "Guns, Powder or Lead *to the Indians*." *Id.* at 19 (emphasis added). And it "seems, indeed, not to have been very strictly enforced." *Id.* at 128. Most importantly, it was not a "New York law," as the State claims, but rather a New Netherland law. New Netherland was a Dutch colony. The Dutch law did not survive when the English seized control of the colony in 1664. This law therefore does not reflect English—not to mention American—tradition.

The State offers a fourth law, but it did not restrict arms sales: a "'1631 Virginia law [that] required the recording not only of all new arrivals to the colony, but also "of arms and munitions."'" Appellants' Br. 46 (quoting *United States v. Holton*, 639 F. Supp. 3d 704, 711 (N.D. Tex. 2022)). This law did not restrict the sale of guns in any way. It simply required the "comanders of all the severall plantations" to take a census of the inhabitants and their goods, also including "corne, cattle, hoggs, goates, barques, boates, gardens, and orchards." 1 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, at 174-75. Indeed, the law's primary effect on arms was helping to ensure that

Virginians could fulfill their legal duties under Virginia law for mandatory firearm possession and carrying. *See, e.g.*, *id.* at 173 ("NOE man shall goe to worke in the grounds without theire armes"), 174 ("ALL men that are fitting to beare armes, shall bringe their peices to the church").

**B. The State's two 19th-century proving laws did not restrict where, when, or to whom functional firearms could be sold.**

The State cites two early 19th-century laws requiring that firearms be proved before being sold. Appellants' Br. 46 (citing 1804 Mass. Acts., at 111, ch. 81; 1821 Me. Laws, at 546, ch. 162).[6] These laws did not restrict where, when, or to whom firearms could be sold and thus are not analogous to California's law. Similarly, the gunpowder inspection laws the State cites have no relation to a ban on gun shows. Appellants' Br. 46. Like the proving laws, they merely ensured the reliability and quality of powder before it entered the stream of commerce. None of these laws controlled how functional products were sold.

---

[6] The State misstates the year of the Massachusetts act, which passed in 1805. *See* 1805 Mass. Acts 588-89. Similarly, Massachusetts's gunpowder inspection act that the State cites, Appellants' Br. 46, passed in 1809 rather than 1808. *See* 1809 Mass. Acts 444-47.

### C. Gunpowder storage laws were enacted to prevent fires.

The State additionally cites "restrictions on the sale and storage of gunpowder." Appellants' Br. 47. These laws were intended to prevent fires. For example, Maine's 1821 law was entitled, "An Act for the prevention of damage by Fire, and the safe keeping of Gun Powder." 1821 Me. Laws 98. New Hampshire's 1825 prohibition on gunpowder sales in "any street, lane, or alley, or on any wharf, or on parade or common" was part of a fire-prevention law enforced by "firewards," and fines for violations were to be used for "purchasing materials necessary and proper for extinguishing fires." 1825 N.H. Laws 73-74.[7] New York City's 1871 law limited the quantity of "dangerous and explosive compounds" that could be kept for sale "within the corporate limits of the city," including "gunpowder, blasting powder, gun-cotton, nitro-glycerine, dualin, or any explosive oils or compounds." THE NEW YORK

---

[7] The State asserts that the 1825 law was "renewed in 1891." Appellants' Br. 47 (citing 1891 N.H. Laws, at 332, ch. 117, § 7). This is not quite right. The 1825 law was repealed and replaced by a similar fire-prevention law in 1827. 1827 N.H. Laws 211. The 1827 act was repealed and replaced by another similar fire-prevention law in 1842. THE REVISED STATUTES OF THE STATE OF NEW HAMPSHIRE, PASSED DECEMBER 23, 1842, at 219-20, 485 (1843). The law continued to evolve throughout the century. *See, e.g.*, THE GENERAL STATUTES OF THE STATE OF NEW-HAMPSHIRE 206 (1867).

CITY CONSOLIDATION ACT, AS IN FORCE IN 1891, at 209 (Mark Ash ed., 1891). It also allowed for "such regulations as the board of fire commissioners shall prescribe." *Id.* But the law did not "prohibit[] the sale of gunpowder in any building that was used in part as a 'dwelling,'" as the State claims. Appellants' Br. 47. It instead required a license for such sales—a licensee could keep up to 14 pounds of gunpowder for sale. THE NEW YORK CITY CONSOLIDATION ACT, at 209. Thus, the concern was the storage, rather than the sale, of gunpowder. These laws might be analogized, at most, to laws requiring merchants not to store their wares in a dangerous manner—for example, laws requiring gun stores to keep their guns locked up when the store is closed.

## D. The Fairgrounds cannot be a "sensitive place" simply because large numbers of people congregate there.

The State argues that "[g]overnment properties where people regularly congregate for large-scale events … are necessarily sensitive places." Appellants' Br. 53.

The Supreme Court has already rejected that argument: "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." *Bruen*, 597 U.S. at 31.

33

"[T]here is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* The State's argument is thus foreclosed by *Bruen*.

**E. Government property is not automatically "sensitive."**

The State argues that the "right of a property owner to control conduct on its own land"—including prohibiting Second Amendment conduct altogether—"applies to the government when it operates as a proprietor." Appellants' Br. 41. The State's argument is effectively another attempt to designate the restricted locations "sensitive places."

*Heller* and *Bruen* demonstrate that property being government-owned is not alone sufficient to qualify as "sensitive." *Heller* deemed "schools" and "government buildings" "sensitive places." 554 U.S. at 626. *Bruen* additionally identified "legislative assemblies, polling places, and courthouses" as "sensitive places," based on specific "historical regulations." 571 U.S. at 30 (citing David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 205, 229-36, 244-47 (2018) (providing historical regulations)). There would have been no need for the Court to identify specific government-owned

locations that were "sensitive" if *all* government-owned locations were "sensitive"; the Court could have simply said "government-owned property." But instead, the Court recognized particular examples that were "historically justifi[ed]." *Heller*, 554 U.S. at 635.

Labeling the Fairgrounds as "sensitive" is not historically justified. The State provides only four historical laws, nearly all of which fall into the categories identified by *Bruen*, and none of which relate to Fairgrounds.

Specifically, the State offers 1650 and 1773 Maryland prohibitions on carrying arms into the legislature while the legislature was sitting, ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND, JANUARY 1637/38–SEPTEMBER 1664, at 273 (William Hand Browne ed., 1883); ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND, 1762–1763, at 294 (J. Hall Pleasants ed., 1941); an 1870 Georgia prohibition on carrying arms into "any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering," 1870 Ga. Laws 421; and an 1879 Missouri prohibition on carrying concealed weapons into "any church," "any school room," "any election

35

precinct, on any election day," "any court room during the sitting of court," or "into any other public assemblage of persons met for any lawful purpose," 1 THE REVISED STATUTES OF THE STATE OF MISSOURI, 1879, at 224 (1879).

Maryland's bans on carrying into legislative buildings fall into *Heller*'s "government buildings" and *Bruen*'s "legislative assemblies." Georgia's "court of justice" and Missouri's "court room" prohibitions fall into *Heller*'s "government buildings" and *Bruen*'s "courthouses." Georgia's "election ground or precinct" and Missouri's "election precinct" prohibitions fall into *Bruen*'s "polling places." And Missouri's "school room" falls into *Heller*'s "schools." Like the locations identified in *Heller* and *Bruen*, these laws all involve locations of basic government functions. *See* Kopel & Greenlee, *The "Sensitive Places" Doctrine*, at 205 ("Protecting government deliberation from violent interference is the core of the sensitive places tradition."). The Fairgrounds are not analogous to these locations because no government deliberation or basic government function occurs there. Nor are the Fairgrounds analogous to "government buildings." While the vast majority of

36

government buildings house government functions, the Fairgrounds is a commercial event space, where the State is a market actor.

From the laws offered by the State, that leaves Georgia's and Missouri's bans on carrying into places of worship and public assemblages. The former does not support the State's argument that government-owned property is necessarily "sensitive" because places of worship are not government-owned. The latter does not support the State because *Bruen* already held that a place cannot be deemed "sensitive" "simply because it is crowded." 571 U.S. at 31; *see* Section III.D *supra*.

Additionally, Georgia's 1870 and Missouri's 1879 laws were enacted too late to establish a tradition. Whereas polling place and legislative building restrictions, for example, predate the Founding, *see* Kopel & Greenlee, *The "Sensitive Places" Doctrine*, at 233-34, the public assemblage laws first appeared after the Civil War, *see id.* at 250-55. As *Bruen* explained, "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." 597 U.S. at 66; *see also id.* at 67-68 ("we will not stake

our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption").

What is more, if all government-owned property were "sensitive," the government could ban firearms on sidewalks and streets as well as in wilderness areas such as national forests and Bureau of Land Management land. That "argument would in effect exempt cities" and public land "from the Second Amendment and would eviscerate the general right[.]" *Id.* at 31.

## CONCLUSION

The decision below should be affirmed.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
GREENLEE LAW, PLLC
PO Box 4061
McCall, ID 83638
(208) 271-2494
joseph@greenlee.law
*Counsel of Record*

DAVID B. KOPEL
INDEPENDENCE INSTITUTE
727 East 16th Avenue
Denver, CO 80203
(303) 279-6536
david@i2i.org

38

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-3793

I am the attorney or self-represented party.

**This brief contains** 6,971 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ☐ it is a joint brief submitted by separately represented parties.

    ☐ a party or parties are filing a single brief in response to multiple briefs.

    ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____ .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Joseph G.S. Greenlee **Date** 2/6/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I certify that on February 6, 2024, I served the foregoing with the
Clerk of the Court using the CM/ECF System, which will send notice of
such filing to all registered CM/ECF users.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*

40