**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| B & L PRODUCTIONS, INC., DBA Crossroads of the West; BARRY BARDACK; RONALD J. DIAZ, Sr.; JOHN DUPREE; CHRISTOPHER IRICK; ROBERT SOLIS; LAWRENCE MICHAEL WALSH; CAPTAIN JON'S LOCKERS, LLC; L.A.X. FIRING RANGE, INC., DBA LAX AMMO; CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC.; SOUTH BAY ROD AND GUN CLUB, INC.; SECOND AMENDMENT FOUNDATION, | No. 23-55431 <br><br> D.C. No. 3:21-cv-01718-AJB-DDL <br><br><br> OPINION |
| *Plaintiffs-Appellants*, | |
| v. | |
| GAVIN NEWSOM, in his official capacity as Governor of the State of California and in his personal capacity; ROB BONTA, in his official capacity as Attorney General of the State of California and in his personal capacity; KAREN ROSS, in her official capacity as Secretary of California Department of Food & Agriculture and in her personal capacity; 22ND | |

DISTRICT AGRICULTURAL
ASSOCIATION; SUMMER
STEPHAN, in her official capacity as
District Attorney of San Diego
County; LONNIE J. ELDRIDGE, in
his official capacity as County Counsel
of San Diego County; DOES, 1-50,

> *Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of California
Anthony J. Battaglia, District Judge, Presiding

| | |
|---|---|
| B & L PRODUCTIONS, INC., DBA Crossroads of the West; CALIFORNIA RIFLE & PISTOL ASSOCIATION; GERALD CLARK; ERIC JOHNSON; CHAD LITTRELL; JAN STEVEN MERSON; ASIAN PACIFIC AMERICAN GUN OWNER ASSOCIATION; SECOND AMENDMENT LAW CENTER, INC.; SECOND AMENDMENT FOUNDATION, | No. 23-3793<br><br>D.C. No. 8:22-cv-01518-JWH-JDE |

> *Plaintiffs-Appellees*,

v.

GAVIN NEWSOM, in his official

capacity as Governor of the State of California; ROB BONTA, in his official capacity as Attorney General of the State of California; KAREN ROSS, in her official capacity as Secretary of California Department of Food & Agriculture and in her personal capacity; 32ND DISTRICT AGRICULTURAL ASSOCIATION,

*Defendants-Appellants*,

TODD SPITZER, in his official capacity as District Attorney of Orange County, DOES, 1-10,

*Defendants*.

Appeal from the United States District Court
for the Central District of California
John W. Holcomb, District Judge, Presiding

Argued and Submitted March 6, 2024
Pasadena, California

Filed June 11, 2024

Before: Richard R. Clifton, Holly A. Thomas, and Roopali H. Desai, Circuit Judges.

Opinion by Judge Clifton

# SUMMARY[*]

### First and Second Amendments/Gun Shows

In two separate actions involving First and Second Amendment challenges brought by B&L Productions, Inc., an operator of gun shows in California, to statutes that bar the sale of guns on state property, the panel affirmed the district court's dismissal of B&L's claims in Case No. 23-55431 and vacated the district court's order granting B&L's motion for a preliminary injunction in Case No. 23-3793.

In Case No. 23-55431, B&L challenged a ban on firearm sales at the Del Mar Fairgrounds. In Case No. 23-3793, B&L challenged bans on firearm sales (1) at the Orange County Fairgrounds and (2) on all state property.

Addressing the First Amendment challenges, the panel held that because the challenged statutes solely restrict nonexpressive conduct—contracting for the sale of firearms—they are not subject to First Amendment scrutiny. The statutes do not prohibit offers to sell firearms but rather bar the acceptance of such offers, which is what determines when a contract becomes binding. Accepting an offer, an act that formally consummates a business transaction, is nonexpressive conduct and is not entitled to First Amendment protection. Moreover, the challenged statutes apply to all vendors and, therefore, do not have the effect of "singling out" those gun show participants who wish to engage in expressive activity.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Addressing the Second Amendment challenges, the panel determined that the plain text of the Second Amendment does not cover B&L's proposed conduct—namely, contracting for the sale of firearms and ammunition on state property. Moreover, B&L essentially conceded that the challenged statutes do not "meaningfully constrain" any individual's ability to keep and bear arms. B&L made no allegation that a ban on sales on state property would impair a single individual from keeping and bearing firearms, even after having an opportunity to amend its complaint.

## COUNSEL

Anna M. Barvir (argued), Tiffany D. Cheuvront, C.D. Michel, and Alexander A. Frank, Michel & Associates PC, Long Beach, California; Donald Kilmer, Law Offices of Donald Kilmer APC, Caldwell, Idaho; for Plaintiffs-Appellants.

Charles J. Sarosy (argued), Deputy Attorney General; Anthony R. Hakl, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, Los Angeles, California; Katie A. Richardson and Timothy M. White, Office of County Counsel, County of San Diego, San Diego, California; for Defendants-Appellees.

## OPINION

CLIFTON, Circuit Judge:

These cases involve challenges brought by B&L Productions, Inc., and associated stakeholders ("B&L") against state officeholders tasked with enforcing various California statutes (the "Challenged Statutes") that bar the sale of guns on state property. In both cases, B&L asserts that the Challenged Statutes restrict protected speech in violation of the First and Fourteenth Amendments and infringe on the right to keep and bear arms under the Second Amendment.

In Case No. 23-55431, which concerns B&L's challenge to a ban on firearm sales at the Del Mar Fairgrounds, the district court dismissed B&L's lawsuit under Federal Rule of Civil Procedure 12(b)(6), holding that B&L had failed to state a claim that the ban violates its constitutional rights. Conversely, in Case No. 23-3793, which concerns B&L's challenge to bans on firearm sales (1) at the Orange County Fairgrounds and (2) on all state property, the district court granted B&L's motion for a preliminary injunction, holding that B&L was likely to succeed on the merits of all its claims.

We conclude that the Challenged Statutes do not infringe on B&L's constitutional rights. Because the statutes solely restrict nonexpressive conduct—contracting for the sale of firearms—they are not subject to First Amendment scrutiny. As well, B&L essentially concedes that the Challenged Statutes do not "meaningfully constrain" any individual's ability to keep and bear arms. The Challenged Statutes therefore do not implicate the plain text of the Second Amendment.

We affirm the district court's dismissal of B&L's claims in Case No. 23-55431. We vacate the grant of a preliminary injunction in Case No. 23-3793.

## I.  Background

Plaintiff B&L Productions, Inc., operates gun shows in California under the name Crossroads of the West. Its gun shows are centered on the sale of firearms, but they also involve lectures, classes, and the sale of other goods. B&L hosts gun shows at the Del Mar Fairgrounds in San Diego County and the Orange County Fair & Event Center ("Orange County Fairgrounds"), which are owned by the State of California and operated by the 22nd and 32nd District Agricultural Associations (singularly, "DAA"), respectively.

In 2018, the 22nd DAA imposed a one-year moratorium on gun shows at the Del Mar Fairgrounds. After B&L filed suit, a district court held that an explicit ban on gun shows likely violates the First and Fourteenth Amendments. *B & L Prods., Inc. v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226, 1236, 1243-50 (S.D. Cal. 2019). In April 2020, the parties reached a settlement, allowing B&L to book gun shows but reserving the right for the 22nd DAA to change its policies in the future.

In October 2019, while that litigation was underway, California passed AB 893, which bars any "officer, employee, operator, lessee, or licensee" of the 22nd DAA from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any firearm or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds." The law on its face does not prohibit gun show vendors from advertising the firearms they are offering for sale. It also does not prevent attendees from taking immediate

possession of a gun purchased at a gun show,[1] which B&L concedes was already banned by other California statutes that it does not challenge here.[2] Instead, AB 893 prevents vendors and gun show attendees from consummating a contract to purchase firearms or ammunition while at the Del Mar Fairgrounds. Whereas visitors to the Fairgrounds could previously agree to purchase firearms and immediately begin the background check process, Cal. Penal Code § 26805(b)(1), AB 893 bars attendees from completing those preliminary steps until they have left the Fairgrounds.

The April 2020 settlement had acknowledged the passage of AB 893 and noted that the agreement's terms were subject to the statute's requirements. Based on AB 893, the 22nd DAA subsequently refused to contract with B&L to host any gun show at which firearms and ammunition were to be sold.

---

[1] The appellees represented at oral argument that the Challenged Statutes do prevent gun show attendees from taking immediate possession of *ammunition*, which was previously lawful.

[2] As B&L asserts, several provisions of the California Penal Code together prevent firearm transfers from taking place at gun shows. Section 27545 requires all firearm transactions to be processed through a licensed dealer. Section 26805 states that firearm dealers can only transfer sold firearms at their licensed premises, although it allows a dealer to prepare documents at a gun show. Section 26815(a) imposes a ten-day waiting period for gun purchases. Finally, Section 27310 requires all firearm transfers at gun shows to comply with state law, including Sections 26805 and 27545. B&L makes clear that it "do[es] not challenge these laws" or their resulting prohibition on taking immediate possession of firearms purchased at gun shows.

B&L filed suit in the Southern District of California against Governor Gavin Newsom and other state officials[3] (the "State Defendants") on October 4, 2021, asserting that AB 893 violated its rights under the First and Fourteenth Amendments. Alleging that its gun shows are not economically viable without firearm sales, B&L asserted that AB 893 therefore has "the intention and effect of shuttering gun show events altogether," along with their attendant pro-gun speech. The district court dismissed the complaint with leave to amend, concluding that AB 893 does not ban gun shows but instead simply prohibits the sale of guns on state property.

B&L filed an amended complaint on August 31, 2022, in which it added a Second Amendment claim based on the Supreme Court's opinion in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). The district court dismissed the amended complaint in its entirety, holding that B&L had failed to state any claim upon which relief could be granted. B&L appealed that decision.

Meanwhile, in 2021, California passed SB 264, which imposes the same restrictions as AB 893 on the Orange County Fairgrounds. The next year, the state passed SB 915, which expanded the ban on firearm sales to all state property. B&L sued the State Defendants[4] in the Central District of

---

[3] Along with Newsom, B&L initially sued California Attorney General Rob Bonta, as well as the San Diego District Attorney and County Counsel, the 22nd DAA, and California Secretary of Food & Agriculture Karen Ross. The district court dismissed its claims against Newsom, Bonta and Ross, and B&L does not challenge that determination on appeal.

[4] In the Orange County case, B&L sued Newsom, Bonta, Ross, the Orange County District Attorney, and the 32nd DAA.

California on August 12, 2022, challenging SB 264 and SB 915 under the same legal theories as in the Del Mar case. The district court granted B&L's motion for a preliminary injunction on October 30, 2023, holding that B&L was likely to succeed on the merits of its claims under the First and Second Amendments. After the State Defendants appealed that order, we coordinated the two cases for oral argument and ultimately consolidated them for decision.

## II. Discussion

We have jurisdiction under 28 U.S.C. § 1291. We review de novo the district courts' legal determinations. *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 889 (9th Cir. 2021) (motion to dismiss); *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016) (preliminary injunction).[5] In each case, B&L argues that the Challenged Statutes impermissibly infringe on protected speech[6] and that a ban on firearm sales on state property violates the plain text of the Second Amendment.

---

[5] The two cases involve different standards of review for questions of fact. A court ruling on a motion to dismiss "accept[s] the factual allegations of the complaint as true and construe[s] them in the light most favorable to the plaintiff." *Mudpie, Inc.*, 15 F.4th at 889. In contrast, we review the factual findings underpinning a preliminary injunction for clear error. *Puente Ariz.*, 821 F.3d at 1103. These differing standards do not affect our analysis: even accepting B&L's factual allegations and the Orange County district court's findings of fact as true, B&L has failed to establish a constitutional violation.

[6] In each case B&L has also alleged violations of the Equal Protection Clause, but it concedes that its Equal Protection claims essentially duplicate its First Amendment claims, as B&L's Equal Protection claims rely on its assertion that the Challenged Statutes target pro-gun speech. We therefore do not separately address those arguments.

### A.  First Amendment

B&L contends that the Challenged Statutes violate its rights under the First Amendment. As the party asserting such a claim, B&L bears the burden "to demonstrate that the First Amendment even applies." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). To meet this burden, B&L raises two separate arguments. First, it asserts that the Challenged Statutes are an attempt to ban gun shows and the pro-gun "pure speech" that occurs at them. Alternatively, B&L argues that contracting for the sale of firearms is itself protected commercial speech, and that a restriction on such contracts therefore implicates the First Amendment.

We need not address the distinction between commercial and pure speech, as B&L fails to establish that the Challenged Statutes regulate any speech cognizable under the First Amendment. The First Amendment only applies when "conduct with a 'significant expressive element' drew the legal remedy or the [statute] has the inevitable effect of 'singling out those engaged in expressive activity.'" *Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706-07 (1986)). Because the Challenged Statutes do not directly or inevitably restrict any expressive activity, they do not implicate the First Amendment.

### 1.  Directly Regulated Conduct

Our first inquiry is to determine what precise conduct "drew the legal remedy" of the Challenged Statutes. That question is a core point of contention. B&L asserts that the statutes regulate all "the commercial speech associated with the sale of an otherwise lawful product," including offers to sell firearms, which we have held implicate the First

Amendment. *Nordyke v. Santa Clara County*, 110 F.3d 707, 710 (9th Cir. 1997) (*Nordyke 1997*).[7] Conversely, the State Defendants characterize the Challenged Statutes as solely regulating "the act of exchanging money for a gun," which we held "is not 'speech' within the meaning of the First Amendment."[8] *Id.* at 710. Neither characterization is sufficiently precise.

The Challenged Statutes simply prohibit "contract[ing] for . . . the sale of any firearm or ammunition" on state property.[9] On its face, that language solely regulates the moment at which a binding contract is formally consummated. The statutes therefore do not prohibit offers to sell firearms—an offer alone does not form a contract,

---

[7] In *Nordyke 1997*, Santa Clara County's addendum explicitly prohibited the "offering for sale" of firearms and ammunition, language not present in the Challenged Statutes. 110 F.3d at 708-09. Another problem in *Nordyke 1997* was that the County used a *lease* provision to "curtail[] commercial speech, rather than attempting to impose by proper legislative acts such restrictions on the sale of guns at gun shows not otherwise provided by, but consistent with, the applicable federal and state law." *Nordyke 1997*, 110 F.3d at 713. The court expressly reserved the question of whether a state could ban offers to sell firearms by statute. While we need not resolve that question, we note that conceptual similarity between commercial advertising and formal contract offers means that offers have a stronger argument for First Amendment protection than *acceptance* of such offers, which we hold does not constitute protected speech.

[8] Contrary to B&L's assertion, that holding is not dicta. We later noted that "[w]e have previously held that the act of exchanging money for a gun is not 'speech' for the purposes of the First Amendment." *Nordyke v. King*, 319 F.3d 1185, 1191 (9th Cir. 2003) (*Nordyke 2003*).

[9] The language regarding "authoriz[ing] or allow[ing]" firearm sales does not regulate conduct beyond contracting for the sale of firearms. It simply extends liability to state officials who allow such conduct to take place.

which is only "completed when the offer is made *and accepted*." *Norfolk & W. Ry. Co. v. Sims*, 191 U.S. 441, 447 (1903) (emphasis added). Because a contract can be consummated prior to delivery of the purchased product, the regulated conduct is likewise not "the act of exchanging money for a gun."[10] As acceptance is what determines when a contract becomes binding, the Challenged Statutes prohibit accepting an offer to sell firearms or ammunition on state property.

The Challenged Statutes' limited scope simplifies our inquiry, as acceptance of an offer is not entitled to First Amendment protection. The Supreme Court has held that "restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Following *Sorrell*, our court has held that consummating a business transaction is nonexpressive conduct unprotected by the First Amendment. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019) ("[T]he 'business agreement or business dealings' associated with processing a booking is not conduct with a 'significant expressive element.'" (quoting *Int'l Franchise Ass'n*, 803 F.3d at 408)). As acceptance of an offer is simply the act that formally consummates such a transaction, *Sims*, 191 U.S. at 447, it is likewise nonexpressive conduct. *Cf. Lowe v. SEC*, 472 U.S. 181, 232 (1985) (White, J., concurring) ("[A]s offer and acceptance are communications incidental to the regulable transaction

---

[10] The immediate transfer of a firearm purchased at a gun show was already illegal in California, Cal. Penal Code §§ 26805, 27310, further indicating that delivery of firearms on state property is not what "drew the legal remedy," *Int'l Franchise Ass'n*, 803 F.3d at 408.

called a contract, . . . [restrictions on them] cannot be said to have enacted a limitation on freedom of speech or the press subject to First Amendment scrutiny."). B&L has therefore failed to establish that "conduct with a 'significant expressive element' drew the legal remedy" of the Challenged Statutes. *Int'l Franchise Ass'n*, 803 F.3d at 408.[11]

### 2. Inevitable Effect

B&L argues that even if the Challenged Statutes do not directly regulate protected speech, they indirectly implicate the First Amendment by jeopardizing the pro-gun speech that occurs at gun shows. B&L emphasizes that at gun shows, "[o]rganizations share information, speakers give lectures, trainers hold classes, and patrons discuss gun

---

[11] While B&L characterizes acceptance as part of "the commercial speech associated with the sale of an otherwise lawful product," it cites no authority for that proposition and fails to identify a single case where regulations on acceptance were subjected to First Amendment scrutiny. Indeed, as acceptance is nonexpressive conduct, it necessarily cannot be considered "commercial speech." The commercial speech doctrine does not expand the scope of the First Amendment beyond expressive conduct; it instead ensures that such conduct receives protection even if the motivations behind it are entirely commercial. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 762 (1976) ("Our question is whether speech which does 'no more than propose a commercial transaction' is so removed from any 'exposition of ideas' . . . that it lacks all protection." (citations omitted)). Regardless, regulations on acceptance do not implicate any of the principles underlying the commercial speech doctrine, which protects "the free flow of commercial information" from regulations that would "keep[] the public in ignorance." *See id.* at 765, 770. Contract formation is not about keeping the public informed; it is a private interaction between parties.

rights," and "[c]andidates for office even attend to discuss politics, government, and law with their constituents."

On their face, the Challenged Statutes do not restrict any of those forms of speech. A "celebration of America's 'gun culture,'" in the words of one of B&L's briefs, can still take place on state property, as long as that celebration does not involve contracts for the sale of guns. B&L nevertheless argues that gun shows "will disappear" "[w]ithout the anchor of commerce in firearms," so a restriction on the latter inherently infringes on gun-related speech. It notes that "[m]any (maybe most) of the people who attend gun shows are there to engage in commerce with experienced firearm retailers," but that "[i]f licensed retailers cannot lawfully sell their products at these events, there is little financial incentive for [those retailers] to attend."

Even assuming B&L's allegations are accurate,**[12]** the indirect economic impacts it alleges do not implicate the

---

[12] We must accept that B&L may stop hosting gun shows in the absence of firearm sales, but its assertion that no other entity would step in to provide a forum for pro-gun speech on state property is speculative. *See, e.g.*, *Graham-Sult v. Clainos*, 756 F.3d 724, 752 (9th Cir. 2014) ("Plaintiffs base their remaining arguments on speculation and inferences."). Indeed, B&L's representation to both district courts that it itself "has offered to attempt to hold events without sales of firearms, ammunition, or firearm precursor parts" appears to undermine its assertions.

On that front, B&L alleges that in response to these offers, both DAAs "dragged [their] feet and refused to provide dates for" future events. The 32nd DAA asserts that it is willing to coordinate with B&L to schedule gun shows that comply with the Challenged Statutes, but that B&L has not reached out since late 2021. Going forward, if the DAAs refuse to schedule gun shows without gun sales, B&L might have grounds for an

First Amendment. Regulations that do not directly regulate expressive activity are only scrutinized if they have "the inevitable effect of 'singling out those engaged in expressive activity.'" *Int'l Franchise Ass'n*, 803 F.3d at 408 (quoting *Arcara*, 478 U.S. at 706-07). The mere fact that a regulation may have economic implications for the feasibility of certain speech does not meet that standard. *See HomeAway.com, Inc.*, 918 F.3d at 685 ("The 'inevitable effect of the [Ordinance] on its face' is to regulate nonexpressive conduct—namely, booking transactions—not speech." (alteration in original) (quoting *Sorrell*, 564 U.S. at 565)); *Nordyke 2003*, 319 F.3d at 1191 (a law could be unconstitutional when it "interfere[s] with speech itself, not [through] the hindering of actions (e.g., sales) that are not speech"); *Sorrell*, 564 U.S. at 567 ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."); *cf. Mobilize the Message, LLC v. Bonta*, 50 F.4th 928, 935-37 (9th Cir. 2022) (statute that classified doorknockers and signature gatherers as employees did not infringe First Amendment rights, even if it impacted the employer's ability to speak by increasing labor costs). B&L may choose not to provide a forum for pro-gun speech if it decides gun shows are not profitable without firearm sales, but doing so would be its own decision, not the "inevitable effect" of the Challenged Statutes. *See HomeAway.com*, 918 F.3d at 685 ("Contrary to the Platforms' claim, the Ordinance does not 'require' that they monitor or screen advertisements. It

---

as-applied challenge against the DAAs, although B&L represented at oral argument that it is not presently maintaining such a challenge. In any event, any anti-gun animus on the part of the DAAs does not support B&L's facial challenge, given that the DAAs had no role in the drafting process.

instead leaves them to decide how best to comply with the prohibition on booking unlawful transactions.").

Because the Challenged Statutes, moreover, apply to all vendors, including those who may wish to sell guns for purely financial reasons or other purposes, they do not have the effect of "singling out" those gun show participants who wish to engage in expressive activity. In other words, the impact of the Challenged Statues does not differ based on whether a party is engaged in such activity. *See id.* at 685-86 (platforms would be impacted based on whether they process transactions, not whether they host commercial speech); *Arcara*, 478 U.S. at 706-07. Even if the ultimate result of the Challenged Statutes is that gun shows on state property are no longer viable, the gun show vendors who are not engaged in pro-gun expression—both those who sell guns for non-expressive reasons and those who sell things like snacks and memorabilia—would be just as impacted as those who are.

When "the only inevitable effect, and the stated purpose"[13] of a statute is to regulate nonexpressive conduct, our inquiry is essentially complete. *HomeAway.com, Inc.*, 918 F.3d at 685. In such circumstances, "a court may not conduct an inquiry into legislative purpose or motive beyond what is stated within the statute itself."[14] *Id.* The Supreme

---

[13] The stated purpose of the Challenged Statutes is to prevent "dangerous incidents" like those in nearby states—"an official vendor accused of trafficking illegal firearms, sales of firearms to individuals registered in the Department of Justice Bureau of Firearms Armed Prohibited Persons System, and illegal importation of large-capacity magazines"—all of which relate to the sale of firearms rather than speech.

[14] B&L cites *City of Austin v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61 (2022), for the proposition that "[i]f there is evidence

Court has disclaimed the idea that "legislative motive is a proper basis for declaring a statute unconstitutional" in the absence of a direct impact on protected speech. *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968); *cf. Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022) ("This Court has long disfavored arguments based on alleged legislative motives.").

Despite that clear precedent, B&L asserts that anti-gun animus underlies the Challenged Statutes,**15** relying on a small number of statements from California officials. As *O'Brien* made clear, courts will not invalidate a statute that is "constitutional on its face, on the basis of what fewer than a handful of [legislators] said about it." 391 U.S. at 384 ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it . . . ."). A party asserting that a statute is a pretext for suppression of First Amendment protected expression must demonstrate that the statute restricts such expression. *Cf.*

---

that an impermissible purpose or justification underpins a facially content-neutral restriction, . . . that restriction may be content based." *Id.* at 76. That doctrine applies when a statute actually regulates speech and a court has to determine whether the statute targets certain content. *Id.* As the Challenged Statutes do not directly or inevitably impact speech, *City of Austin* is inapposite.

15 While some statements describe the Challenged Statutes as a "ban on gun shows," such an interpretation cannot be squared with the plain text of the Challenged Statutes, which only restricts firearm sales. *See, e.g.*, *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1082 (9th Cir. 1986) ("When interpreting a statute, the plain meaning of the words used is controlling absent 'a clearly expressed legislative intent to the contrary.'" (quoting *United States v. Turkette*, 452 U.S. 576, 580 (1981))). That any legislator described the Challenged Statutes as a ban on gun shows demonstrates only that legislator's personal understanding of the statutes' purpose.

*Arcara*, 478 U.S. at 707 n.4 (considering potential pretext arguments against a statute that shuttered bookstores). It is virtually inevitable that elected officials will have underlying ideological views on political issues. But even if California legislators hold personal animus against pro-gun speech, the statutes they enact only implicate the First Amendment if that animus manifests as legislation with the direct or inevitable impact of restricting speech.[16] *See*

---

[16] Motivation can, in contrast, be relevant in examining efforts by government officials to reach beyond their authority to coerce others into doing something that the official cannot regulate directly. The Supreme Court's recent decision in *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. ___, 2024 WL 2751216 (May 30, 2024), illustrates an important distinction. In that case the Court held that the NRA had plausibly alleged that the superintendent of the New York Department of Financial Services violated the First Amendment by coercing entities regulated by the Department to terminate their business relationships with the NRA in order to punish or suppress its advocacy. The difference between that case and ours is that the Department did not have the authority to accomplish the result it sought by direct regulation. As the Court stated, the First Amendment problem with the Department's approach was that it allowed government officials to "expand their regulatory jurisdiction to suppress the speech of organizations that they have no direct control over." *Id.* at *11. It reiterated that distinction by quoting its own precedent: "Ultimately, *Bantam Books* stands for the principle that *a government official cannot do indirectly what she is barred from doing directly*: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Id.* at *8 (emphasis added) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67-69 (1963)).

The challenge in our case is different. B&L objects to statutes enacted by the Legislature, but it does not contest the Legislature's enactment of the statutes as beyond its authority to regulate state property. As discussed above, individual intent is not relevant to a facial challenge against a statute without the direct or inevitable impact of restricting speech.

*HomeAway.com, Inc.*, 918 F.3d at 685. As the Challenged Statutes have no such impact, B&L has failed to allege a First Amendment violation as a matter of law.

### B.  Second Amendment

B&L also contends that the Challenged Statutes violate the Second Amendment. In *Bruen*, the Supreme Court held that a litigant invoking the Second Amendment must first establish that "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. As the plain text of the Second Amendment does not cover B&L's proposed conduct—namely, contracting for the sale of firearms and ammunition on state property[17]—B&L's argument necessarily fails.

The plain text of the Second Amendment directly protects one thing—the right to "keep and bear" firearms.

---

Although we therefore need not inquire into the motives of individual legislators, we note that the statements highlighted by B&L itself suggest that the authors of the Challenged Statutes were primarily concerned with commerce, rather than speech. Assemblymember Todd Gloria's contention that "California should in no way help to facilitate the sale of firearms" is focused on firearms commerce. Senator Dave Min similarly positioned SB 264 as demonstrating that California does not endorse "our taxpayer venues being used to sell more guns in our communities."

[17] While B&L suggests that its proposed conduct is the general "purchase of firearms," such a definition is not attuned to the actual activity that the Challenged Statutes regulate: namely, the sale and purchase of firearms and ammunition *on state property*. *Doe v. Bonta*, No. 23-55133, 2024 WL 2037144, at \*5 (9th Cir. May 8, 2024) (proposed conduct is "what the plaintiffs wanted to do and what the challenged law prevented them from doing"). In particular, as discussed above, the proposed conduct is consummating a formal contract for firearms or ammunition on state property. *See Sims*, 191 U.S. at 447.

U.S. Const. amend. II. On its face, that language says nothing about commerce, let alone firearm sales on state property. To be sure, our court has consistently held that the Second Amendment also "protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc). While we held in *Teixeira* that the right to *sell* firearms is not a protected ancillary right,[18] *id.* at 673, 683, we acknowledged that unless the right to *acquire* firearms receives some Second Amendment protection, the right to keep and bear firearms would be meaningless, *id.* at 677; *see Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, . . . and to purchase and provide ammunition suitable for such arms . . . .").

We nevertheless held in *Teixeira* that "gun buyers have no right to have a gun store in a particular location, at least as long as their access is not *meaningfully constrained*." *Teixeira*, 873 F.3d at 680 (emphasis added). We did not define "the precise scope of any such acquisition right under the Second Amendment," but held that a violation would require evidence that a statute "impedes . . . residents from acquiring firearms." *Id.* at 678.

---

[18] We reasoned that "[n]othing in the specific language of the Amendment suggests that sellers fall within the scope of its protection," and that Founding-era "Second Amendment analogues in state constitutions . . . nowhere suggest[ed] in their text that the constitutional protection extends to those who would engage in firearms commerce." *Teixeira*, 873 F.3d at 683. As this holding was based on the type of text-and-history analysis mandated by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *Bruen*, it remains good law.

B&L argues that this holding involves the type of "interest-balancing inquiry" that *Bruen* proscribes. *Bruen*, 597 U.S. at 22 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008)). That assertion is inaccurate. At no point in *Teixeira* did we balance the litigants' competing interests, as we determined that it was unnecessary to apply any level of scrutiny. *Teixeira*, 873 F.3d at 679. Instead, we held that the plain text of the Second Amendment only prohibits meaningful constraints on the right to acquire firearms. *Id.* at 680.

Reading such a limit into the extent to which the Second Amendment's plain text protects ancillary rights is fully consistent with *Bruen*. The Supreme Court has made clear that the Second Amendment does not speak to all restrictions that impact firearms in any way. *See Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring) ("[T]he right secured by the Second Amendment . . . was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (quoting *Heller*, 554 U.S. at 626)). Instead, it secures the right to firearms "for lawful purposes, most notably for self-defense." *McDonald v. City of Chicago*, 561 U.S. 742, 781 (2010). Ancillary rights are protected to the extent necessary to serve those purposes; otherwise, the Second Amendment is not implicated by restraints on such rights.[19]

The Supreme Court itself has suggested that the ancillary right at issue in these cases—the right to acquire firearms—

---

[19] Such an interpretation also conforms with logic: if the Second Amendment's full protections apply to any restriction that implicates the ability to purchase firearms, laws of general applicability that restrict all forms of commerce in a given area could be subjected to exacting Second Amendment review.

only implicates the Second Amendment in limited circumstances. The Court explicitly framed "laws imposing conditions and qualifications on the commercial sale of arms" as "*presumptively lawful* regulatory measures." *Heller*, 554 U.S. at 626-27 & n.26 (emphasis added); *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring). For any law to be "presumptively lawful," it necessarily must not implicate the plain text of the Second Amendment. Otherwise, *Bruen* makes clear that the Constitution would "presumptively *protect*[] that conduct," and the government would bear the burden of identifying a historical tradition of similar regulation. *Id.* at 17 (emphasis added). The most reasonable interpretation of that passage is that commercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test. While the Court did not specify what is required to overcome that presumption, requiring that a regulation "meaningfully constrain[]" the right to keep and bear arms for the purpose of self-defense faithfully tracks the Second Amendment's plain text. *Teixeira*, 873 F.3d at 680.

In assessing whether particular "laws imposing conditions and qualifications on the commercial sale of arms" implicate that right, the approach we took in *Teixeira*—whether a challenged regulation meaningfully impairs an individual's ability to access firearms—remains appropriate. Under that approach, we have held that a ban on all sales of a certain type of gun or ammunition in a region generally implicates the Second Amendment, as such a ban meaningfully constrains the right to keep and bear that firearm or ammunition. *See, e.g.*, *Jackson v. City & County of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014); *Teixeira*, 873 F.3d at 677. But a minor constraint on the precise locations within a geographic area where one can

acquire firearms does not. As we held in *Teixeira*, "the Second Amendment does not elevate convenience and preference over all other considerations," nor does it "guarantee[] a certain type of retail experience." *Teixeira*, 873 F.3d at 680 & n.13.

B&L essentially concedes that the Challenged Statutes do not "meaningfully constrain" the right to keep and bear arms. It makes no allegation that a ban on sales on state property would impair a single individual from keeping and bearing firearms, even after having an opportunity to amend its complaint to add one. B&L's implicit concession is unsurprising, as the record suggests that no individual's access to firearms would be limited. For instance, there are six licensed firearm dealers in the same zip code as the Orange County Fairgrounds. Merely eliminating one environment where individuals may purchase guns does not constitute a meaningful constraint on Second Amendment rights when they can acquire the same firearms down the street.

Indeed, B&L notes that "[g]un show vendors are often the same licensed vendors that have brick-and-mortar stores in the community[] [and] operate legally over the internet." Given that offers are not proscribed, attendees of gun shows in California can peruse such offers, leave the premises, and immediately order their desired goods from the vendor. Such a system does not meaningfully delay the delivery of purchased firearms—B&L acknowledges and expressly "do[es] not challenge" existing laws that already require gun show attendees who purchase a firearm to "pick up their

firearm offsite" after a waiting period.[20] The only thing attendees can no longer do is *agree* to buy firearms while physically present at the gun show. Nothing in the Second Amendment's text provides a right to the contrary.

## III. Conclusion

We conclude that B&L has failed to establish that the Challenged Statutes violate its constitutional rights.[21] The district court's dismissal of Case No. 23-55431 is **AFFIRMED**. The preliminary injunction granted in Case No. 23-3793 is **VACATED**. Costs shall be awarded to the State Defendants in both cases.

---

[20] As noted above, this requirement did not apply to ammunition purchases, meaning that attendees were previously able to immediately receive ammunition they purchased at gun shows. That fact does not change our analysis, as no plaintiffs allege that the Challenged Statutes meaningfully constrain their ability to acquire ammunition.

[21] Because B&L failed to show even "serious questions going to the merits," we need not consider the other injunction factors in reversing the grant of a preliminary injunction in the Orange County case. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011)).